**VERITAS OPERATING CORPO-RATION, a Delaware corporation, Plaintiff,**

v.

**MICROSOFT CORPORATION, a Washington corporation, Defendant.**

**Microsoft Corporation, a Washington corporation, Counterclaim Plaintiff,**

v.

**Veritas Operating Corporation, a Delaware corporation, and Veritas Software Corporation, a Delaware corporation, Counterclaim Defendants.**

No. C06–0703–JCC.

United States District Court, W.D. Washington. At Seattle.

Feb. 20, 2008.

Belinda Lee, D. Inder Comar, Jennifer T. Barnett, Mark A. Flagel, Renny Hwang, Robert Steinberg, Sean Pak, Yury Kapgan, Latham & Watkins, Los Angeles, CA, David A. Nelson, Latham & Watkins, Chicago, IL, Karen Y. Tu, Latham & Watkins, New York, NY, Lynn M. Engel, Ralph H. Palumbo, Philip S. McCune,

Summit Law Group, Seattle, WA, Michael J. Schallop, Symantec Corporation, Cupertino, CA, for Plaintiff.

Arthur W. Harrigan, Jr., Christopher T. Wion, Danielson Harrigan & Tollefson, Adam Randal Wichman, Klarquist Sparkman, Seattle, WA, Bruce Braun, Dan K. Webb, Raymond C. Perkins, Winston & Strawn, Chicago, IL, Garth A. Winn, Kristin L. Cleveland, Richard D. McLeod, Todd M. Siegel, Klarquist Sparkman, James E. Geringer, John D. Vandenberg, Klarquist Sparkman Campbell Leigh & Whinston, LLP, Portland, OR, Michael F. Browning, Porzak Browning & Bushong LLP, Boulder, CO, for Defendant.

### ORDER

JOHN C. COUGHENOUR, District Judge.

This matter comes before the Court for review of the Special Master's Report and Recommendation on Microsoft Corporation's Motion for Summary Judgment on Veritas' Claim of Infringement of U.S. Patent No. 5,469,573 (Dkt. No. 396). The Court has reviewed de novo the Special Master's Report and Recommendation ("'573 Infringement R & R"), the parties' respective objections and responses thereto (Dkt. Nos. 403, 409), the briefing and exhibits presented to the Special Master in the first instance, and all other relevant documents in the case file. The Court has determined that oral argument is not necessary.

The Court hereby APPROVES and ADOPTS the Special Master's '573 Infringement R & R in its entirety. Accordingly, the Court hereby GRANTS Microsoft's Motion for Summary Judgment on Veritas' Claim of Infringement of U.S. Patent No. 5,469,573 (Dkt. No. 204).

### SPECIAL MASTER'S REPORT AND RECOMMENDATION ON MICROSOFT CORPORATION'S MOTION FOR SUMMARY JUDGMENT ON VERITAS' CLAIM OF INFRINGEMENT OF U.S. PATENT NO. 5,469,-573

### FILED UNDER SEAL CONTAINS INFORMATION DESIGNATED AS "CONFIDENTIAL," "CONFIDENTIAL—ATTORNEY EYES ONLY," AND/OR "CONFIDENTIAL—ATTORNEY EYES ONLY—SOURCE CODE" SUBJECT TO PROTECTIVE ORDER

### TABLE OF CONTENTS

I. Introduction ................................................. 1149
 A. Nature of the Suit ...................................... 1149
 B. Referral to the Special Master ........................... 1150
 C. Issued Under Seal ...................................... 1150

II. Summary Judgment Standard ................................. 1150
 A. Summary Judgment ..................................... 1150
 B. Burden of Proof ....................................... 1151

III. Brief Overview of the Patent–in–Suit ........................ 1152

IV. Infringement .............................................. 1154
 A. Direct Infringement .................................... 1154
 B. Indirect Infringement .................................. 1155
 1. Inducing Infringement ............................. 1155
 2. Contributory Infringement ......................... 1156
 C. Asserted Claims ....................................... 1158

D. The Parties' Arguments ............................................. 1159
E. Discussion ........................................................ 1160
 1. The Accused Products ........................................ 1160
 a) System Deployment ....................................... 1162
 b) System Backup & Recovery ................................ 1163
 2. Uses of the Accused Products ................................ 1163
 a) Infringing Uses ......................................... 1163
 b) Substantial Non–Infringing Uses ........................ 1163
 c) U.S. and Foreign Uses .................................. 1175
 d) Use with Veritas' Products ............................. 1175
 3. Infringement ............................................... 1175
 a) "users manuals, advertising materials and other product
 documentation" .......................................... 1177
 (1) WAIK Guide ........................................ 1178
 (2) WAIK Getting Started .............................. 1192
 (3) OPK Guide ......................................... 1200
 (4) BRC 74 ............................................ 1210
 (5) Presentation ...................................... 1213
 (6) Remaining Product Manuals, Materials & Documentation ....... 1216
 4. "Microsoft's own witnesses" ................................ 1235
 a) John MacIntyre .......................................... 1235
 b) Mark Myers ............................................. 1241
 c) Wes Miller ............................................. 1242
 5. "e-mails, customer specifications and other documents" ...... 1247
 a) Nike Email ............................................. 1247
 b) Boeing Email ........................................... 1249
 c) Hershey Email .......................................... 1250
 d) DaimlerChrysler Documents .............................. 1251
 e) "dogfood" Documents .................................... 1258
 f) Windows Vista CompletePC Restore Documents ............. 1260
 g) "14 bugs" Email ........................................ 1262
 h) Zions Bank Email ....................................... 1264
 i) Dr. Nichols Report, Exh. L ............................. 1266
F. Recommendation .................................................... 1268

V. Software as a Material or Apparatus Under § 271(c) ................. 1268
 A. The Parties' Arguments .......................................... 1268
 B. Discussion ...................................................... 1269
 C. Recommendation .................................................. 1275

VI. Inducing Infringement—Intent .................................... 1275
 A. The Parties' Arguments .......................................... 1275
 B. Discussion ...................................................... 1277
 C. Recommendation .................................................. 1285

VII. Willfulness ..................................................... 1285
 A. The Parties' Arguments .......................................... 1285
 B. Discussion ...................................................... 1285
 C. Recommendation .................................................. 1286

VIII. Damages ....................................................... 1286
 A. The Parties' Arguments .......................................... 1286
 B. Discussion ...................................................... 1287
 C. Recommendation .................................................. 1287

IX. Recommended Disposition .......................................... 1287

X. Report and Recommendation ......................................... 1287

GAIL R. PETERSON, Special Master.

## I.

### Introduction

#### A. Nature of the Suit

Veritas alleges in its complaint causes of action for trade secret misappropriation, breach of contract, breach of an implied covenant of good faith and fair dealing, unfair competition, unjust enrichment and collective trust, conversion, copyright infringement, and infringement of U.S. Patent No. 6,826,661 ("the '661 patent") [Dkt. No. 1]. Microsoft alleges in its counterclaim causes of action for breach of contract, breach of an implied covenant of good faith and fair dealing, and for declaratory judgments of invalidity and non-infringement of the '661 patent, and for infringement of U.S. Patent Nos. 5,588,147 ("the '147 patent"); 6,820,214 ("the '214 patent"); and 6,851,073 ("the '073 patent") [Dkt. No. 32]. Veritas, in response, alleged additional counterclaims seeking declaratory judgments of non-infringement and invalidity of the '147, '214 and '073 patents, declaratory judgments that the '073 and '214 patents are unenforceable due to inequitable conduct, and a counterclaim asserting infringement of U.S. Patent No. 5,469,573 ("the '573 patent") [Dkt. No. 39]. Microsoft answered and added counterclaims for declaratory judgments that the '573 patent was invalid and not infringed [Dkt. No. 53]. The parties subsequently stipulated to dismiss Microsoft's counterclaims for infringement of the '214 and '073 patents, and Veritas' corresponding declaratory judgment counterclaims for non-infringement, invalidity and unenforceability of those patents [Dkt. No. 58]. The parties further stipulated to stay the action with respect to the '661 patent after the U.S. Patent and Trademark Office (PTO) granted Microsoft's request for *inter partes* reexamination of the '661 patent [Dkt. No. 63].

Thus, the patents remaining in this action are Veritas' '573 patent and Microsoft's '147 patent. The master issued the Special Master's Report and Recommendation on Claim Construction Regarding U.S. Patent No. 5,469,573 on May 25, 2007. *See* Dkt. No. 128 ("the *Markman* RR"). The Court adopted the *Markman* RR on September 12, 2007. *See* Dkt. No. 239 ("*Markman* Order").

Microsoft now moves for summary judgment of no direct or indirect infringement, and that Veritas' damages, if any, should be limited to certain specific instances of direct infringement that Veritas can now prove. With respect to direct infringement, Microsoft argues that Veritas has not shown that any Microsoft customer has used the accused software to perform in the U.S. any of the asserted method claim. With respect to indirect infringement, Microsoft argues that the accused software (1) has substantial non-infringing uses, (2) is information, rather than a physical material or apparatus and (3) Veritas cannot show the intent necessary for inducing infringement. Along with its argument regarding intent, Microsoft contends that Veritas cannot show the "recklessness" required under *In re Seagate Technology, LLC,* 497 F.3d 1360, 1371 (Fed.Cir.2007). *See* Microsoft Corporation's Motion for Summary Judgment on Veritas' Claim of Infringement of U.S. Patent No. 5,496,573 and Memorandum in Support Thereof, dated August 31, 2007 [Dkt. No. 204] ("Microsoft's Brief") at 21.

Veritas responds that it has substantial proof of (1) direct infringement and (2) intent to induce, and (3) that is has "raised factual questions" on willfulness. Veritas also contends that (4) software can infringe under § 271(c), (5) the accused software

contributorily infringes, and (6) Veritas has established its damages case, and need not prove every instance of direct infringement now. *See* Veritas Software Corporation's Opposition to Microsoft Corporation's Motion for Summary Judgment on Veritas' Claim of Infringement of U.S. Patent No. 5,496,573, dated September 17, 2007 [Dkt. No. 266] ("Veritas' Response").

In its reply, Microsoft largely re-urges the issues presented in its opening brief, arguing that no reasonable jury could find for Veritas on those issues. *See* Defendant Microsoft Corporation's Reply in Support of its Motion for Summary Judgment on Veritas' Claim of Infringement of U.S. Patent No. 5,496,573, dated September 21, 2007 [Dkt. No. 301] ("Microsoft's Reply").

### B. Referral to the Special Master

This Court's Order of January 18, 2007 [Dkt. No. 76], appointed the undersigned as special master in this action to handle all pre-trial patent-related issues. In the Court's Order of September 10, 2007 [Dkt. No. 235], the Court specifically directed the special master to hear the patent-related motions for summary judgment in this case including, *inter alia*, the above-mentioned motion. In accordance therewith, a hearing was held in San Antonio, Texas, on October 2, 2007. A record of that hearing has been prepared and filed with the Court.

After reviewing the transcript of that hearing as well as the exhibits and briefs offered by the parties, and pursuant to the foregoing Order and Rule 53 of the Federal Rules of Civil Procedure, the master issues the following report and recommendation on the foregoing issue of non-infringement with respect to the '573 patent.

For the reasons discussed below, the master recommends that the Court GRANT Microsoft's motion.

### C. Issued Under Seal

Some of the parties' exhibits were designated as having been filed under seal. Because it references certain of those sealed exhibits, this report and recommendation is likewise designated "FILED UNDER SEAL." However, the public nature of these proceedings should be preserved to the fullest extent possible. Therefore, the parties are strongly encouraged to promptly advise the Court whether this report and recommendation may be released from seal either entirely or with appropriate redaction.

## II.

### Summary Judgment Standard

### A. Summary Judgment

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Fed.R.Civ.P. 56(c) ("Rule 56(c)"). "[T]he plain language of Fed.R.Civ.P. 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. The Supreme Court has held that Rule 56(c) requires the nonmoving party to go beyond the pleadings, and by affidavits, depositions, answers to interrogatories and admissions on file, to designate specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548.

A genuine issue of material fact exists if the evidence is such that a reasonable jury could find for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *General Mills, Inc. v. Hunt–Wesson, Inc.,* 103 F.3d 978, 980 (Fed.Cir.1997). A disputed fact is material if it might affect the outcome of the suit such that a finding of that fact is necessary and relevant to the proceeding. "[T]he dispute about a material fact is 'genuine,' * * *, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Of course, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis in original). "If the evidence is merely colorable * * * or is not significantly probative, * * *, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505. However, "[t]he evidence submitted by the nonmovant, in opposition to a motion for summary judgment, 'is to be believed, and all justifiable inferences are to be drawn in [its] favor.' " *KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.,* 997 F.2d 1444, 1449–50 (Fed.Cir.1993)(internal citations omitted)(quoting *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505).

The Court's responsibility is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. The inquiry is "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505; *see also Cooper v. Ford Motor Co.,* 748 F.2d 677, 679 (Fed.Cir.1984); *see also SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1116 (Fed.Cir.1985)(*en banc* )("[T]he district court must view the evidence in a light most favorable to the nonmovant and draw all reasonable inferences in its favor, * * *, and must resolve all doubt over factual issues in favor of the party opposing summary judgment.") (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Martin v. Barber,* 755 F.2d 1564, 1566 (Fed.Cir.1985); and *Palumbo v. Don–Joy Co.,* 762 F.2d 969, 973 (Fed.Cir.1985)). The Federal Circuit has held that "summary judgment is as appropriate in a patent case as in any other * * *." *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,* 731 F.2d 831, 835 (Fed.Cir. 1984); *see also Meyers v. Brooks Shoe, Inc.,* 912 F.2d 1459, 1461 (Fed.Cir.1990)(summary judgment is appropriate in patent cases).

## B. Burden of Proof

 Veritas, as the patentee asserting infringement, bears the burden of proof by a preponderance of the evidence. Indeed, the Federal Circuit recognizes that the "patent owner has always borne the burden of proving infringement," *Wilson Sporting Goods Co. v. David Geoffrey & Assocs.,* 904 F.2d 677, 685 (Fed.Cir. 1990), and has often applied this burden to motions for summary judgment. *See, e.g., TechSearch, L.L.C. v. Intel Corp.,* 286 F.3d 1360, 1372 (Fed.Cir.2002); *Display Techs., Inc. v. Paul Flum Ideas, Inc.,* 282 F.3d 1340, 1348 (Fed.Cir.2002). "Since the ultimate burden of proving infringement rests

with the patentee, an accused infringer seeking summary judgment of non-infringement may meet its initial responsibility either by providing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case." *Novartis Corp. v. Ben Venue Labs.*, 271 F.3d 1043, 1046 (Fed.Cir.2001).

■ "[O]n issues in which the nonmovant bears the burden of proof, in contrast to those in which the movant bears the burden, the movant need not 'produce evidence' showing the absence of a genuine issue of material fact in order to properly support its summary judgment motion." *Exigent Tech., Inc. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1307 (Fed.Cir.2006)(citing *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548). Rather, "'the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Exigent Technology*, 442 F.3d at 1308 (quoting *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548). That is, "nothing more is required than the filing of a summary judgment motion stating that the patentee had no evidence of infringement and pointing to the specific ways in which accused systems did not meet the claim limitations." *Exigent Technology*, 442 F.3d at 1309.

Once the movant has satisfied its initial burden, the "burden of production then shift[s] to [the non-movant] to identify genuine issues that preclude summary judgment." *Optivus Tech., Inc. v. Ion Beam Applications S.A.*, 469 F.3d 978, 990 (Fed.Cir.2006)(citing Fed.R.Civ.P. 56(e); and 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2727 (3d ed. 1998)("[I]f the movant makes out a prima facie case that would entitle him to

a judgment as a matter of law if uncontroverted at trial, summary judgment will be granted unless the opposing party offers some competent evidence that could be presented at trial showing that there is a genuine issue as to a material fact.")). Thus, "'the [summary judgment] motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Exigent Technology*, 442 F.3d at 1308 (alterations in original)(quoting *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548).

## III.

### Brief Overview of the Patent–in–Suit

As discussed in the master's report and recommendation on claim construction regarding the '573 patent, the '573 patent generally discloses "a data backup procedure and apparatus for backing up and restoring, or otherwise loading a fully configured operating system to the high capacity storage device (e.g., hard disk) of a computer workstation, such as a personal computer," "from standard system backup media, such as magnetic backup tapes, without the need to reload and re configure the operating system from its original distribution media." '573 patent, col. 2, lines 2–6.

According to the specification, "[c]omplex computer systems require[d] similarly complex disk operating systems" such as "IBM OS/2 (commercially available from IBM corporation), Microsoft MS–DOS, and Microsoft Windows 3.x (both commercially available from Microsoft Corporation, Redmond, Wash.)." '573 patent, col. 1, lines 21– 23 & 14–17. The specification explains that "[b]ecause there are so many possible system configurations available, a typical operating system needs to be individually

tailored for each personal computer system on which it is installed"—a process that "typically requires that a skilled technician spend several hours building the operating system on the personal computer according to the desired system configuration." '573 patent, col. 1, lines 25–31. Data stored on "magnetic media disk drives," though, were vulnerable to loss or corruption, and "[d]ata backup systems, such as magnetic tape backup," were generally used to restore "corrupted or destroyed data files on the high capacity hard disk." '573 patent, col. 1, lines 34–45. According to the specification, however, such backup systems normally required that "the disk operating system installed on the hard disk be intact and fully operational before data [could] be restored to the hard disk. A data loss affecting the operating system itself is typically not recoverable by using the tape backup system, and requires that the operating system be reloaded onto the hard disk and configured anew." '573 patent, col. 1, lines 46–52.

For addressing that problem, the specification discloses (1) a data processing system on which the recovery process may be run, (2) creation of an electronic backup, for example on tape, (3) creation of a recovery disk, and (4) the recovery process.

The "data processing system" is said to include, *inter alia*, "a computer workstation" having a "storage device [that] stores files necessary to start (boot) and operate the workstation," *i.e.*, "operating system files, system configuration files, device driver files, and any other files necessary to properly configure and operate the workstation," and "a tape drive adapter for communicating with the backup tape drive device." '573 patent, col. 3, line 44–col. 4, line 8 (reference numbers omitted).

The backup tape, according to the specification, may include the "operating sys-

tem files, system configuration files, [and] device driver files," and is "used as the source for the operating system subsequently loaded or restored onto the PC hard drive." '573 patent, col. 5, lines 36–38 (reference numbers omitted).

As for creating a recovery disk, the specification explains that "a recovery diskette is prepared from the fully configured PC by copying various files from the hard disk onto the recovery diskette, which essentially define the current PC configuration." Such files include "vital operating system configuration files, system configuration files, and device drivers * * * required for the proper operation of the hardware, operating system, and attached devices," as well as "[o]perating system installation files" from the " 'Installation' diskette, distributed with the original operating system distribution diskettes," "an application program for implementing the loading or recovery procedure of this invention, and an application program capable of recovering the operating system files from the backup media onto the hard disk of the PC." '573 patent, col. 5, lines 39–65 (reference numbers omitted). According to the specification, "the recovery diskette can actually be a set of several recovery diskettes, each diskette containing a particular sub-set of files." '573 patent, col. 4, lines 54–56.

The specification discloses a number of recovery processes, such as "the operating system recovery and loading procedure." For that procedure, the specification explains, "[t]o begin the recovery process the operator inserts the backup tape containing the operating system files to be restored into the PC tape drive." Then, the "operator starts (i.e., boots)" the PC "from the recovery diskette which loads an initial, temporary operating system into the memory of the PC. The recovery diskette also supplies this initial operating system

with the necessary system configuration files and device drivers, i.e., the files previously copied to the recovery diskette from the fully configured PC." '573 patent, col. 6, lines 10–18 (reference numbers omitted). "Next, a recovery program is loaded from the recovery diskette into the PC and run to directly recover the operating system files from the backup tape," as well as recover other files on the backup tape. "Finally, the PC is rebooted from the recovered operating system files now installed on the hard disk, and the hard drive can be further restored from the backup tape if necessary." '573 patent, col. 6, lines 26–33 (reference numbers omitted).

## IV.

### Infringement

#### A. Direct Infringement

A patentee may sue for direct infringement under 35 U.S.C. § 271(a):

Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States, or imports into the United Sates any patented invention during the term of the patent therefor, infringes the patent.

The "making, using, or selling of a patented invention is the usual meaning of the expression 'direct infringement.'" *Joy Techs. Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed.Cir.1993). The Federal Circuit has long held that the determination of patent infringement involves a two-step process. "The claimed invention must first be defined, a legal question of claim interpretation. Second, the trier of fact must determine whether the claims, as properly interpreted, cover the accused device or process." *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 889 (Fed.Cir.1988). *See also Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 355

F.3d 1361, 1367 (Fed.Cir.2004)("The court must first interpret the claim and determine the scope and the meaning of the asserted patent claims, and then compare the properly construed claims to the allegedly infringing device."); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1324 (Fed.Cir.2003)( "Because claim language defines claim scope, the first step in an infringement analysis is to construe the claims. * * * Thereafter, the properly construed claims are compared to the accused product or process to determine whether each of the claim limitations is met * * *."); *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed.Cir.1998).

The first step of the infringement analysis, claim construction, is a question of law. *See id.* at 1451. The court must "examine the claims, the rest of the specification, and, if in evidence, the prosecution history" to determine "the scope and meaning of that which is allegedly infringed." *Amgen*, 314 F.3d at 1324. *See also Markman v. Westview Instrs., Inc.*, 52 F.3d 967, 976 (Fed.Cir.1995), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir.2005).

The second step of the infringement analysis, comparison of the claim to the accused device, is a question of fact. *See Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed.Cir.1998); *Liquid Dynamics*, 355 F.3d at 1367. The trier of fact must determine whether, using the properly construed claims as a guide, every claim limitation or its equivalent is found in the accused device or process. *See Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997).

■ Thus, literal infringement requires a showing that every limitation of at least one claim "reads on" or covers the

accused device, *i.e.*, that the accused device falls within the scope of at least one properly construed claim. *See SmithKline,* 859 F.2d at 889. "To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly." *Southwall Techs., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1575 (Fed.Cir.1995); *Lantech, Inc. v. Keip Mach. Co.,* 32 F.3d 542, 547 (Fed.Cir.1994)("For literal infringement, each limitation of the claim must be met by the accused device exactly, any deviation from the claim precluding a finding of infringement."). Accordingly, a claim cannot be literally infringed if any claim element or limitation is missing entirely from the accused product. *See London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1539 (Fed.Cir.1991). Furthermore, "the addition of features does not avoid infringement, if all the elements of the patent claims have been adopted. Not is infringement avoided if a claimed feature performs not only as shown in the patent, but also performs an additional function." *N. Telecom, Inc. v. Datapoint Corp.,* 908 F.2d 931, 945 (Fed.Cir.1990) (citation omitted).

"For process or method patent claims, infringement occurs when a party performs all the steps of the process." *BMC Resources,* 498 F.3d at 1379 (citing *Joy.,* 6 F.3d at 773 (regarding making or selling industrial plan designed to enable use of patented system)). "Because a process is nothing more than the sequence of actions of which it is comprised, the use of a process necessarily involves doing or performing each of the steps recited." *NTP, Inc. v. Research in Motion, Ltd.,* 418 F.3d 1282, 1318 (Fed.Cir.2005).

However, "[m]ethod claims are only infringed when the claimed process is performed, not by the sale of an apparatus that is capable of infringing use." *Ormco Corp. v. Align Tech., Inc.,* 463 F.3d 1299, 1311 (Fed.Cir.2006). That is, "[t]he mere sale of an apparatus capable of performing the claimed process" is "not a direct infringement because a method or process claim is directly infringed only when the process is performed." *Joy,* 6 F.3d at 773 (citing and discussing *Standard Havens Prods., Inc. v. Gencor Indus., Inc.,* 953 F.2d 1360 (Fed.Cir.1991)). "To hold that the sale of equipment which performs a patented process is itself a direct infringement would make that portion of section 271(c) relating to the sale of an apparatus for use in practicing a patented process meaningless." *Joy,* 6 F.3d at 774.

"In order to prove direct infringement, a patentee must either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit." *ACCO Brands, Inc. v. ABA Locks Mfr. Co.,* 501 F.3d 1307, 1313 (Fed.Cir.2007). Direct infringement may be shown through direct evidence as well as circumstantial evidence. *Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1272 (Fed.Cir. 1986)("It is hornbook law that direct evidence of a fact is not necessary."). Indeed, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Id.* at 1272 (quoting *Michalic v. Cleveland Tankers, Inc.,* 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960)).

## B. Indirect Infringement

A patentee may also sue for indirect infringement—for inducing infringement and for contributory infringement.

### 1. Inducing Infringement

Inducing infringement is defined under § 271(b):

Whoever actively induces infringement of a patent shall be liable as an infringer.

As noted above, "direct infringement * * * is a prerequisite to indirect infringement." *Alloc, Inc. v. Int'l Trade Comm'n,* 342 F.3d 1361, 1374 (Fed.Cir.2003). *See also Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.,* 279 F.3d 1022, 1033 (Fed. Cir.2002)("It is well settled that there can be no inducement of infringement without direct infringement by some party.").

■ To prevail on a charge of inducing infringement, the patentee must prove two additional elements after establishing the predicate act of direct infringement. First, the patentee must prove that the alleged inducer committed an act which constitutes inducement. For example, sales-related activities, including advertising, solicitation, and product instruction that encourage the infringing use may be acts constituting inducement. *Biotec Biologische Naturverpackungen GmbH v. Biocorp, Inc.,* 249 F.3d 1341 (Fed.Cir.2001) (product manual instructed customers to use product so as to meet the patented limitation, thereby constituting an act of inducement). *See Golden Blount, Inc. v. Robert H. Peterson Co.,* 438 F.3d 1354 (Fed.Cir.2006)(instruction sheets); *Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261 (Fed.Cir.1986)(instruction sheet, puzzle solution booklet).

Second, the patentee must prove that the accused infringer intended to cause direct infringement. For example, the Federal Circuit *en banc* has held that "if an entity offers a product with the object of promoting its use to infringe, as shown by clear expression or other affirmative steps taken to foster infringement, it is then liable for the resulting acts of infringement by third parties." *DSU Med. Corp. v. JMS Co.,* 471 F.3d 1293, 1306 (Fed.Cir.2006). That is, "the intent re-quirement for inducement requires more than just intent to cause the acts that produce direct infringement Beyond that threshold knowledge, the inducer must have an affirmative intent to cause direct infringement. * * * Accordingly, inducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *Id.* (citations omitted). *See MEMC Elec. Materials v. Mitsubishi Materials Silicon Corp.,* 420 F.3d 1369, 1378 (Fed.Cir.2005)(Inducement requires "that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement."); and *Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005)(drawing on the inducement of infringement standard long applied in the patent law context and "holding that one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties.").

## 2. Contributory Infringement

Contributory infringement is defined under § 271(c):

Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing

use, shall be liable as a contributory infringer.

"[D]irect infringement * * * is a prerequisite to indirect infringement." *Alloc, Inc.,* 342 F.3d at 1374. *See also Aro Mfg. Co. v. Convertible Top Replacement Co. ("Aro I")*, 365 U.S. 336, 341, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961)("[T]here can be no contributory infringement in the absence of a direct infringement.").

 Beyond a showing of direct infringement, to prevail on a charge of contributory infringement, a patentee must prove two elements: (1) knowledge and (2) materiality. *See DSU,* 471 F.3d at 1303 ("[T]o prevail on contributory infringement, DSU must have shown that ITL made and sold the Platypus, that the Platypus has no substantial non-infringing uses in its closed-shell configuration, that ITL engaged in conduct (made sales) within the United States that contributed to another's direct infringement, and that JMS engaged in an act of direct infringement on those sales that ITL made in the United States."). As for knowledge, the plaintiff must prove that the defendant *knew* that the product was especially made or adapted for use in infringing the patented method. *See Aro Mfg. Co. v. Convertible Top Replacement Co. ("Aro II")*, 377 U.S. 476, 488, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964)(emphasis in original)("It is only sale of a component of a patented combination *knowing* the same to be especially made or especially adapted for use in an infringement of such patent' that is contributory infringement under the statute."); *Hewlett–Packard Co. v. Bausch & Lomb, Inc.,* 909 F.2d 1464, 1469 (Fed.Cir.1990)(emphases in original)("[o]nly proof of a defendant's *knowledge*, not *intent,* that his activity cause infringement was necessary to establish contributory infringement").

 As for materiality, the patentee must prove that the product sold to the alleged direct infringer constituted a *material part* of the invention, *i.e.,* that it is "a component especially made or adapted for use in the patented combination [and] is not a staple article suitable for substantial noninfringing use." *Preemption Devices v. Minn. Mining & Mfg. Co.,* 803 F.2d 1170, 1174 (Fed.Cir.1986). *See Grokster, Ltd.,* 545 U.S. at 932, 125 S.Ct. 2764 ("This analysis reflected patent law's traditional staple article of commerce doctrine, now codified, that distribution of a component of a patented device will not violate the patent if it is suitable for use in other ways. The doctrine was devised to identify instances in which it may be presumed from distribution of an article in commerce that the distributor intended the article to be used to infringe another's patent, and so may justly be held liable for that infringement. * * * In sum, where an article is 'good for nothing else' but infringement, there is no legitimate public interest in its unlicensed availability, and there is no injustice in presuming or imputing an intent to infringe."); *Dawson Chem. Co. v. Rohm & Haas Co.* 448 U.S. 176, 213, 100 S.Ct. 2601, 65 L.Ed.2d 696 (1980) ("[B]y enacting §§ 271(c) and (d), Congress granted to patent holders a statutory right to control nonstaple goods that are capable only of infringing use in a patented invention, and that are essential to that invention's advance over prior art."); *Golden Blount,* 365 F.3d at 1061 ("Thus, Blount must show that Peterson 'knew that the combination for which its components were especially made was both patented and infringing.' Further, Blount must show that Peterson's components have no substantial noninfringing uses." (quoting *Preemption Devices* )).

 The question of whether a component is capable of substantial non-

infringing use is a question of fact. *See Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365 (Fed.Cir.2001) (upholding jury verdict of contributory infringement where there was a lack of substantial non-infringing uses); *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, 911 F.2d 670 (Fed.Cir.1990)(summary judgment on contributory infringement inappropriate when there existed disputed material fact issues regarding substantial non-infringing use). A suggested non-infringing use must not be farfetched, illusory, impractical or merely experimental. *See Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336 (Fed.Cir.2001).

### C. Asserted Claims

Veritas asserts claims 1–5, 7–10, 13–19, 22–24, 26–30 and 32–33 of the '573 patent. All are method claims. Of the asserted claims, claims 1, 18, 30 and 33 are independent, and provide:

1. A method for loading a fully configured operating system onto a storage device of a data processing system, comprising the steps of:

 providing a first media comprising operating system files for installing the fully configured operating system onto the storage device;

 providing a second media comprising configuration-specific data files;

 initializing the data processing system from the second media to provide a temporary operating system and using the configuration-specific data files to configure the data processing system;

 loading the fully configured operating system files from the first media to the storage device using the temporary operating system; and

 reinitializing the data processing system from the storage device to in-

stall the fully configured operating system.

18. A method for loading a fully configured operating system onto a disk drive of a data processing system, comprising the steps of:

 copying fully configured operating system files stored on the disk drive to a first media;

 copying configuration-specific data files from the disk drive to a second media;

 initializing the data processing system from the second media to provide a temporary operating system and using the configuration-specific data files to configure the data processing system;

 initializing the disk drive prior to the step of loading the fully configured operating system files from the first media to the disk drives;

 loading the fully configured operating system files from the first media to the disk drive using the temporary operating system to install the fully configured operating system; and

 reinitializing the data processing system from the disk drive to provide the fully configured operating system.

30. A method for loading a fully configured operating system onto a disk drive of a first data processing system, comprising the steps of:

 configuring a disk drive of a second data processing system with the desired configuration for the first data processing system;

 copying fully configured operating system fries stored on the disk drive of the second data processing system to a first media;

 copying configuration specific data files from the disk drive of the sec-

ond data processing system to a second media;

initializing the first data processing system from the second media to provide a temporary operating system and using the configuration-specific data files to configure the first data processing system; and

loading the fully configured operating system files from the first media to a disk drive of the first data processing system using the temporary operating system to install the fully configured operating system.

33. A method for loading a fully configured operating system onto a storage device of a data processing system, comprising the steps of:

initializing the data processing system from a second media, having configuration-specific data files, to provide a temporary operating system using the configuration-specific data files to configure the data processing system;

loading the fully configured operating system files from a first media to the storage device using the temporary operating system, the first media having operating system files for installing the fully configured operating system onto the storage device; and

reinitializing the data processing system from the storage device to install the fully configured operating system.

Also as noted above, the master construed disputed terms of the '573 patent. *See Markman* RR.

**D. The Parties' Arguments**

According to Microsoft, "Veritas alleges infringement by, and seeks damages on, each unit of Microsoft Windows® Vista (and other) operating system software 'sold' by Microsoft in the United States, under two theories. First, it alleges that these operating systems have certain built-in 'backup and restore' capabilities that *can be used* to infringe the '573 Patent. Second, it alleges that software kits provided by Microsoft to computer manufacturers (OEMs) and to system administrators *can be used* to install these operating systems onto computers using a process that infringes the '573 Patent." Microsoft's Brief at 1 (Microsoft's emphases).

Microsoft illustrates the "fundamental flaw in Veritas' case" by the following "hypothetical:"

A (hypothetical) patent claims a method of installing a spare tire (in case of a flat) by loosening and tightening the lug nuts in a particular order. A retailer sells a kit including a spare tire, a lug wrench, a jack, and instructions describing several installation methods, including the patented one. The patent's owner complains that these kits unfairly embody the patented invention to take sales rightfully belonging to the patent holder, and seeks damages on each such kit sold by the retailer. Under U.S. Patent Law, the patent owner loses. It loses because its patent is on a method, not on a kit. The spare-tire-installation method patent is not infringed by selling the kit, even if the kit gives its buyers the *capability* to practice the patented method, and even if each kit takes a sale from the patent owner. The kit does not infringe, moreover, even though much of the psychological benefit of the patent's technique—namely, giving the driver ease of mind—is achieved by merely having the kit stored in the trunk. Rather, the spare-tire-installation method patent is infringed *only* in the rare event that the driver actually puts the kit in the trunk,

has a flat tire, and, in the U.S., changes the flat using the patented steps.

Microsoft's Brief at 2 (Microsoft's emphases).

That is, Microsoft argues, "for each asserted patent claim and for each accused software offering of Microsoft, Veritas must prove that a third-party, with no license or authorization from the patent owner or its agent, directly infringed the asserted method claim in the U.S. using that software." According to Microsoft, "[i]t is unlikely that Veritas will be able to prove any instance of direct infringement using the accused software" because of the complexity of proof required. Microsoft urges, for example, that for Veritas "to prove direct infringement of independent claim 30, Veritas must prove, among other things, that someone in the U.S., without authority of the patent owner or its agent, used Microsoft's accused software kits to copy an operating system from a disk drive of a master computer—configured with the desired configuration for a target computer—to a first media, and to copy configuration-specific data files *from that same disk drive* of the master computer to a second media, and then used that second media to load that identically configured operating system on to the target computer." *Id.* at 19 (Microsoft's emphasis).

Veritas responds that "[c]ontrary to Microsoft's assertion, proof of indirect infringement does *not* require that the patentee provide proof of each individual instance of underlying direct infringement. Rather, indirect infringement under §§ 271(b) and (c) of a method claim may be proven by evidence that a broad class of users (such as Microsoft's OEM and/or enterprise customers) directly infringe the patented methods," and that "[s]uch proof of underlying direct infringement can be satisfied by circumstantial evidence." Veritas proffers evidence said to show infringement, namely, (1) "advertisements and instructions that encourage infringing use despite the lack of any first-hand evidence of direct infringement by customers can provide sufficient circumstantial evidence of inducement," (2) "testimony of the defendant's own witnesses concerning the typical ways in which the accused products are used by customers, constitutes strong evidence of the underlying direct infringement", and (3) "direct evidence in the form of documents and testimony that certain customers and internal Microsoft testers are actually using the accused products in an infringing manner constitutes proof of direct infringement as well." Veritas' Response at 7–8.

Microsoft asserts that "Veritas has not offered particularized, admissible evidence that any specific customer has used the accused software in a method that practices each step of any claim, in the U.S. and without authority." Microsoft further argues that Veritas' "expert's claim charts map the claims to *capabilities,* not to actions of customers" "[a]nd, all the evidence of use Veritas submits is inadmissible, and thus cannot be considered on this motion for summary judgment." Microsoft's Reply at 5 (Microsoft's emphasis). Microsoft also asserts that Veritas misrepresents the testimony of all of Microsoft's deponents, and misstates controlling law.

The parties' arguments are discussed in more detail below.

### E. Discussion

Overall, Microsoft does not dispute that the accused products are capable of performing the methods of the asserted claims.

### 1. The Accused Products

Veritas accuses "Microsoft's recommended system deployment tools and pro-

cedures for Windows Vista, Windows Server 2008 (formerly known as Longhorn), Windows XP and Windows Server 2003, and system recovery tools and procedures for Windows Vista and Windows Server 2008" of infringing the asserted claims. Veritas' Response at 1.

Generally, Veritas presents its infringement case through its expert, Dr. Nichols. Dr. Nichols examined the following products:

System Deployment for Windows XP / Server 2003 and Windows Vista / Server 2008[1]

Microsoft's packages for deployment include:

- Windows Automated Installation Kit (WAIK)
- OEM Preinstallation Kit (OPK)
- Business Desktop Deployment

These packages include some or all of the following components:

- Windows Preinstallation Environment (WinPE)
- ImageX
- WIM file format
- Windows System Image Manager (SIM)
- Sysprep (System Preparation)

There may be other WinPE-based scenarios recommended by Microsoft

System Backup and Restore for Windows Vista / Server 2008

Built-in capabilities in Windows Vista / Server 2008

- Vista Complete PC Backup and Restore
- Server 2008 Backup and Recovery

These packages rely on the following:

- Windows Recovery Environment (WinRE)
- Windows Preinstallation Environment (WinPE)
- VHD file format

*See* Declaration of Michael J. Schallop in Support of Veritas Software Corporation's Opposition to Microsoft Corporation's Motion for Summary Judgment on Veritas' Claim of Infringement of U.S. Patent No. 5,469,573 ("Schallop Decl."), Exh. B: Infringement Expert Report of A.J. Nichols, Ph.D. ("Nichols Infringement Report").[1]

Overall, "Veritas has accused specific combinations of Accused Products recommended by Microsoft for use in the infringing system recovery and system deployment scenarios." In a footnote, Veritas urges that "[f]or the recovery scenarios, Veritas is accusing the following features based on Microsoft's recommendations: Complete PC Backup and Restore of Windows Vista (Premium, Ultimate and Enterprise Editions) and Backup and Restore of Microsoft's forthcoming Windows Server 2008. For the deploying scenarios, Veritas is accusing the following features based on Microsoft's recommendations: Windows XP, Server 2003, Vista, and Server 2008 include combinations of the following: the OEM Preinstallation Kit (OPK), Windows Automated Installation Kit (WAIK), Business Desktop Deployment (BDD) tools, using the following components in their system deployment tools and procedures: Windows Preinstallation Environment (WinPE), ImageX, Windows Imaging (WIM) image file format, Windows System Image Manager (SIM), Sysprep (System Preparation), Setup Manager. All of these products collectively, when used to deploy or recover

---

1. In a footnote, Dr. Nichols notes that "Windows Server 2008 was formally known as Longhorn Server." Nichols Infringement Report at 1 n. 1.

Windows operating systems will be referred to herein as 'Accused Products.'" Veritas' Response at 4 at n. 5.

### a) System Deployment

With respect to system deployment, Dr. Nichols contends that Windows Vista and Windows Server 2008 include Windows Automated Installation Kit ("WAIK"), OEM Preinstallation Kit ("OPK"), and Business Desktop Deployment ("BDD"), and that an earlier version of OPK supported Windows XP and Windows Server 2003. *See* Nichols Infringement Report at 9.

The WAIK, Dr. Nichols contends, "is a tool to simplify and speed up the process of configuring multiple numbers of computers with the same Windows operating system. It is intended for use by the IT department in an organization to simplify the setup of similar computer systems throughout the organization. WAIK depends on Windows PE, ImageX, and the WIM image file format." According to Dr. Nichols, deploying WAIK consists of the following steps:

1. Setting up a lab environment to fully configure the desired operating system. This environment is built upon a computer referred to as the "Technician Computer".

2. Deciding what features will be incorporated into the operating system by providing an "Answer File".

3. Building the desired system (a master installation) on another computer called the "master computer" (a model system).

4. Creating an image of the Master Computer on the first media and creating a Windows PE media (a second media).

5. Initializing Windows PE on the "destination computer" (a target system) using the second media.

6. Deploying the image onto one or more Destination Computers.

7. Initializing the Destination Computer by the user and running a fully configured Windows operating system.

Nichols Infringement Report at 9. Dr. Nichols urges that steps 4—7 "involve infringement" of the asserted claims, and provides Exhibit E, which includes "screen shots" said to "show Microsoft's recommended process of creating and customizing the Windows PE media (the second media), capturing the image of the fully configured Windows operating system from the Master Computer (the first media), initializing the Destination Computer with the Windows PE media, partitioning and formatting the disk drive, loading the fully configured operating system onto the disk drive, and re-initializing with the fully configured Windows operating system." According to Dr. Nichols, the "screenshots were generated using the recommended deployment procedures described in the Windows Automated Installation Kit (Windows AIK) User's Guide." *Id.* at Exh. E.

The OPK, according to Dr. Nichols, "is practically identical to WAIK; the major difference being that here the OPK is installed on the Technician Computer instead of the WAIK." Nichols Infringement Report at 11.

Use of the BDD, Dr. Nichols urges, "implies use of the WAIK," and that "[i]t is only necessary to examine the relationship of WAIK to the '573 patent to determine the relationship of BDD to the patent." *Id.*

Further with respect to system deployment, Dr. Nichols includes claim charts said to show infringement by the (1) "deployment tools and procedures for Windows Vista and Windows server 2008," *see id.* at 16 & Exh. F, and (2) "deployment tools and procedures for Windows XP and

Windows Server 2003," *see id.* at 16 & Exh. G.

### b) System Backup & Recovery

With respect to system backup and recovery, Dr. Nichols points to the "built-in backup and restore components" of Windows Vista and Windows Server 2008 as infringing. Dr. Nichols provides a claim chart said to show infringement by the "system recovery tools and procedures for Windows Vista and Windows Server 2008, comprising Windows RE, Complete PC Backup and Restore (for Windows Vista) and Server 2008 Backup and Recovery (for Windows Server 2008)." *See* Nichols Infringement Report at 16, Exh. H.

### 2. Uses of the Accused Products

### a) Infringing Uses

As noted above, Microsoft does not—at least in its present motion—dispute that the accused products are capable of being used to perform the method steps of the asserted claims. *See* Microsoft's Reply at

5 (Microsoft's emphasis) (Dr. Nichols' "claim charts map the claims to *capabilities*, not to actions of consumers.").

### b) Substantial Non–Infringing Uses

 However, Microsoft urges that the accused products also have substantial non-infringing uses, as well. Microsoft provides a table said to show "18 exemplary ways of using the accused software * * * that do not even arguably infringe," and of those, particularly points out "seven indisputable examples of the myriad substantial non-infringing uses of the accused software." *See* Microsoft's Brief at 15 & 5, and Declaration of Xuan–Giang Tran in Support of Microsoft Corporation's Motion for Summary Judgment on Veritas' Claims of Infringement of U.S. Patent No. 5,469,-573 ("Tran Decl."), APX0192–94: Table A—Non-infringing Uses. *See also* Tran Decl., APX0015–90: Rebuttal Expert Report of Mark Morrissey ("Morrissey Rebuttal Report") at 21–65 (detailing substantial non-infringing uses).[2] Microsoft

---

**2.** With respect to "Deployment Tools—OPK/WAIK/BDD," Mr. Morrissey explains:

Many of the accused Microsoft tools are commonly provided by Microsoft as part of the OPK, WAIK or BDD toolkits. Those toolkits are generally directed to different ways to prepare and deploy images. However, those kits, like the tools they contain, can be used in a variety of methods—many of which clearly do not include every step required by any asserted claim. For example, the Vista OPK and WAIK (which forms the basis of BDD) each outlined six general "Deployment Walk-throughs." Each of those Walk-throughs outlines one possible way to deploy the Vista operating system using some or all of the tools included in the OPK and WAIK. Further, there are myriad variations to many of the six Walk-throughs and many "sub" Walk-throughs described in the Microsoft deployment toolkits. The WinXP OPK lists the general steps for various methods such as "Build–to–Plan Method," "Build–to–Order Method," "Network Setup Method," and "CD

Boot Method." Dr. Nichols' report focuses primarily on only one variation of one Walk-through—Deploy an Image from Network Share. Dr. Nichols report does not address the "clearly non-infringing methods of using the OPK, WAIK and BDD, many of which are mentioned in the toolkits themselves * * *."

Morrissey Rebuttal Report at 21–22. Mr. Morrissey then provides a table with "non-infringing deployment scenarios" using the OPK, WAIK and BDD, and describes those scenarios in more detail in his report. *See id.* at 22–47.

Mr. Morrissey also explains that Microsoft deployment tools have substantial non-infringing uses other than deploying operating systems:

It is not necessary to use every tool provided with Microsoft's toolkits. Rather, a user can obtain one of the toolkits and use just one or a few of the individual tools. For example, a user can obtain the OPK and use only WinPE, ImageX or Sysprep. Each of these tools has several uses that do not

argues that "Veritas cannot meet its burden of proof on this issue for any combination of an asserted patent claim and an accused item of Microsoft software," and that Veritas' expert, "Dr. Nichols, admitted several non-infringing uses in his deposition, and admitted that he had not even tried to identify or quantify the non-infringing uses of the accused software, and that he is not an expert in how OEMs or system administrators deploy operating systems." Microsoft's Brief at 14.

Microsoft elaborates on seven particular scenarios:

1. *"Install OS Using DVD and 'Answer File':* One primary and substantial use of the accused WAIK (or OPK or BDD) software kit is to create an 'Answer file' that stores various configuration choices, and helps automate installation of the operating system (OS) onto a computer. Then, use a generic operating system (OS) installation DVD to install the OS onto a computer, having the OS's set-up program look to the Answer file for the necessary configuration choices. Veritas' expert Dr. Nichols admitted in deposition that this is a non-infringing use of WAIK."

2. *"Install OS Using Hard Disk Duplication:* Another substantial non-infringing use of OPK is to install the OS onto a hard disk using [this method] or other non-infringing technique. Then, copy that configured operating system onto multiple hard disks connected to a hard disk duplication machine, and then remove those hard disks and install them into computers."

3. *"Install Win RE and Win RE Onto a Computer For Diagnostics and Repair:* The accused software toolkits are like physical toolkits: one can use the pliers without ever using the hammer, file, wrench or other tools in the kit. Here, for example, another substantial non-infringing use of OPK, WAIK and BDD is to use Microsoft's Win PE (Preinstallation

even arguably infringe the asserted '573 patent claims. Some of these uses are not even related to deploying an operating system.

Each of these plainly non-infringing uses of one or more of the individual tools included in OKP, WAIK and BDD are, of course, plainly non-infringing uses of the toolkits, because each toolkit permits the user to use an individual tool, in the manner described below, without using the entire kit to deploying operating system.

*Id.* at 47–48. Mr. Morrissey then provides a table summarizing examples of "non-deployment, non-infringing scenarios," and provides a more detailed explanation of those scenarios in his report. *See id.* at 48–55.

Finally, Mr. Morrissey explains that "Microsoft's recovery functionality also has substantial non-infringing uses:"

This recovery functionality is not provided as a standalone product. Rather, it is provided as part of certain versions of Microsoft's Vista operating system and Micro-

soft's Server 2008 operating system. It is my understanding that the existence of substantial non-infringing uses is evaluated with respect to the software actually provided by Microsoft, namely the Vista operating system and Server 2008 operating system. Dr. Nichols does not, and cannot, reasonably contend that these operating systems have no substantial non-infringing uses. To the contrary, these operating systems have virtually countless uses that do not relate to loading a fully configured operating system. For example, these operating systems support networking, access to the Internet, myriad software application programs, computer hardware diagnosis and maintenance among other things. Such uses are clearly substantial and are clearly non-infringing.

*Id.* at 55. Mr. Morrissey provides a table summarizing examples of non-infringing "recovery scenarios" and describes those scenarios in detail in his report. *See id.* at 55–65.

Environment) 2.0 software—provided with WAIK, OPK and BDD—without using any other tool provided in the accused WAIK, OPK or BDD software kits." For example, "Win PE 2.0 is integrated with Window Recovery Environment (Window RE)" and constitutes a non-infringing use such that "[a]n OEM or system administrator can install Win PE and Win RE onto a computer, without using the accused OS deployment methods." According to Microsoft, "Dr. Nichols admitted in deposition that Win PE and Win RE can be used together in a non-infringing way, for diagnosis and repair of various problems."

4. *"Other Substantial Non-infringing Uses of Win PE 2.0:* Dr. Nichols in deposition, and Mr. Morrissey in his expert report/declaration, have identified several other non-infringing uses of the Win PE 2.0 tool provided in the accused software kits. For example, Win PE can be used to perform the following functions without even arguably infringing the '573 patent: (1) create or edit 'Boot Configuration Data (BCD)' stores that describe boot applications and boot application settings, (2) restore the boot sector on a computer, (3) map network drives, (4) create new physical or logical drives, (5) partition and format existing drives, (6) otherwise manage disks, partitions, or volumes, etc. Indeed, Dr. Nichols himself has written a computer program that uses Win PE 2.0 in a non-infringing way."

5. *"Install Or Recover OS By Booting Win PE From Hard Disk:* Veritas alleges that Win PE serves the role of the 'temporary operating system' of the '573 patent claims. The claims require that the temporary OS be provided by 'second media' that, as found by the Special Master and not challenged by Veritas, is 'physically distinct' from the storage device. Another substantial non-infringing use of Win PE 2.0 is to store it on the computer's hard disk and, either in deployment or in a crash recovery situation, 'flat boot' the computer from that hard disk." Microsoft argues that "[u]sed in that manner, the alleged temporary OS is not on a physically distinct media, so this is another non-infringing use of the accused software."

6. *"Use OS Without Using The Accused Backup and Restore Functionality:* As Dr. Nichols admitted, one can use Windows® Vista and Window© Server 2008 with more than one hundred different applications without infringing the patent, and as he further admitted, these operating system have *substantial* non-infringing uses."

7. *"Use The Accused Backup and Restore Functionality To Backup, But Not Restore:* As Dr. Nichols also admitted, one can use the accused backup and restore feature (e.g., Complete PC Backup and Restore built into Windows Vista) and not infringe the '573 Patent, by using it to backup files but then not restoring those files. A computer user is no more required to later restore those files to the computer than a car driver is required to install a spare tire. Dr. Nichols admitted that this backup-but-no-restore was a *substantial* non-infringing use of the OS an of the accused built-in functionality of the OS."

Microsoft's Brief at 5–8 (Microsoft's emphases).

In rebuttal, Veritas relies on the testimony of its expert, Dr. Nichols, and particularly on Exhibit I to Dr. Nichols' expert report of July 17, 2007 (Nichols Infringement Report), and Exh. L of Dr. Nichols' expert report of August 14, 2007 (Nichols Validity Report). *See* Nichols Infringement Report, Exh. I at I–1—I–17 & Nichols Validity Report, Exh. L at L–1—L–11. Exhibit I is a table entitled "Evidence of Infringement," and is 17 pages long. Exhibit I, furthermore, references Exhibit F to the July report. Exhibit F is a table entitled "Claim Chart vs. Vista / Server 2008 System Deployment," and is 22 pages long. *See* Nichols Infringement Report, Exh. F at F–1—F–22. Exhibit L is a table entitled "Supplemental Evidence of Infringement," and is 11 pages long. Veritas cites generally to those exhibits, and does not point out any specific instance in which Dr. Nichols addresses any of the scenarios posited by Microsoft. Nor does Veritas particularly point the Court to anything in those exhibits tending to raise a genuine issue of material fact regarding Microsoft's assertion that the accused products do not have substantial non-infringing uses. Nor is any such instance apparent upon review of the exhibits, which the master has done despite Veritas' lack of particularity. *See Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir.2001)("We hold that the district court may determine whether there is a genuine issue of fact, on summary judgment, based on the papers submitted on the motion and such other papers as may be on file and specifically referred to and facts therein set forth in the motion papers. Though the court has discretion in appropriate circumstances to consider other materials, it need not do so. The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with ade-

quate references so that it could conveniently be found.").

In his July report, Dr. Nichols opined that "Microsoft's infringing tools and procedures have no substantial non-infringing uses." Nichols Infringement Report at 16. However, Dr. Nichols conceded during deposition that the foregoing statement "is unqualified and it should be qualified," and provided the qualification that "I believe that I have seen no evidence of substantial non-infringing use." *See* Tran Decl., APX0112–66: Deposition Excerpts of A.J. Nichols, Ph.D. ("Nichols Dep.") at 237:7–239:25. That is consistent with Dr. Nichols' statement in his July report that "[t]he Windows automated installation Kit, OEM Preinstallation Kit, Business Desktop Deployment packages are all described as products for deployment. Microsoft suggests no other use of the products, and I *know* of no substantial non-infringing use of them. Similarly, Vista Complete PC Backup and Restore and a Server 2008 Backup and Recovery used in conjunction with Windows RE are intended for backing up and recovering the operating system environment, and I *know* of no substantial non-infringing use of them." Nichols Infringement Report at 17 (emphases added) (paragraphing omitted).

Indeed, Dr. Nichols' qualification came after Microsoft questioned him about a number of substantial non-infringing uses. Dr. Nichols conceded that the accused products had many non-infringing uses, although he also stated that he had not determined whether those uses were "substantial." *See, e.g.*, Nichols Dep. at 11:25–12:1 ("[T]here are ways in which one can use the Vista operating system without infringing the '573 patent."), 14:7–15:18 ("One can use the Vista operating system to run an application—run the Word application to write a, for example, a report such as a validity report or an infringe-

ment report of the '573 patent. One could use a—the Vista operating system to run a program such as Excel to construct a spreadsheet * * *. One can use a Vista operating system to run a Visual Studio, a Visual C++ 6.0 to construct a program that would be used to, for example, analyze source code for duplication. * * * One could use the Vista operating system to gain access to the web * * *. One can use the Vista operating system to open up a DOS box and run programs * * *. One can use the Vista operating system * * * to run the PowerPoint application for Microsoft. One can use the Vista operating system for running Access, which is a database management system * * *. * * *"), 19:9–12 ("I have no idea as to how many people, whether it's millions or billions or hundreds, but I know that some of those programs are widely used."), 22:25–23:12 ("I'll do the best I can here. 'Substantial noninfringing use' in my mind as a—as a legal layperson, not as an expert in legalities as you yourself are, I hope, to me that term means that there are some large percentage, substantial amount of uses of a product, a large number of uses, I should say, of a product that do not infringe. That's what I think 'substantial noninfringing use' means. * * * More than a trivial amount, more than a small amount."), 23:17–29 ("The Windows Vista operating system has substantial uses—uses beyond infringement of the '573 patent."), 23:3–18 ("[T]here are probably many programs, application programs that Windows 2008 can run. Probably more than a hundred. * * * Without infringing the 573 patent. * * * and I will even go so far as to give you a substantial number of ways that server 2008 can be used without infringing the 573 patent."), 29:3–7 (Q. "Is it possible to use Windows PE 2.0 without infringing the '573 patent?" A. "Yes, I think it's possible."), 32:2–6 (Q. "And just to clarify, one noninfringing use of Windows PE 2.0 vis-à-vis the '573 patent is to support the running of your program called clonedir; is that correct?" A. "That is a non-infringing use, yes."), 35:5–7 ("I don't recall specifically attempting to look for noninfringing uses. I certainly discovered one."), 45:7–10 ("I did not do any research on trying to determine the number of people who had used the Microsoft products to infringe the '573 patent."), 46:14–16 ("I don't believe I have looked at Windows PE enough to determine whether the noninfringing uses of Windows PE are substantial."), 46:23–25 ("I have seen no evidence of anything from Microsoft that would lead me to believe there are substantial noninfringing uses of the OPK."), 47:4–15 (Q. "Is it possible to receive Microsoft Windows OPK and use only Windows PE 2.0 for any purpose and not use the remainder of the OPK?" A. "It is possible."), 49:5–25 ("And I thought of a few more things that one can do with Windows Vista that did not infringe the patent. * * * One can run virus programs and get into the operating system in a variety of ways. * * * One can run programs that will block such attempts such as firewalls, virus checker, spyware checkers, route kit checkers. * * * One can watch movies, can put in a CD and watch a movie using a Windows Vista operating system."), 55:4–12 (Q. "What are some of the ways in which one can install Windows Vista on a computer without infringing claim 30 of the '573 patent?" A. "Microsoft loaded Vista somehow onto computers presumably by building and installing them using some mechanism that would not necessarily have infringed the '573 patent, claim 30."), 90:13 ("I have not used OPK."), 90:23–91:9 ("WAIK and OPK are almost identical, A; B, there is testimony, I believe, that I've read, and I'd have to review again. But I believe I've read testimony by Microsoft existing or former employees that the—as to the purpose of

WAIK and OPK that led me to believe that Microsoft's employees, at least, I believe there were no other—there was no intention, at least, of using these products for any other purpose. That they were built explicitly for purposes that would infringe the '573 patent. I think that was enough analysis on my part."), 91:18–21 (Q. "Have you ever backed up operating system files and not later restored them from the backup?" A. "Yes."), 91:23–92:1 (Q. "Is it possible to use the Complete PC feature of Vista to back up operating system files and never restore them from the backup?" A. "Hopefully."), 92:12–21 (Q. "Do you have an informed opinion as to the percentage of Vista users that back up their operative system using Complete PC? What percentage of those users will never restore the operating system from the backup?" A. "I have not tried to determine those percentages, no."), 93:16–19 ("If one backed up the operating system files, but did not actually restore them, then one would not meet every element of the independent claims of the '573 patent."), 93:25–94:9. (A. "I would expect that a goodly number of people would do a backup—that did a backup would not use it, would not need to restore from it." Q. "So isn't that a substantial noninfringing use of the Complete PC feature; namely, to back up operating system files but not restore them?" A. "Probably. Hopefully."), 94:11 95:25 (Q. "And is the same true for the backup and restore feature in Server 2008; namely, that a substantial noninfringing use of that particular feature is to back up operating system files but not restore them?" A. "There are probably a goodly number of people—I don't think server 2008 is released. Is a released yet?" Q. "Not commercially, no." A. "Then we are talking about something that is really hypothetical here because it doesn't even exist. But when it exists, I will expect that some people will use the backup and not have to do a restore of the operating system." * * * Q. "And that won't be a trivial number, will it? It will be a substantial number, won't it?" A. "We are talking about the future. I have no idea. Probably it will be a substantial number."), 104:11–23 (Q. "And when a person goes to a store and picks up the Vista retail DVD and installs on the computer, they are not infringing any of the claims of the '573 patent, are they, because they're not installing a fully configured operating system, isn't that right?" A. "That's correct."), and 224:14–17 ("When you use Windows RE to do automatic diagnosis and repair of an installation that has become uninitializable, then that would not, by itself, be infringement of the '573 patent.").

Veritas nevertheless argues that the accused products "have no substantial noninfringing uses for the *mode of operation* accused." Veritas' Response at 18 (Veritas' emphasis). According to Veritas, "Microsoft's argument misses the mark, however, because Microsoft never points to a substantial noninfringing use for any of the accused recovery or deployment scenarios referenced above. Instead, it merely discusses the allegedly noninfringing uses of certain components in the identified scenarios, or the allegedly noninfringing uses of the Accused Products outside of the identified scenarios. Microsoft is therefore arguing that the Accused Products are staple articles simply because they perform functions in addition to those functions that are accused to infringe." *Id.* at 18–19. According to Veritas, that is "contrary to the law and should be rejected," citing *Oak Indus., Inc. v. Zenith Elecs. Corp.* (*"Oak Industries II"*), 726 F.Supp. 1525 (N.D.Ill.1989), and *Imagexpo, L.L.C. v. Microsoft Corp.*, 284 F.Supp.2d 365 (E.D.Va.2003). Veritas' Response at 19.

Microsoft replies that "[w]hen determining whether an accused product has a substantial noninfringing use, it is the thing sold, not some allegedly infringing ingredient or portion of an accused product, that matters," citing *Hodosh v. Block Drug Co.*, 833 F.2d 1575, 1578 (Fed.Cir.1987). According to Microsoft, *Oak Industries* and *Imagexpo* are "irrelevant." *See* Microsoft's Reply at 2–3.

■■■ Veritas' argument pertains particularly to indirect infringement under § 271(c), *i.e.*, contributory infringement. Focus on particular "system recovery and system deployment scenarios" is improper for the staple/non-staple inquiry under § 271(c). Again, the asserted claims are all method claims, and so the contributory infringement analysis focuses on "a material or apparatus for use in practicing a patented process." Whether the accused software constitutes a "material or apparatus" is discussed separately below; nevertheless, the staple/non-staple inquiry properly focuses on what Microsoft "offers to sell or sells within the United States or imports into the United States."

In other words, as Microsoft points out, § 271(c) "deals with the material actually sold by the accused and the uses made of it by its purchasers." *Hodosh*, 833 F.2d at 1578. In *Hodosh*, the accused infringer sold toothpaste, and the court rejected the patent owner's attempt to limit the staple/nonstaple inquiry to one ingredient of that toothpaste, namely, potassium nitrate:

> Section 271(c) requires examination of the patented method only in determining whether the material the accused actually sells constitutes a material part of the invention and is known by the accused to be especially made or adapted for use in infringing the patent. Neither party here "sells" potassium nitrate, and Block's attempted limitation of the staple/nonstaple inquiry to that mere ingre-

dient would eliminate the § 271(c)—mandated inquiries relating to whether what was actually sold was a material part of the invention and whether the seller knew that what was actually sold was especially made or adapted for use in infringement of the patent.

*Id. See also Aquatex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1383 n.* * [sic] (Fed.Cir.2005) ("From the record before us, the 'apparatus for use in practicing' the claimed methods is Techniche's multi-layered product. The proper question is not whether Vizorb TM is a staple article of commerce, which is readily apparent, but whether the accused Techniche products are "suitable for substantial noninfringing use[s]." "). Here, there is no dispute that Microsoft sold and offered to sell the accused products as units, *e.g.*, Windows Vista and Server 2008, not just the specific recovery or deployment scenarios urged by Veritas. It must be concluded, therefore, that Veritas does not dispute the scenarios posited by Microsoft, or dispute that the accused products, namely, Windows XP, Server 2003, Vista and Server 2008, have substantial non-infringing uses.

As noted above, Veritas cites two cases, *Oak Industries* and *Imagexpo*, in support of its argument. In *Oak Industries*, the patented method, the "Mandell method," claimed a method for eliminating direct interference on CATV systems. According to the opinion, Defendant Zenith sold converters "capable of practicing the Mandell method" to cable operators. However, the opinion explains that "these converters also perform other functions such as expanding the number of channels that the subscriber may receive, providing subscribers with the ability to unscramble protected signals, thus allowing cable operators to scramble protected frequencies, and allowing cable operators to address and remotely control subscribers' programming. Zenith converters apparently

contain several electronic systems, such as a tuner, a detector, a decoder and a modulator. These systems are interconnected to perform multiple functions. In other words, the same circuitry that, for example, expands the number of channels that a subscriber may receive, also allows the subscriber to receive on cable an over-the-air VHF channel output on a channel not used by the over-the-air stations (such as channel 3 in Chicago). The use of the converter's electronic systems in this manner, when combined with the shielding inherent in the housing in the Zenith con-

verters, allows subscribers—at least for the purposes of this motion—to directly infringe the Mandell method." *Oak Industries II*, 726 F.Supp. 1525, 1529. Zenith had earlier moved for summary judgment claiming, *inter alia*, that it was not liable for contributory infringement. The court had then held that Zenith had not presented sufficient evidence to show an absence of material fact concerning whether its converters were staple articles.[3]

In *Oak Industries II*, the issue before the court was: "are Zenith's converters

---

**3.** *Oak Indus., Inc. v. Zenith Elecs. Corp.* (*"Oak Industries I"*), 697 F.Supp. 988 (N.D.Ill.1988). In *Oak Industries I*, the court provided its "tentative legal views" in denying summary judgment:

Section 271(c) liability requires a showing that the device sold was used in practicing a patent process and that the seller knew it was especially made for that purpose and not a staple article suitable for a substantial noninfringing use. Zenith, for the purposes of its motion, does not contest that it knew that the Z–TAK could be used to practice the Mandell patent. Its motion focuses on the conjunctive of § 271(c), which states that in order for there to be liability for contributory infringement the product sold must have been made for the infringing use and is unsuitable for substantial noninfringing use. This provision, according to one view, codified a traditional patent requirement which recognized that sellers of products capable of noninfringing use may lack the intention necessary for a finding of infringement. "The presence or absence of the element of substantial noninfringing use is significant principally in determining whether there is an *intention* to infringe. The absence of a substantial noninfringing use, of course, warrants the inference of an intention to infringe." *Fromberg, Inc. v. Thornhill*, 315 F.2d 407, 414 n. 20 (5th Cir.1963) (emphasis in original) (citations omitted).

Zenith claims that its products performed other functions, such as channel expansion and unscrambling of coded progress, and are therefore capable of substantial noninfringing use. This argument is legally flawed.

\* \* \*

It is hornbook law that distinctions in the particular apparatus used are irrelevant for determining whether a device is capable of infringing a method patent. *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1482 (Fed.Cir.1984); *International Glass Co. v. United States*, 408 F.2d 395, 400, 187 Ct.Cl. 376 (1969). This rule parallels the patent axiom that mere additions and improvements upon a patented device do not avoid infringement. *See Datascope Corp. v. SMEC, Inc.*, 776 F.2d 320, 326 (Fed.Cir. 1985) (" 'an embellishment' made possible by technological advances may not permit an accused device to escape 'the web of infringement' "); *Amstar Corp.*, *supra*, (collecting cases). *See also* 6 Lipscomb's Walker on Patents §§ 2:29–22–30 (3d ed.1987). From these rules it is clear that the addition of channel-expanding and unscrambling functions to the accused devices would not preclude a finding of direct infringement by users of Zenith's converters.

The question remains, however, whether the addition of these functions qualified the products so that they were capable of substantial noninfringing use, thereby averting Zenith's liability for contributory infringement. We believe that it has not been conclusively demonstrated that they did not, and that contributory infringement can possibly be established.

Section 271(c) covers a lot of ground, and the cases which interpret it are relatively few in number. One is left with the conclusion that the fact variations which may invoke § 271(c) are infinite and that standards derived from a specific fact situation are necessarily suspect in other circumstances. We must, ultimately, apply statu-

Footnote 3 continued

tory language to a specific fact situation in light of the congressional purpose. And that purpose can perhaps be no better defined than according the patent owner a reasonable area of protection, and according others a reasonable latitude in pursuing the fruits of technological change.

Let us go back to what is, or at least appears to be, undisputed. Suppression of VHF broadcast interference is not always necessary. For many, if not most CATV subscribers, however, it is necessary, and they would not accept a converter that did not provide that function. Accordingly, cable networks would not offer converters without that facility and manufacturers, such as defendant, could not market a device that did not include a suppression feature. An unscrambling function may be an essential, and indeed the only essential function in some areas. A channel expansion feature may be an essential function in many areas and the only essential function in some. A VHF interference suppression function may not be needed in some areas or in some specific locations. Other functions may be desirable or essential in some circumstances. There are other ways to eliminate VHF interference. Even in an interference area, a viewer watching a UHF cable channel does not use the Mandell patented method. The Zenith Z–TAC combines a number of functions, one of which (for the purposes of this motion) is the suppression of VHF interference in a manner infringing the Mandell patent method. Can that mean that the seller of the Z–TAC contributorily infringes? We believe that the answer is that it possibly can.

Let us go back to what we know from the cases, which on occasion require us to interpolate from concepts of patent misuse or copyright. A herbicide seller contributorily infringes if the only use of the material is in a patented method. *Dawson Chemical, supra.* If the manufacturer added a fertilizer as an additional ingredient, could he escape liability for the reason that the fertilizer was a staple? We think not. Perhaps the fertilizer might be helpful in growing some crop where the herbicide is an incidental waste, but the possibility, or even the likelihood, that someone may use it in a noninfringing manner does not protect the manufacturer. Additional functions in a device that practices a patented method does not diminish direct infringement and, therefore, the fact that the device sold has other functions which are performed simultaneously with the patented method does not otherwise substantiate a noninfringing use for the purposes of § 271(c). This rule flows directly from the logic of the patent laws. To hold to the contrary would allow sellers of products that are clearly intended to infringe a patented method to avert liability simply by adding functions to that device. Therefore, we do not think it enough that Zenith may have combined in the same package several devices: one to suppress VHF interference, one to unscramble signals, and one to expand channels. That does not mean that a supplier of a staple is liable for contributory infringement even if he knows its intended use. A supplier of potassium nitrate need not be concerned about his purchasers' anticipated combination, *see Hodosh v. Block Drug Co.*, 833 F.2d 1575, 4 U.S.P.Q.2d 1935 (Fed.Cir.1987), but he needs to be concerned if what he is supplying is a recipe or combination useful only for practicing a method that directly infringes a patent. If *Oxy Metal Industries Corp. v. Quin–Tec, Inc.*, 216 U.S.P.Q. 318 (E.D.Mich.1982), is to the contrary, this court disagrees with that conclusion.

That does not, however, lead to the conclusion that the seller of a device which, to perform one function, necessarily but incidentally is capable of performing an unrelated infringing function, is a contributory infringer. *Sony Corp. v. Universal City Studios*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), suggests that if the device has an unrelated use beyond the scope of patent protection (time-shifting), an inevitable possible use which directly infringes does not cause the seller of the device to contributorily infringe. Perhaps the result there would have been different if reasonably uncomplicated technology permitted a Betamax to differentiate between temporary recovery for time-shifting and permanent preservation of copyrighted material. The present record does not conclusively establish whether the Zenith ZTAC is in effect a combination of separable functions in a single package, one of which leads to infringement, or a device designed for other purposes which, because of the limits of technology, necessarily and incidentally permits the practice of the patented method if those other purposes are to be accomplished. Can a simple change in design leave, for example, the channel-expan-

staples?" 726 F.Supp. at 1538. The court reasoned as follows:

> For if they are, Zenith is not liable for contributory infringement. *See Calhoun v. State Chem. Mfg. Co.*, 153 F.Supp. 293, 301, 115 U.S.P.Q. 120, 126 (N.D.Ohio 1957); 35 U.S.C. § 271(b). To answer this question we must examine the converter Zenith sells. *See Hodosh v. Block Drug Co.*, 833 F.2d 1575, 1577, 4 U.S.P.Q.2d 1935, 1937 (Fed.Cir. 1987), *cert. denied*, 485 U.S. 1007, 108 S.Ct. 1472, 99 L.Ed.2d 701 (1988). For the purposes of this motion Zenith has agreed that its converters are capable of practicing the Mandell method. Although these converters also perform additional functions, we recognized the general rule that combining non-infringing functions in one device that is capable of practicing a patented method will not ordinarily result in the court finding that such device is a staple. *Oak*, 697 F.Supp. at 995, 9 U.S.P.Q.2d at 1143–44. If this were not the rule, a seller could avoid liability for contributory infringement of a method patent simply by adding other materials or functions. We do not believe that Congress intended that the seller could so easily avoid liability.

> The difficulty arises here because Zenith's converters use the same parts to perform non-patented methods and to practice the Mandell method. Zenith claims that because of these physical limitations, infringement of the Mandell patent is inevitable. Thus we continue to believe that the proper test to determine if a device that can practice non-infringing methods, but allows practice of a patented method, is a staple, is that the practice of the patented method must be incidental and necessary due to technological limitations. *Id.* at 996, 9 U.S.P.Q.2d at 1145. If the practice of the patented method is incidental and necessary to the practice of the unpatented methods, the device is a staple and there can be no contributory infringement. If, on the other hand, the practice of the patented method is not necessary or incidental to the practice of the unpatented methods, a jury could find that the device *as a whole* is not staple and the seller could be liable for contributory infringement.

726 F.Supp. at 1538–39. Zenith argued non-infringement on two bases: (1) that structural housings shielded electronic components from electromagnetic radiation and thus served a number of non-

---

Footnote 3 continued
sion function intact, while eliminating the capacity to eliminate VHF broadcast interference? We do not know.

> Zenith claims that when its products were used in areas where there was no threat of this interference, such as in areas outside a local transmitter's "grade A contour" or where cable operators employed head-end channel shifting, there was no direct infringement and therefore the converters were capable of substantial noninfringing use. Zenith contends that in roughly ten per cent of its sales the products were used in areas where direct pickup interference did not pose a problem.

> In order to establish contributory infringement plaintiffs must show direct infringement by cable users. *See Aro Manufacturing Co. v. Convertible Top Replacement Co.*,

365 U.S. 336, 341, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961). We believe, however, that the contention relates to damages. If the device is a package of separable functions, one of which often infringes, Zenith is liable only to the extent of that use. If it is a different animal, then there may be no contributory infringement, even though a user may often directly infringe. The extent to which geographical and operational factors preclude direct infringement does not necessarily avoid Zenith's liability, although it may be relevant in determining damages owed to plaintiffs. The parties have addressed neither the tentative legal views here expressed nor the factual implications of those views, and we therefore leave both to another day.

697 F.Supp. at 994–96.

infringing purposes, and (2) simple design changes would render the converter non-infringing. With respect to (1), the patentee responded that the degree of shielding was not necessary to perform the non-patented methods, but was necessary only if one wished to practice the Mandell method. The court concluded that there was a genuine issue of material fact whether "the new shielded converters have no reason for being other than to infringe the Mandell patent," *i.e.*, whether "converters with extra shielding perform no additional non-infringing functions from the unshield-ed converters." In other words, with respect to a patented method, there remained a genuine issue of material fact whether a structural element added non-infringing functionality to the accused product. As for (2), the court rejected Zenith's arguments because Zenith did not sell products with those design changes.

There is no need here to address the "tentative legal views" of *Oak Industries I* or the reasoning of *Oak Industries II*, for those cases are readily distinguishable from the present situation.[4] As in *Oak*

---

**4.** As Microsoft notes, the court that decided *Oak Industries* later distinguished its *Oak Industries* decisions and clarified the "relevant inquiry" in a staple/nonstaple analysis in light of subsequent Federal Circuit caselaw. In *Universal Elecs., Inc. v. Zenith Elecs. Corp.*, 846 F.Supp. 641 (N.D.Ill.1994), *aff'd without opinion*, 41 F.3d 1520 (Fed.Cir.1994), Zenith accused Universal's remote control of infringing its patent:

Universal argues that to be liable for contributory infringement, whether or not end user's would directly infringe, its remote control units must not be "a staple article or commodity of commerce suitable for substantial noninfringing use...." *See* 35 U.S.C. § 271(c) (1988). Zenith disagrees. Universal's argument is straight-forward. Its remote control units may be used by its customers to operate various electronic devices produced by a number of manufacturers other than Zenith. (*See* Tyler Decl. ¶ 5, Ex. 3.) Zenith does not dispute this contention, but argues that this fact does not make Universal's remotes staple articles of commerce. According to Zenith, the fact that Universal has added non-infringing functions to its remotes, in addition to infringing functions, does not make those remotes capable of substantial non-infringing use. *See Oak Indus., Inc. v. Zenith Elecs. Corp.*, 726 F.Supp. 1525 (N.D.Ill.1989).

To determine if Universal's remotes are staple articles, the Court must look at the entire device, not just the part capable of practicing the '647 claims. *See Hodosh v. Block Drug Co.*, 833 F.2d 1575, 1578 (Fed. Cir.1987), *cert. denied*, 485 U.S. 1007, 108 S.Ct. 1472, 99 L.Ed.2d 701 (1988). There is no doubt that the Universal remote con-trol transmitter units, as a whole, are capable of controlling a large number of non-Zenith electronic appliances without practicing the '647 patent. But the question remains whether, by adding the capability to practice the patented method, Universal has made its remotes incapable of substantial non-infringing use.

Zenith refers the Court to *Oak* where the court considered whether cable converters that used the same circuitry to perform several functions, including one function that infringed a patented method, could be staple articles. Although *Oak* and this case are similar in that the accused contributory infringer sells an unpatented device capable of infringing, there is a major difference between the two cases. In *Oak*, the defendant, Zenith, argued that it was not liable for contributory infringement because the converters could perform several unpatented functions and any infringement of the claimed process was inevitable due to the technology involved. *See Oak*, 726 F.Supp. at 1538. Based on the evidence, the *Oak* court concluded that there remained a question of fact about whether Zenith's converters had a substantial non-infringing use because the converters contained radiation shielding that may not have been necessary for the converters to practice the non-infringing functions. In this case, however, the parties agree that there is no infringement of Zenith's claims by users of Universal's remotes when controlling televisions manufactured others. Thus, infringement of the '47 claims is not inevitable. Because of these factual differences, the Court concludes that the *Oak* test is inappropriate to the circumstances of this case.

*Industries,* the focus here is on the accused product as a whole, not on a particular functional scenario. Unlike the situation in *Oak Industries II,* however, here there is no dispute that the accused products perform non-infringing functions. Thus, infringement is not inevitable. Nor is there any structure at issue that may or may not add non-infringing functions to the accused products. The situation in *Oak Industries II* is simply not analogous to the present situation, nor is there anything in *Oak Industries* that suggests looking at less than the product as a whole.

*Imagexpo* does not compel a different conclusion. The court in *Imagexpo* relied exclusively on the reasoning in *Oak Industries I* in couching the issue as "whether and how intricately each software package combines the patented method with additional software applications?" *Imagexpo,* 284 F.Supp.2d at 368. Imagexpo had argued that "neither of the accused software applications, Buddy Browser or whiteboard, is a staple article or commodity of commerce suitable for any substantial non-infringing use." Microsoft had argued that "the products at issue are not the single applications of Buddy Browser and whiteboard, but rather MSN 8 and Net-Meeting, as suites or packages of software." And according to the court, the MSN 8 suite added "parental controls, a junk e-mail filter, and photo-supporting e-mail software to the accused Buddy Browser function, and the NetMeeting suite adds application sharing, file transfer, and chat features to the accused whiteboard feature." *Id.* at 367. The court questioned whether "the Microsoft software suites [were] a combination of separable functions, or [whether] each suite [was] designed such that, due to the limits of technology, each necessarily and incidentally practices the patented method in order to accomplish its purpose? Stated another way, even if Microsoft made every effort to remove Buddy Browser and

---

Furthermore, after *Oak* was decided, the Federal Circuit made clear that the relevant inquiry is whether there are substantial non-infringing uses for a device, not whether a device is designed so as to allow infringement of a patented process. *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.,* 911 F.2d 670, 674 (Fed.Cir.1990). In *C.R. Bard,* the patent at issue claimed a method for using a catheter to perform cardiac angioplasty. The alleged infringer supplied a device that contained extra openings for blood to flow. Analyzing the alleged infringing device, the district court stated:

> '[t]hat [the alleged infringer] has added extra holes further from the balloon does not affect the conclusion of infringement, as the patent does not require that *all* holes be 'immediately adjacent'; the balloon, nor that the blood flowing through the balloon come *solely* from the coronary artery.'

*Id.* at 674 (quoting *C.R. Bard, v. Advanced Cardiovascular Sys., Inc.,* No. SA CV 88–646–JSL, slip op. at 13 (C.D.Cal. July 28, 1989)).

The Federal Circuit assumed, without deciding, that the district court correctly decided that the patent claim covered the use of the alleged infringing apparatus. However, the court stated that the apparatus may have had other, non-infringing uses and consequently, the district court should not have granted summary judgment in favor of the patent owner. *Id.* It seems clear from *C.R. Bard* that the Court must decide if Universal's remote control units have any non-infringing uses. If they do, those transmitters are staple articles and Universal cannot be liable for contributory infringement by selling them.

846 F.Supp. at 651–52. *See also Lucent Tech. v. Gateway, Inc.,* 2007 WL 925502, at *4 (S.D.Cal. Mar.21, 2007)("The question focuses on 'the thing sold' by the one accused of contributing to infringement."); *TV Interactive Data Corp. v. Microsoft Corp.,* 2005 WL 1910929, at *4 (N.D.Cal. Aug.10, 2005)("To determine whether a product is a staple of commerce, a court must look at the entire device and not just the part capable of practicing the claims of the patent at issue.")

white board from software suites, would the remaining technology, used to practice the other functions in MSN 8 and Net-Meeting, nevertheless permit a user to practice the patented method? These are disputed questions of material fact that the court finds relevant to the question of substantial non-infringing use." *Id.* at 368. Here, however, there is no dispute that the accused products have substantial non-infringing uses, which distinguishes the instant case from that of *Imagexpo.* Veritas' arguments regarding *Oak Industries* and *Imagexpo* must therefore be rejected.

With no dispute that the accused products have substantial non-infringing uses, Microsoft cannot be held liable for contributory infringement. *See, e.g., Grokster.,* 545 U.S. at 932, 125 S.Ct. 2764 ("This analysis reflected patent law's traditional staple article of commerce doctrine, now codified, that distribution of a component of a patented device will not violate the patent if it is suitable for use in other ways.").

#### c) U.S. and Foreign Uses

There also appears to be no dispute that the accused products are used both in the United States and outside the United States. *See, e.g.,* Veritas' Response at 20 ("Veritas has *not* accused *exported* Microsoft golden masters or any exported Microsoft software * * *." (Veritas' emphasis)) and 23 n. 21 (discussing apportioning damages for U.S. versus non-U.S. use).

#### d) Use with Veritas' Products

Finally, Veritas does not appear to dispute that Veritas' own software may be used to deploy Windows operating system. *See* Morrissey Rebuttal Report at 65 ("It is not necessary to use Microsoft's toolkits and tools to deploy Windows operating system. Several third parties provide tools that can be used to deploy Windows operating systems. For example, at least the following third-parties offer tools that can be used to deploy the Windows XP operating system: * * * Symantec, * * *. The Vista operating system can be deployed with at least the following third-party tools: Symantec Ghost, * * *.").

\* \* \* \* \* \*

Viewing the evidence in light most favorable to Veritas, therefore, there is no dispute that the accused products—as sold—are (1) capable of infringing uses, (2) capable of substantial non-infringing uses and (3) used both inside and outside the United States. Nor does there appear to be any dispute that (4) Veritas' own products, running on the accused products, may be used to deploy Windows operating systems.

#### 3. Infringement

It is worth emphasizing here that Microsoft's motion for summary judgment with respect to direct infringement urges that Veritas has no evidence of infringing use by Microsoft's *customers.* In other words, Microsoft does not here contend that it (Microsoft) has not made infringing use of the accused products.

Microsoft thus seeks to limit its damages exposure by removing on summary judgment the largest class of potential infringers—Microsoft's customers for the accused products. In the instant suit, Veritas did not sue Microsoft's customers for infringing the accused products; rather, Veritas seeks to hold Microsoft vicariously liable for its customer's infringement. To avoid summary judgment, therefore, Veritas must, *inter alia,* raise a genuine issue of material fact regarding use by Microsoft's customers of the accused products to perform "all the steps of the process." *BMC Resources,* 498 F.3d at 1379. *See Glenayre Elecs., Inc. v. Jackson,* 443 F.3d 851, 875–76 (Fed.Cir.2006)("The rule is

that the patent must be shown to be directly infringed, usually by a third person who is not before the court, before the patentee can seek damages from the entity that induced or contributed to that direct infringement."); *see Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed.Cir.2004)("Indirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement, though the direct infringer is typically someone other than the defendant accused of indirect infringement.").

■ A hypothetical act of direct infringement is insufficient. *See Dynacore*, 363 F.3d at 1274–76 (rejecting Dynacore's argument that "a hypothetical direct infringement suffices to establish the defendants' broad vicarious liability across the entire category of IEEE 1394 compliant networks"). Rather, Veritas must either show that use of the accused products necessarily infringes, or identify a specific instance of direct infringement. *See id.* at 1275–76 ("Dynacore must therefore either demonstrate that LANs compliant with the IEEE 1394 Standard necessarily infringe the '732 Patent, or point to a specific instance of direct infringement and restrict its suit to liability stemming from that specific instance."); *ACCO Brands*, 501 F.3d at 1313 ("In order to prove direct infringement, a patentee must either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit. Here, the parties do not dispute that the accused device can be operated in either of two modes—the infringing Dornfeld method or the noninfringing press-to-lock method. Because the accused device can be used at any given time in a noninfringing manner, the accused device does not necessarily infringe the '989 patent.").

Because the accused products have undisputed substantial non-infringing uses, Veritas cannot show that use of the accused products necessarily infringes. Thus, Veritas must point to a specific instance of direct infringement in order to avoid summary judgment on its charge of indirect infringement.

Of course, mere sale of the accused products by Microsoft is insufficient to raise a genuine issue of material fact regarding infringement of the asserted claims. *See Ormco Corp.*, 463 F.3d at 1310–11 ("Method claims are only infringed when the claimed process is performed, not by the sale of an apparatus that is capable of infringing use."). And, because use of the accused products does not necessarily infringe, mere use of the accused products by Microsoft's customers is likewise insufficient to raise a genuine issue of material fact regarding infringement. In other words, Veritas must do more than make a showing that a customer used the accused products to deploy or restore. Veritas must make a showing that such deployment or restoration was accomplished using a method recited in the claims.

Also, some of the claimed method steps are inherently ordered, *i.e.*, one step must follow another. For example, in independent claims 1, 18 and 30, the step of "initializing the data processing system from the second media" must follow the steps that introduce the "second media." *See Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*, 152 F.3d 1368, 1376 (Fed.Cir. 1998) (holding that "the sequential nature of the claim steps is apparent from the plain meaning of the claim language and nothing in the written description suggests otherwise"). Thus, Veritas must also show that Microsoft's customers not only performed the claimed method steps, but performed those steps in an order inherent to

the claims. *See E–Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222 (Fed.Cir. 2007) (citation omitted)("Procedurally, it is hornbook law that to survive the defendants' motions for summary judgment, E–Pass must 'make a showing sufficient to establish the existence of [each] element essential to [its] case.' Substantively, because the language of most of the steps of its method claim refer to the completed results of the prior step, E–Pass must show that all of those steps were performed in order.").

■ Furthermore, Veritas must show use within the U.S. After all, under § 271(a) provides for infringement based on activities "within the United States." *See also* § 271(c) ("Whoever offers to sell or sells within the United States or imports into the United States * * * shall be liable as a contributory infringer."). One cannot not infringe by performing a claimed method outside the U.S. *See NTP*, 418 F.3d at 1318 ("We therefore hold that a process cannot be used 'within' the United States as required by section 271(a) unless each of the steps is performed within this country."); *Voda v. Cordis Corp.*, 476 F.3d 887, 901 (Fed.Cir.2007)("A patent right is limited by the metes and bounds of the jurisdictional territory that granted the right to exclude.").

Likewise, Veritas must show that such use was not accomplished using Veritas' software. Under § 271(a), there is no infringement unless Microsoft's customers performed the accused action "without authority."

Generally, Veritas' evidence of direct infringement falls into three categories: (1) "users manuals, advertising materials and other product documentation that instruct [Microsoft's] customers how to use the Accused Products to perform the infringing

methods in both the system deployment and system recovery scenatios identified by Veritas," supported by "an expert report from Dr. Nichols that provides a detailed, claimed-by-claim, infringement analysis of all the Accused Products, identifying such offending literature," (2) "Microsoft's own witnesses [who] have testified concerning the use of the Accused Products by Microsoft's customers in an infringing manner," and (3) "in hundreds of e-mails, customer specifications and other documents establishing that customers use the Accused Products as instructed by Microsoft to perform the claimed recovery and deployment methods." Veritas' Response at 8–9 & 12. The master addresses each category of evidence in turn.

### a) "users manuals, advertising materials and other product documentation"

■ Veritas specifically points to the (1) Windows Automated Installation Kit (Windows AIK) User's Guide, *see* Schallop Decl., Exh. G: ("WAIK Guide"), (2) Getting Started with the Windows Automated Installation Kit (Windows AIK), *see* Schallop Decl., Exh. H: ("WAIK Getting Started"), (3) OEM Preinstallation Kit (OPK) User's Guide for Windows XP Service Pack 2, *see* Schallop Decl., Exh. HH: ("OPK Guide"), (4) Windows Backup and Restore Center—Complete PC Backup and Restore, *see* Schallop Decl., Exh. J: ("BRC"), and (5) a presentation delivered to Microsoft customers entitled "Backup and Restore in Windows Vista and Windows Longhorn Server", *see* Schallop Decl., Exh. K: ("Presentation"), among other documents considered by Dr. Nichols.[5]

Veritas also points to Dr. Nichols' treatment of the WAIK Guide in his report at Exh. E, the WAIK Getting Started refer-

---

**5.** Dr. Nichols appears to have considered, in connection with his infringement analysis,

each of the five documents now proffered by Veritas. *See* Nichols Infringement Report,

ence in his Exh. F, the OKP Guide in his report at Exh. G, and the BRC and Presentation in his report at Exh. H. *See* Veritas' Response at 8–9.

### (1) WAIK Guide

Turning first to the WAIK Guide (*see* Schallop Decl., Exh. G: VRTS 00943244–718), the WAIK Guide appears to be an electronic hyperlinked manual that corresponds to approximately 475 pages when printed out, at least as provided by Veritas. The WAIK Guide provides the following introduction:

**Introduction to the Windows AIK User's Guide**

The Windows Automated Installation Kit (Windows AIK) is designed to help original equipment manufacturers (OEMs), system builders, and corporate IT professionals deploy Windows onto new hardware. The Windows AIK is a set of deployment tools supporting the latest release of Windows. This guide describes the current methods, tools, and requirements for deploying Windows.

The goals of this guide are to:

- Ensure a consistent user experience of the core functionality of the Windows Vista operating system.
- Enable you to brand and to customize any Windows Vista product.
- Enable you to install applications and device drivers that are not part of the Windows Vista operating system.
- Reduce illegal software piracy.
- Provide flexible methodology and tools to help optimize your manufacturing process, whether you build 10 or 10,000 computers per month.

This guide includes the following sections:

- Introduction
 General information about how to use the guide.
- Windows Preinstallation Phases
 Detailed information about how to deploy Windows onto new hardware. This section is organized into five installation phases to help you build, deploy, and maintain your Windows Vista installations.
 - Phase 1: Preinstallation Planning
 - Phase 2: Preinstallation Preparation
 - Phase 3: Preinstallation Customization
 - Phase 4: Image Deployment
 - Phase 5: Image Maintenance
- Deployment Tools Technical Reference
 A comprehensive technical discussion of the technologies used in the Windows AIK, including how the technologies work and what settings you can configure.
- Glossary
 A collection of terms and definitions used in the Windows AIK.

In addition, this guide includes walkthrough topics that provide step-by-step instructions on how to build a specific solution based on a series of tasks.

WAIK Guide at VRTS 00943245. According to the WAIK Guide, "[e]ach phase contains a collection of topics including conceptual, how-to, and walk-through topics. Conceptual topics focus on what you need to know during that phase of deployment. How-to topics provide specific instructions on common tasks. Walk-through topics are step-by-step instruc-

tions on building specific solutions." *Id.* at VRTS–262.

Dr. Nichols' Exhibit E infringement chart for the WAIK relies on the WAIK Guide. That chart is reproduced below to the extent that it references the WAIK Guide (screenshots and accompanying discussion are omitted), and in the order provided by Dr. Nichols:

---

Exh. D: Documents Considered at D–1 (items 10, 12, 13, 16 and 17).

| '573 Claim Element | WAIK Guide Excerpt / Screen shot |
|---|---|
| "providing a first media comprising operating system files for installing the fully configured operating system onto the storage device" | **WAIK Guide:** "Walkthrough: Build a Configuration Set" [VRTS 00943295]<br><br>*Step 5: Add a Device Driver to the Answer File*<br><br>In this step, you will add an out-of-box driver (.inf) path to your answer file.<br><br>5. In Windows SIM, on the Insert menu, select Driver Path, and click Pass 2 windowsPE.<br><br>In the following screen shot, out-of-box drivers were added to the |
| "providing a first media comprising operating system files for installing the fully configured operating system onto the storage device" [cont.] | **WAIK Guide:** "Walkthrough: Deploy an Image From a Network Share" [VRTS 00943403]<br><br>*Step 2: Capture an Image of this Installation*<br><br>In this step, you will capture an image of one master installation using ImageX and then store the custom image on the network share.<br><br>1. Boot the master computer with your bootable Windows PE media.<br><br>2. At a command prompt, capture an image of the installation. For example:<br><br>3. Copy the image to a network share. For example,<br><br>If necessary, provide network credentials for access to a network share. |
| "providing a second media comprising configuration-specific data files" | **WAIK Guide:** "Walkthrough: Build a Configuration Set" [VRTS 00943448]<br><br>*Add a Device Driver to an Offline Windows PE Image*<br><br>The following procedure shows you how to add the .inf file to add a device driver (.inf) to an offline Windows PE image. Before you can fix any Pkg.exe commands, you must first apply or mount the Windows PE image by using ImageX. Windows PE provides a base image (Winpe.wim) that you can customize. For an example of how to build custom Windows PE images, see Walkthrough: Customize Windows PE.<br><br>To add a device driver to an offline Windows PE image<br><br>1. Apply the base image (Winpe.wim) by using ImageX to a local Windows PE directory. For example:<br><br>2. Add the .inf file to the base image by using the peimg /inf command. For example:<br><br>where <path> is the location of the .inf file.<br><br>3. Repeat steps 1 and 2 for each additional device driver. When you finish customizing the image, prepare the image for deployment by using the peimg /prep command. |

| | |
|---|---|
| "initializing the data processing system from the second media to provide a temporary operating system [and] using the configuration-specific data files to configure the data processing system" | **WAIK Guide: "Walkthrough: Deploy an Image from a Network Share"** [VRTS 00943403]<br><br>**Step 3: Apply the image from the network share**<br><br>This step requires booting the new computer with Windows PE and applying the image with ImageX.<br>1. Boot the new computer with your Windows PE media.<br>2. In Windows PE, format the hard drive using Diskpart.<br>3. At a command prompt in Windows PE, map the network drive to your network share. For example, |
| "initializing the storage device comprises formatting the storage device"<br><br>"initializing the storage device comprises partitioning the storage device<br><br>"initializing the storage device further comprises formatting a partition of the storage device" | **WAIK Guide: "Walkthrough: Deploy an Image from a Network Share"** [VRTS 00943403-4]<br><br>**Step 3: Apply the image from the network share**<br><br>This step requires booting the new computer with Windows PE and applying the image with ImageX.<br>1. Boot the new computer with your Windows PE media.<br>2. In Windows PE, format the hard drive using Diskpart.<br>3. At a command prompt in Windows PE, map the network drive to your network share. For example,<br><br>**Next Step**<br><br>This completes a basic image deployment. You can automate a number of these steps. For example, you can script Windows PE to partition the hard drive automatically, connect to the network, and then apply the image.<br><br>In the following screen sheet, the storage device of the Destination Computer is initialized by partitioning the device and formatting it. |
| "loading the fully configured operating system files from the first media to the storage device using the temporary operating system" | **WAIK Guide: "Walkthrough: Deploy an Image from a Network Share"** [VRTS 00943403-4]<br><br>**Step 3: Apply the image from the network share**<br><br>This step requires booting the new computer with Windows PE and applying the image with ImageX.<br>1. Boot the new computer with your Windows PE media.<br>2. In Windows PE, format the hard drive using Diskpart.<br>3. At a command prompt in Windows PE, map the network drive to your network share. For example,<br><br><br><br>4. Apply the image from the network share by using ImageX. For example, |
| "reinitializing the data processing system from the storage device to install the fully configured operating system" | **WAIK Guide: "Walkthrough: Deploy an Image from a Network Share"** [VRTS 00943404]<br><br>**Next Step**<br><br>This completes a basic image deployment. You can automate a number of these steps. For example, you can script Windows PE to partition the hard drive automatically, connect to the network, and then apply the image. |

Nichols Infringement Report, Exh. E. As may be seen from the chart, Dr. Nichols pulls together three portions of the WAIK Guide in an effort to show infringement, namely, those at pages VRTS 00943295, –403–04 and –448.

Starting with the five phases discussed in the foregoing Introduction, one may drill down to the specific pages referenced by Veritas in order to put those pages in context. Page VRTS 00943295 is part of Phase 3, which addresses "Preinstallation Customization:"

**Phase 3: Preinstallation Customization**

This section describes how to customize a Windows installation. You begin the process by building an answer file (Unattend.xml) with Windows System Image Manager (Windows SIM). The following How-To section provides a collection of customizations that you can make by using Windows SIM. The Walkthroughs section provides scenario-based examples.

After you create an answer file, your next step is to assemble the hardware and to run Setup for the Windows Vista™ operating system with your answer file. This process is described in Phase 4: Image Deployment.

☞ Note:
You can also programmatically create and maintain answer files by using Component Platform Interface Libraries.

Important For original equipment manufacturers (OEMs), it is important that you refer to the OEM User Experience Guidelines for specific information about what settings you can customize.

**In This Section**

Building an Answer File
Customization Walkthroughs
Customization How-To Topics

**See Also**

OEM User Experience Guidelines

WAIK Guide at VRTS –285. The "Customization Walkthroughs" section describes a number of walkthroughs. Of interest is the "Walkthrough: Build a Configuration Set."

**Customization Walkthroughs**

This section contains walkthroughs, step-by-step instructions on how to build a specific solution. A *walkthrough* is a sequence of procedures that help you understand the process of building a solution. The first two walkthroughs, simple and advanced, describe the fundamental process of creating an answer file. It is recommended that you complete the first two walkthroughs because the later walkthroughs are built upon the first two walkthroughs.

**In This Section**

Walkthrough: Build a Simple Answer File
Walkthrough: Build a Configuration Set
Walkthrough: Customize Help and Support
Walkthrough: Customize Welcome Center
Walkthrough: Customize Windows Welcome
Walkthrough: Build a BitLocker-Drive Encryption Solution

**See Also**

Deployment Walkthroughs
Windows PE Walkthroughs

WAIK Guide at VRTS –287.

The "Walkthrough: Build a Configuration Set" section provides the following discussion:

**Walkthrough: Build a Configuration Set**

This walkthrough describes how to build an answer file that includes basic Windows Setup configuration, minimum Windows Welcome customizations, a device driver and an application. In this example, you will build a distribution share. A distribution share is an optional storage folder for third-party drivers, applications, and packages issued by Microsoft, such as security bulletins. Once you build your answer file, you will create a configuration set. A configuration set is a smaller version of a distribution share, which is more easily copied to removable media or a network share. A configuration set is a collection of files converted to binary form. These files are a self-contained alternative to referencing a distribution share.

**Prerequisites**

To complete this walkthrough you need the following:

* Windows System Image Manager (Windows SIM) installed on a technician computer. For more information, see Building a Technician Computer
* An authorized copy of a Windows Vista product DVD.
* A custom device driver (.inf file).
* A third-party application.
* Access to a network share or a removable media with sufficient storage space.

WAIK Guide at VRTS –292. Following that discussion, the walkthrough provides an 8–step process for "Building a Configuration Set." *See id.* at VRTS –292–97. Those steps include: (1) "Create a Distribution Share," (2) "Add Drivers and Applications to Distribution Share," (3) "Create an Answer File," (4) "Add and Configure Windows Settings," (5) "Add a Device Driver to the Answer File," (6) "Add a Third–Party Application," (7) "Validate the Answer File" and (8) "Create a Configuration Set." Page VRTS 00943295 discloses the first part of step 5 of that process, the step that Veritas references:

**Step 5: Add a Device Driver to the Answer File**

In this step, you will add an out-of-box driver (.inf) path to your answer file.

1. In Windows SIM, on the **Insert** menu, select **Driver Path**, and click **Pass 1 windowsPE**.

For context, step 5 continues on page – 296:

**Note:**
You can add drivers to the auditSystem pass which will be processed during Audit mode only. Booting to Audit mode is possible only by using Sysprep. For more information about Sysprep, see the Sysprep Technical Reference.

The **Browse for Folder** dialog box appears.

2. Select the driver path to add to the answer file, and then click OK. For example,

 C:\MyDistributionShare\Out-of Box Drivers

3. The driver path selected is added to the answer file under the configuration pass that you selected. Depending on the configuration pass that you selected, the driver path is included as a list item to one of the following components:

 * Microsoft-Windows-PnpCustomizations\WinPE for windowsPE
 * Microsoft-Windows-PnpCustomizations\NonWinPE for auditSystem

To add an .exe or .msi driver package, you must add a custom command to install the driver package. See Add a Custom Command to an Answer File.

*Id.* at VRTS –295–96.

Pages VRTS 00943403–04 are part of Phase 4, which discusses "Image Deployment."

### Phase 4: Image Deployment

This section provides instructions on how to build and deploy the Windows Vista operating system onto new computers. In Phase 3, you created an answer file that contains custom settings that are applied during Setup. Depending on your choice of deployment methods, you:

- Install Windows Vista by using a product DVD with an answer file (DVD-boot method).
- Install Windows Vista from a configuration set.
- Copy an image of a master installation from a distribution share (image-based installation method).

The walkthrough section provides specific instructions for each method listed above. For more information about the different deployment methods, see Preinstallation Methods.

**In This Section**

Building and Deploying an Image
Using Windows PE and Imagex for Deployment
Deployment Walkthroughs
Deployment How-To Tools

**See Also**

Phase 3: Preinstallation Customization
Phase 5: Image Maintenance

*Id.* at VRTS –394.

Drilling down further, the "Deployment Walkthroughs" section provides a number of walkthrough scenarios:

### Deployment Walkthroughs

There are three core deployment methods: DVD boot; configuration set; and image-based deployment. Variations of image-based deployment are described in this section. You can also combine parts of each method to form other methods.

A "walkthrough" is a sequence of procedures that help you understand the process of building a solution.

**In This Section**

Walkthrough: Deploy Windows by Booting from a DVD
Walkthrough: Deploy Windows by Using a Configuration Set
Walkthrough: Deploy an Image from a Network Share
Walkthrough: Deploy an Image by Using Windows Setup
Walkthrough: Deploy an Image by Using Windows DS
Walkthrough: Deploy an Image by using PXE

*Id.* at VRTS –398.

Specifically, pages VRTS 00943403–04 are part of the "Deploy an Image from a Network Share" Walkthrough:

## Walkthrough: Deploy an Image from a Network Share

This walkthrough demonstrates how to deploy an image from a network share by using Windows PE and ImageX technologies.

### Prerequisites

To complete this walkthrough, you need the following:

* Windows System Image Manager (Windows SIM), ImageX, and Windows PE tools installed on a technician computer. For more information, see Building a Technician Computer.
* A Windows Vista product DVD.
* A bootable Windows PE media with ImageX. For more information, see Windows PE Walkthroughs.

### Step 1: Create a master installation

1. Create a master installation by using one of the following methods:
 Walkthrough: Deploy Windows by Booting from a DVD
 Walkthrough: Deploy Windows by using a Configuration Set
2. After the installation is complete, shut down the computer.

### Step 2: Capture an image of the installation

In this step, you will capture an image of the master installation using ImageX and then store the custom image on the network share.

1. Boot the master computer with your bootable Windows PE media.
2. At a command prompt, capture an image of the installation. For example,

```
```

3. Copy the image to a network share. For example,

```
```

If necessary, provide network credentials for appropriate network access.

### Step 3: Apply the image from the network share

This step requires booting the new computer with Windows PE and applying the image with ImageX.

1. Boot the new computer with your Windows PE media.
2. In Windows PE, format the hard drive using DiskPart.
3. At a command prompt in Windows PE, map the network drive to your network share. For example,

```
```

4. Apply the image from the network share by using ImageX. For example,

```
```

### Next Step

This completes a basic image deployment. You can automate a number of these steps. For example, you can script Windows PE to partition the hard drive automatically, connect to the network, and then apply the image.

**Important:**
This method requires that you install the image to the same volume. To install an image to a different volume, see Walkthrough: Deploy an Image by using Windows Setup.

### See Also

Deployment Walkthroughs
ImageX Technical Reference

*Id.* at VRTS –403–04. As may be seen from Dr. Nichols' chart, Veritas focuses on step 3.

Finally, Veritas also points to page VRTS 00943448. That page is also part of Phase 4, which discusses "Image Deployment" as noted above. *See id.* at VRTS –394. Focusing on the "Deployment How–To Topics," that section provides:

**Deployment How–To Topics**

This section provides a set of procedures on how to deploy the Windows Vista™ operating system onto new hardware. The primary tools for deploying Windows Vista are Windows PE and ImageX. For specific deployment solutions, see Deployment Walkthroughs.

**In This Section**

Work with Windows PE
Work with ImageX and Windows Images
Create Spanned Media

**See Also**

Windows PE Technical Reference
ImageX Technical Reference

*Id.* at VRTS –415.

Drilling down further to the "Work with Windows PE" section, that section provides further sub-topics:

**Work with Windows PE**

The following topics describe the procedures that are used to create and customize Windows PE for image deployment. The Windows OEM Preinstallation Kit (Windows OPK) and Windows Automated Installation Kit (Windows AIK) provide a base Windows PE image (Winpe.wim) that you can customize by using the PEImg tool. You can boot into Windows PE from a variety of media, including DVD-ROM, a USB Flash Drive (UFD), and directly from the hard drive.

**In This Section**

Booting Windows PE
Building a Windows PE Image
Windows PE Walkthroughs
Windows PE Customization How-To Topics

*Id.* at VRTS –416.

Turning to the "Windows PE Customization How–To Topics," that section provides:

### Windows PE Customization How-To Topics

This section provides a collection of procedures on how to customize a Windows PE image. Before using any of the procedures in this section, make sure you understand how an image is built as outlined in the previous topic, Building a Windows PE Image.

**In This Section**

Add a Device Driver to an Offline Windows PE Image

Add a Device Driver to an Online Windows PE Image

Include a Custom Script in a Windows PE Image

Add an Application to a Windows PE Image

Add a Package to a Windows PE Image

Add a Language Pack to a Windows PE Image

Add an Update to a Windows PE Image

Prepare a Windows PE Image

View Current Packages in a Windows PE Image

Customizing the Windows PE Experience

**See Also**

Windows PE Walkthroughs

*Id.* at VRTS –446.

Page VRTS 00943448, which Veritas points to, introduces the "Add a Device Driver to an Offline Windows PE Image" section:

### Add a Device Driver to an Offline Windows PE Image

The following procedure demonstrates how to use the PEImg tool to add a device driver (.inf) to an offline Windows PE image. Before you can run any PEImg command, you must first apply or mount the Windows PE image by using ImageX. Windows PE provides a base image (Winpe.wim) that you can customize. For an example of how to build custom Windows PE images, see Windows PE Walkthroughs.

**To add a device driver to an offline Windows PE image**

1. Apply the base image (Winpe.wim) by using ImageX to a local Windows PE directory. For example:

 imagex /apply Winpe.wim 1 c:\windows_pe_customization

 -OR-

 imagex /mount Winpe.wim 1 c:\windows_pe_customization\

2. Add the .inf file to the base image by using the peimg /inf command. For example:

 peimg /inf=<path> c:\windows_pe_customization

 where <path> is the location of the .inf file.

3. Repeat steps 1 and 2 for each additional device driver.
 When you finish customizing the image, prepare the image for deployment by using the peimg /prep command.

After you prepare the image, you can burn the image to the designated media. First, recapture or commit the local Windows PE directory into a .wim file by using ImageX, create an .iso file by using one of the provided tools, and then burn the .iso file to the appropriate media.

**See Also**

Prepare a Windows PE Image
PEImg Command-Line Options

*Id.*

Dr. Nichols also relies on the WAIK Guide, along with three other references,[6] in his infringement claim chart regarding Vista / Server 2008 system deployment. *See* Nichols Infringement Report, Exh. F. However, Dr. Nichols relies on the WAIK Guide only for certain claims and claim elements in the Exhibit F claim chart. Also, Dr. Nichols relies on different parts of the WAIK Guide in the Exhibit F claim chart than he did for the Exhibit E claim chart above.

With respect to Exhibit F, for the claim 1 element "providing a second media comprising configuration-specific data files," Dr. Nichols relies on the WAIK Guide at VRTS 00943433–36 and –449–50. Pages VRTS 00943433–36 are part of Phase 4, under the "Windows PE Walkthroughs" discussed above at VRTS –416.

The various "Windows PE Walkthroughs" include:

**Windows PE Walkthroughs**

This section contains walkthrough topics on how to build a specific solution. A walkthrough is a sequence of procedures that help you understand the process of building a solution.

**In This Section**

Walkthrough: Create a Bootable Windows PE RAM Disk on CD-ROM
Walkthrough: Create a Bootable Windows PE RAM Disk on UFD
Walkthrough: Create a Bootable Windows PE RAM Disk on Hard Disk
Walkthrough: Boot Windows PE from Hard Disk
Walkthrough: Create a Custom Windows PE Image
Walkthrough: Build a Windows Recovery Solution

WAIK Guide at VRTS –422.

Pages VRTS 00943433–36 discuss the "Create a Custom Windows PE Image" walkthrough (Dr. Nichols focuses only on step 3):

**6.** Namely, WAIK Getting Started (discussed below), Vista Deployment Tools Overview (2007) and the deposition testimony of John MacIntyre ("former Lead Program Manager, Vista Deployment"). *See* Nichols Infringement Report, Exh. F at F–1.

| Asserted claims | vs. Windows Vista and Windows Server 2008 system deployment tools and procedures |
| --- | --- |
| | • Claims 1, 10, 13, 14, 15, 16, 17, 30, 32, 33 |
| Representative References | • Windows Vista Deployment Tools Overview ("*Vista Deployment Tools Overview (2007)*") (VRTS 01837060-086) |
| | • Getting Started with Windows Automated Installation Kit (Windows AIK) ("*WAIK Getting Started (2006)*") (VRTS 01843128-39) |
| | • Windows Automated Installation Kit (Windows AIK) User's Guide ("*WAIK User Guide (2006)*") (VRTS 00943244-718) |
| | • Excerpts from deposition transcript of John MacIntyre, former Lead Program Manager, Vista Deployment ("*J. MacIntyre Dep.*") |

## Walkthrough: Create a Custom Windows PE Image

This walkthrough describes how to create a custom Windows PE image. The primary tool for customizing Windows PE 2.0 is PEImg, a Windows PE command-line tool. After creating a custom image, you can deploy the image to a hard disk or create a bootable Windows PE RAM disk on a CD-ROM, USB Flash Drive (UFD) or hard disk.

**Note:**
Windows PE RAM disk boots directly into memory and gets assigned the drive letter X, which does not correspond to the media (UFD, CD-ROM) from which you booted. Make sure you have sufficient memory to support the size of your Windows PE image plus any additional memory requirements, for example, if you plan on running any custom applications that need additional working memory.

### Prerequisites

To complete this walkthrough, you need the following:

- A technician computer that provides all the tools and source files. For more information, see Building a Technician Computer.

### Step 1: Set up a Windows PE Build Environment

In this step, you will create a required directory structure that supports building a Windows PE image.

1. On your technician computer, click **Start**, point to **All Programs**, point to **Windows OPK** or **Windows AIK**, and then click **Windows PE Tools Command Prompt**.
 The menu shortcut opens a Command Prompt window and automatically sets environment variables to point to all the necessary tools. By default, all tools are installed at C:\Program Files\<version>\Tools, where <version> can be Windows OPK or Windows AIK.

2. At the command prompt, run the Copype.cmd script. This script requires two arguments: hardware architecture and destination location. For example,

 ```
 copype <arch> <destination>
 ```

 Where <arch> can be x86, amd64, or ia64 and <destination> is a path to the local directory. For example,

 ```
 copype x86 c:\winpe_x86
 ```

 The script creates the following directory structure and copies all the necessary files for that architecture. For example,

 ```
 \winpe_x86
 \winpe_x86\ISO
 \winpe_x86\mount
 ```

### Step 2: Mount the Base Windows PE Image

In this step, you will mount the base image to a local directory so that you can add or remove packages.

1. At the command prompt, mount the base Windows PE image (Winpe.wim) to the \mount directory by using ImageX. For example,

```
imagex /mountrw c:\winpe_x86\winpe.wim 1 c:\winpe_x86\mount
```

## Step 3: Add Additional Packages

By using the Peimg tool, you will install Windows features by using the /install option. Windows features are included with the base image (Winpe.wim) but are not installed. You can also import packages and add drivers and language packs. For more information, see Windows PE Customization How-To Topics.

1. Add a Windows feature to the base image by using the peimg /install command. For example,

```
peimg /install=<pkg> c:\winpe_x86\mount\Windows
```

where <pkg> denotes the package name. A list of available packages and their names can be obtained by using the /list command. Wildcards can be used when specifying a package name. Any packages with matching names will be installed. For example,

```
peimg /install=WinPE-HTA-Package c:\winpe_x86\mount\Windows
```

-OR-

```
peimg /install=*HTA* c:\winpe_x86\mount\Windows
```

Where wildcards denote any package with HTA in the package name.
Windows PE 2.0 provides the following Windows features referred to as packages:

| Package Name | Description |
|---|---|
| WinPE-HTA-Package | HTML application support |
| WinPE-MDAC-Package | Microsoft Data Access Component support |
| WinPE-Scripting-Package | Windows Script Host support |
| WinPE-SRT-Package | Windows Recovery Environment components |
| WinPE-XML-Package | Microsoft XML (MSXML) parser support |

2. Repeat step 1 for each package.
3. Verify that the packages were installed by using the peimg /list command to view all packages in the current image. For example,

```
peimg /list c:\winpe_x86\mount\Windows
```

In the INS column, (+) denotes installed packages and (-) denotes not installed.

## Step 4: Add Additional Customizations (Optional)

This step is optional but recommended. You can add applications and scripts to your Windows PE image that you might need while working in Windows PE. The following is a list of common tools to include in your Windows PE image:

- **ImageX**
 A command-line tool for capturing and applying images during deployment scenarios. For example, at a command prompt,

 ```
 copy "c:\program files\ ... "
 ```

- **Package Manager (Pkgmgr.exe)**
 A tool for servicing Windows image (.wim) files offline. You must copy the entire \Servicing folder. Offline servicing requires ImageX. For example,

 ```
 xcopy "c:\program files\ ... "
 ```

Where <version> can be Windows OPK or Windows AIK and <architecture> can be x86, amd64, or ia64. In both previous examples, the tools are not loaded into memory during a Windows PE RAM boot. The media must be available to access the tools.

To load the tools into memory along with Windows PE, copy the source files into the mounted \Windows directory. For example,

```
xcopy ... \Windows\ ...
```

⊕**Important:**
Adding files to the \Windows directory will increase the size of your Windows PE RAM image. Make sure your computer has sufficient memory to boot Windows PE and run various applications.

### Step 5: Prepare the Image

In this step, you will prepare the image by using the peimg /prep command. This operation removes any non-installed packages from the final image. This operation reduces the overall image size. For example,

```
peimg /prep c:\buildtemp\ ... \Windows
```

The /prep option cannot be reverted, and after the /prep option is run, the /install, /uninstall, /import, and /list options will not function, while the /lang and /inf options will continue to function. The Peimg tool prompts you to confirm the command. To suppress this prompt for scripting, add the /f option.

### Step 6: Commit Changes to the Image

In this step, you commit the changes to the original image file (Vhnpe.wim) by using the ImageX /unmount option with the /commit option. For example,

```
imagex /unmount /commit c:\buildtemp\mount
```

### Step 7: Replace the Default Boot.wim File

In this step, you replace the default Boot.wim in the \ISO directory with your new custom image. The image must be called Boot.wim. For example,

**Next Step**

You now have a custom Windows PE RAM disk image that you can place on bootable media, like a CD-ROM or UFD.

**To create a Bootable CD-ROM**

1. On your technician computer, at a command prompt, create an .iso file by using Oscdimg. For example,

 For x64 architecture, replace etfsboot.com with efisys.bin.

2. Burn the image (Winpe_x86.iso) to a CD-ROM.

**To create a bootable UFD**

1. During a running Windows Vista operation system or Windows PE session, insert your UFD device.

2. At a command prompt, use Diskpart to format the device as FAT32 spanning the entire device, setting the partition to active. For example,

 Where the value of disk 1 is equal to UFD.

3. On your technician computer, copy all the content in the ISO directory to your UFD device. You can manually create the directory structure or use the xcopy command to automatically build and copy the appropriate files from your technician computer to your UFD device. For example,

 Where c: is your technician computer hard disk and f: is your UFD device.

You can further customize your Windows PE image by adding language packs, custom scripts, and drivers. For more information, see Windows PE Customization How-To Topics.

**See Also**

Building a Windows PE Image
Booting Windows PE

---

Dr. Nichols relies on the other references with respect to the rest of claim 1.

Dr. Nichols also relies on the WAIK Guide for the following:

| Claim | WAIK Guide pages (VRTS 000943—) |
|---|---|
| Claim 10 | Pages –271 and –578 |
| Claims 13–16 | For all four claims, pages – 497, –525 and –590 |
| Claim 17 | Pages –428 and –431 |
| Claim 30: "configuring a disk drive of a second data processing system with the desired configuration for the first data processing system" | Page –496 |
| Claim 30: "copying configuration-specific data files from the disk drive of the second data processing system to a second media" | Pages –433–36 (discussed above in connection with claim 1) |
| Claim 32 | Page –408 |
| Claim 33: "initializing the data processing system from a second media, having configuration-specific data files, to provide a temporary operating system using the configuration-specific data files to configure the data processing system" | Pages –433–36 (discussed above in connection with claim 1) |

See Nichols Infringement Report, Exh. F.

Once again, there is no dispute that the WAIK Guide discloses a number of different deployment scenarios or walkthroughs that a customer may utilize without infringing the asserted claims, which makes actual infringing use too speculative to circumstantially raise a genuine issue of material fact of direct infringement by Microsoft's customers.

Also, Dr. Nichols cobbles together parts of various walkthroughs to show that the

WAIK Guide teaches the claimed methods. However, those parts are not disclosed together, and in the claimed order, so as to teach the claimed method steps in the order required by the claims. Dr. Nichols' approach indicates that the accused products are capable of performing the claimed methods—and that is not in dispute—but nothing in the WAIK Guide indicates that Microsoft's customers have actually used the accused products in the manner that Dr. Nichols suggests. The manner in which the WAIK Guide discloses the claimed method suggests to the contrary, and Dr. Nichols does not explain whether the WAIK Guide itself would lead a user to use the accused products as Dr. Nichols suggests. Thus, Veritas' *ad hoc* reliance on the WAIK Guide to show that a user actually performed the claimed method is too speculative to raise a genuine issue of material fact in that regard. *See E–Pass* *Technologies,* 473 F.3d at 1222 ("[T]he evidence here shows, at best, that the Palm defendants taught their customers each step of the claimed method in isolation. Nowhere do the manual excerpts teach all of the steps of the claimed method together, much less in the required order. Accordingly, it requires too speculative a leap to conclude that any customer actually performed the claimed method.").

### (2) WAIK Getting Started

The same may be said with respect to the WAIK Getting Started (*see* Schallop Decl., Exh. H: VRTS 01843128–39) reference. Veritas argues that the reference "instructs user[s] to employ the same deployment method" as the WAIK Guide. Veritas' Response at 9. The WAIK Getting Started reference comprises 12 pages, and begins as follows:

# Getting Started with the
# Windows Automated Installation Kit
# (Windows AIK)

**Last Updated: May 2006**

**Applies to: IT Professionals**

Abstract: This document covers a basic end-to-end deployment scenario. This document demonstrates how to create, capture, and deploy an installation in a network environment.

This information applies to the following operating systems:
 Windows Vista™

### Disclaimer

This document supports a preliminary release of a software product that may be changed substantially prior to final commercial release, and is the confidential and proprietary information of Microsoft Corporation. It is disclosed pursuant to a non-disclosure agreement between the recipient and Microsoft. This document is provided for informational purposes only and Microsoft makes no warranties, either express or implied, in this document. Information in this document,

including URL and other Internet Web site references, is subject to change without notice. The entire risk of the use or the results from the use of this document remains with the user. Unless otherwise noted, the companies, organizations, products, domain names, e-mail addresses, logos, people, places, and events depicted in examples herein are fictitious. No association with any real company, organization, product, domain name, e-mail address, logo, person, place, or event is intended or should be inferred. Complying with all applicable copyright laws is the responsibility of the user. Without limiting the rights under copyright, no part of this document may be reproduced, stored in or introduced into a retrieval system, or transmitted in any form or by any means (electronic, mechanical, photocopying, recording, or otherwise), or for any purpose, without the express written permission of Microsoft Corporation.

Microsoft may have patents, patent applications, trademarks, copyrights, or other intellectual property rights covering subject matter in this document. Except as expressly provided in any written agreement with Microsoft, the furnishing of this document does not give you any license to these patents, trademarks, copyrights, or other intellectual property.

© 2006 Microsoft Corporation. All rights reserved.

Microsoft, MS-DOS, Windows, Windows Server, and Windows Vista are either registered trademarks or trademarks of Microsoft Corporation in the United States and/or other countries.

All other trademarks are property of their respective owners.

## Contents

Introduction...........................................................................................................1
 Deployment Scenario .......................................................................................1
 Requirements.....................................................................................................1
Build a Lab Environment...........................................................................................2
Build an Answer File.................................................................................................2
Build a Master Installation........................................................................................5
Create an Image.......................................................................................................6
Deploy an Image......................................................................................................8
Summary..................................................................................................................9

## Introduction

The Windows Automation Installation Kit (Windows AIK) is designed to help corporate IT professionals deploy Windows Vista onto new hardware.

This document covers a basic end-to-end deployment scenario, specifically how to create, capture, and deploy an installation in a network environment. This document demonstrates one example of a deployment. For a comprehensive description of all the tools and deployment methods, see the *Windows Automated Installation Kit User's Guide* (Waik.chm).

### Deployment Scenario

In this example, you will implement basic image-based deployment, illustrated below.

This process includes:

1. Building a lab environment.
2. Creating an answer file by using Windows System Image Manager (Windows SIM).
3. Building a master installation by using the product DVD and your answer file.
4. Creating an image of the master installation by using the Windows Presinstallation Environment (Windows PE) and ImageX technologies.
5. Deploying the image from a network share onto a destination computer using Windows PE and ImageX technologies.

At the end of this example, you will have a working lab environment that includes a technician computer, a valid answer file, a bootable Windows PE CD, and your first custom Windows image. You will have a basic understanding of how to use the Windows AIK tools to deploy a new installation. You can go back and modify your answer file to include additional customizations. You can also automate parts of the process by scripting some of the manual steps in this example.

For more information on the tools and different deployment techniques, see the *Windows Automated Installation Kit User's Guide* (Waik.chm)

WAIK Getting Started at VRTS 01843128–30.

The WAIK Getting Started reference provides the following list of requirements:

## Requirements

To complete this scenario, you need the following:

- Window Vista product DVD.
- Windows AIK Download.
- A technician computer.
- A master computer.
- Network connectivity to simulate deployment.
- Floppy disk or Universal Flash Device (UFD), such as a USB memory key.
- One blank CD-R/RW disc.

The *technician computer* is the computer in your lab on which you install the Windows AIK. The technician computer can be any computer running Windows XP, Windows Server 2003, or Windows Vista. This computer requires a DVD-ROM drive and CD-R/RW-capable drive, or a combo drive that supports both.

A *master computer*, sometimes called a reference computer, is a fully assembled computer on which you install a customized installation using the Windows product DVD and your custom answer file. Once installed, you capture and store an image of the installation on a network share. There are no software requirements for this computer. Both technician and master computers require a network card and working network environment.

Note For the purposes of this example, the master computer will serve as your master and destination computer. The master/destination computer represents the computer you are about to deploy. After you build a master installation, you will capture and store an image of that installation on a network share. You will then reformat the hard drive, returning it to a blank state. The computer now becomes your destination computer. You will then deploy the image from the network share back onto the same computer. This process simulates an image-based deployment.

*Id.* at VRTS –131.

Dr. Nichols relies on the WAIK Getting Started reference, along with other references and witness testimony,[7] in his infringement claim chart regarding Vista / Server 2008 system deployment. *See* Nichols Infringement Report, Exh. F at F–1. According to Dr. Nichols, "[t]his exemplary claim chart describes the deployment of Windows Vista as taught by Microsoft in the Microsoft's [WAIK Guide] (as part of the Windows Automated Instal-lation Kit). The same teachings are in Microsoft's [OPK Guide] (as part of the OEM Preinstallation Kit). Upon information and belief, Microsoft recommends the use of the same infringing components, particularly WinPE 2.0, in the same manner in the deployment of Windows Server 2008." *Id.* Exh. F at F–1 n. 2.

In connection with claim 1, for example, Dr. Nichols uses WAIK Getting Started as follows:

| Claim | Claim Language | Windows Vista and Windows Server 2008 System Deployment Tools and Procedures |
|---|---|---|
| Claim 1 [a] | A method for loading a fully configured operating system onto a storage device of a data processing system, comprising the steps of: | Microsoft teaches the use of the following infringing components in their system deployment tools and procedures for Windows Vista and Windows Server 2008, including, but not limited to: <br> • Windows Preinstallation Environment (WinPE), version 2.0 <br> • ImageX <br> • Windows Imaging (WIM) image file format <br> • Windows System Image Manager (SIM) <br> • Sysprep (System Preparation) <br><br> Microsoft recommends the use of these components in an infringing manner in several tools or packages, including, but not limited to: <br> • Windows Automated Installation Kit (WAIK) <br> • OEM Preinstallation Kit (OPK) <br> • Business Desktop Deployment (BDD) Solution <br><br> For example, WAIK for Windows Vista[2] provides a method for loading a fully configured operating system onto a storage device, i.e., a device for storing software and other digital data, of a data processing system. |
| | | "The Windows Automation Installation Kit (Windows AIK) is designed to help corporate IT professionals deploy Windows Vista onto new hardware. <br><br> This document covers a basic end-to-end deployment scenario, specifically how to create, capture, and deploy an installation in a network environment. This document demonstrates one example of a deployment. For a comprehensive description of all the tools and deployment methods, see the *Windows Automated Installation Kit User's Guide* (WAIK.chm)." <br> [*WAIK Getting Started (2006)*, p. 1 (VRTS 01843129)] <br><br> Microsoft teaches deployment technicians to use WAIK to customize Windows to provide a fully configured operating system. This customized version of Windows is "tailored" for the particular system on which it was pre-installed. <br><br> "This process includes: <br> 1. Building a lab environment. <br> 2. Creating an answer file by using Windows System Image Manager (Windows SIM). <br> 3. Building a master installation by using the product DVD and your answer file. <br> 4. Creating an image of the master installation by using the Windows Preinstallation Environment (Windows PE) and ImageX technologies. <br> 5. Deploying the image from a network share onto a destination computer by using Windows PE and ImageX technologies." <br> [*WAIK Getting Started (2006)*, p. 2 (VRTS 01843130)] |

---

7. *See* note 6 *supra.*

| [b] | providing a first media comprising operating system files for installing the fully configured operating system onto the | The WAIK deployment tools and procedures provide a first media, i.e., a data storage material, to store operating system files for installing the fully configured operating system. The fully configured operating system is "tailored" for the particular system on which it was pre-installed.<br><br>**"Build a Master Installation** |
| | storage device; | A master computer is a customized installation of Windows that you plan to duplicate onto one or more destination computers. By using the Windows product DVD and an answer file, you can create a master installation.<br><br>The basic process includes:<br>1. Assembling new hardware.<br>2. Installing Windows from a Windows product DVD and answer file.<br>3. Verifying installation and customizations.<br>4. Shutting down the computer when the installation is complete.<br><br>**To install Windows from the Windows product DVD**<br>1. Turn on the new computer.<br>2. Insert removable media containing the answer file (Autounattend.xml) and Windows Vista product DVD into the new computer.<br>3. Restart the computer (CTRL+ALT+DEL). This example assumes the hard drive is blank. Windows Vista Setup (Setup.exe) will begin automatically. By default, Windows Setup will search all removable media for an answer file called Autounattend.xml.<br>4. After Setup finishes, validate that all customizations were applied.<br>5. Reseal (generalize) and shut down the computer. From a command prompt, type:<br>c:\windows\system32\sysprep\sysprep.exe /oobe /generalize /shutdown.<br><br>Sysprep will prepare the image for capture by cleaning up various user and machine settings and log files. The master installation is complete and ready to be imaged."<br>[WAIK Getting Started (2006), pp. 7-8 (VRTS 01843135-36)]<br><br>**"Create an Image**<br>After you build a master installation, you can deliver the new computer to a customer, and then repeat the previous steps for each new computer. However, it is more efficient to capture an image of the master installation and then deploy that image onto other new computers. The primary tools for completing this process are ImageX and Windows PE. ImageX is a command-line tool that enables you to capture, modify, and apply file-based disk images. Windows PE provides an environment from which you can capture and deploy an image.<br><br>The basic process includes:<br>1. Creating a bootable Windows PE media. |
| | | 2. Booting the master installation by using Windows PE media.<br>3. Capturing an image of the installation by using ImageX.<br>4. Storing the image on a network share."<br>[WAIK Getting Started (2006), p. 8 (VRTS 01843136)] |

| [c] | providing a second media comprising configuration-specific data files; | The WAIK deployment tools and procedures provide Windows PE as a second media, i.e., data storage material from which the data processing system may be started (booted). Windows PE on the second media contains configuration-specific data files, such as drivers, which can be used to configure the data processing system in a specific manner and collectively provide necessary information for loading data form the first media to the storage device (or disk drive) of that system.<br><br>**"To create bootable Windows PE media**<br>In this step, you will create a bootable Windows PE RAM CD. You will use this CD to capture an image of your master computer and later deploy that image onto your destination computer."<br>[WAIK Getting Started (2006), p. 8 (VRTS 01843136)] |

| [d] | initializing the data processing system from the second media to provide a temporary operating system and using the configuration-specific data files to configure the data processing system; | The WAIK deployment tools and procedures involve starting the operating operation of the data processing system, i.e., the "destination computer," from the second media, and adjusting the starting configuration of the data processing system, i.e., the "destination computer" using the configuration-specific data files (e.g., device drivers) to set up a temporary operating system, i.e., Windows PE, for use.<br><br>"Deploy an Image<br>After you have an image of your master installation, you can deploy the image onto new hardware by using ImageX and Windows PE.<br><br>The basic process includes:<br>1. Assembling new hardware.<br>2. Booting new hardware by using Windows PE media. |
|---|---|---|

3. Formatting the hard drive.
4. Connecting to your network share and copying the custom image down to your local hard drive.
5. Applying the image by using ImageX.

**To deploy a custom image from a network share**

In this step, you will use DiskPart to format the hard drive, and then copy an image down from the network share. For this example, use your master computer as your destination computer.

1. On your destination computer, insert your Windows PE media and restart the computer. Windows PE will start and launch a command-prompt window.

2. Format the hard drive to reflect the required disk configuration requirements by using DiskPart. For example, from a command prompt, type:

```
diskpart
select disk 0
clean
create partition primary size=20000
select partition I
active
format
exit
```

3. Copy the image from the network share to your local hard drive. For example, from the command prompt, type:

```
net use y: \\network_share\images
copy y:\myimage.wim c:
```

If necessary, provide network credentials for appropriate access.
4. Apply the image to the hard drive using ImageX located on your Windows PE media. For example, from the command-prompt window, type:

```
d:\tools\imagex.exe /apply c:\myimage.wim 1 c:
```

Your custom image is now deployed onto your destination computer. The computer is ready for customer delivery. You can repeat the previous steps for each additional machine you want to ship."
[*WAIK Getting Started (2006)*, pp. 11-12 (VRTS 01843138-39)]

| [e] | loading the fully configured operating system files from the first media to the storage device using the temporary operating system; and | The WAIK deployment tools and procedures involve loading the fully configured operating system files from the first media to the storage device (of the "destination computer") using the temporary operating system, i.e., Windows PE.<br><br>"Deploy as Image<br>After you have an image of your master installation, you can deploy the image onto new hardware by using ImageX and Windows PE.<br><br>The basic process includes:<br>1. Assembling new hardware.<br>2. Booting new hardware by using Windows PE media.<br>3. Formatting the hard drive.<br>4. Connecting to your network share and copying the custom image down to your local hard drive.<br>5. Applying the image by using ImageX.<br><br>To deploy a custom image from a network share<br><br>In this step, you will use DiskPart to format the hard drive, and then copy an image down from the network share. For this example, use your master computer as your destination computer. |
| | | 1. On your destination computer, insert your Windows PE media and restart the computer. Windows PE will start and launch a command-prompt window.<br><br>2. Format the hard drive to reflect the required disk configuration requirements by using DiskPart. For example, from a command prompt, type:<br><br>`diskpart`<br>`select disk 0`<br>`clean`<br>`create partition primary size=20000`<br>`select partition 1`<br>`active`<br>`format`<br>`exit`<br><br>3. Copy the image from the network share to your local hard drive. For example, from the command prompt, type:<br><br>`net use y: \\network_share\images`<br>`copy y:\myimage.wim c:`<br><br>If necessary, provide network credentials for appropriate access.<br>4. Apply the image to the hard drive using ImageX located on your Windows PE media. For example, from the command-prompt window, type:<br><br>`d:\tools\imagex.exe /apply c:\myimage.wim 1 c:`<br><br>Your custom image is now deployed onto your destination computer. The computer is ready for customer delivery. You can repeat the previous steps for each additional machine you want to ship." [WAIK Getting Started (2006), pp. 11-12 (VRTS 01843138-39)] |
| [f] | reinitializing the data processing system from the storage device to install the fully configured operating system. | The WAIK deployment tools and procedures involve restarting the operation of the data processing system, i.e., the destination computer, from the storage device to set up a fully configured operating system for use. |

Nichols Infringement Report, Exh. F at F–1—F–15.

As with the WAIK Guide, however, Dr. Nichols selectively relies on various method steps disclosed in the WAIK Getting Started reference, and relies on the other three references where the WAIK Getting Started reference lacks disclosure. Thus, although the WAIK Getting Started reference is substantially shorter than the WAIK Guide, Dr. Nichols' selective use of the WAIK Getting Started reference in conjunction with other references and testimony to show that a user actually performed the claimed method is likewise too speculative to raise a genuine issue of material fact in that regard. *See E–Pass Technologies,* 473 F.3d at 1222.

Furthermore, the front page of the WAIK Getting Started reference contains a disclaimer that indicates that the reference had limited release, if at all, and would not have been generally available to Microsoft customers:

**Disclaimer**
This document supports a preliminary release of a software product that may be changed substantially prior to final commercial release, and is the confidential and proprietary information of Microsoft Corporation. It is disclosed pursuant to a non-disclosure agreement between the recipient and Microsoft. This document is provided for informational purposes only and Microsoft makes no warranties, either express or implied, in this document. Information in this document.

**Disclaimer**

This document supports a preliminary release of a software product that may be changed substantially prior to final commercial release, and is the confidential and proprietary information of Microsoft Corporation. It is disclosed pursuant to a non-disclosure agreement between the recipient and Microsoft. This document is provided for informational purposes only and Microsoft makes no warranties, either express or implied, in this document. Information in this document.

That is, the WAIK Getting Started reference pertains to a version of WAIK for a product (Windows Vista) that had not yet been commercially released. Viewing the WAIK Getting Started reference in a light most favorable to Veritas, no reasonable juror could conclude from WAIK Getting Started that a Microsoft customer actually used the accused software to perform a claimed method.

### (3) OPK Guide

As for the OPK Guide (*see* Schallop Decl., Exh. HH: VRTS 01828315–571), Veritas contends that the OPK Guide "instructs users to perform the same infringing method for installation of the XP and Server 2003 operating systems." Veritas' Response at 9. The OPK Guide appears to be an electronic hyperlinked manual that corresponds to approximately 257 pages when printed out, at least as provided by Veritas. The OPK Guide provides the following introduction:

## Introduction

Original equipment manufacturers (OEMs) who build new computers from individual hardware components can use the tools in this kit to preinstall and configure the following versions of Windows XP and members of the Windows Server 2003 family:

* Windows XP Home Edition with Service Pack 2 (SP2)
* Windows XP Professional with Service Pack 2 (SP2)
* Windows Server 2003, Standard Edition, with Service Pack 1 (SP1)
* Windows Server 2003, Enterprise Edition, with Service Pack 1 (SP1)

* Windows Server 2003, Datacenter Edition, with Service Pack 1 (SP1)
* Windows Server 2003, Web Edition, with Service Pack 1 (SP1)
* Windows Server 2003, Standard Edition, for 64-bit extended systems (available in English and Japanese)
* Windows Server 2003, Enterprise Edition, for 64-bit extended systems (available in English and Japanese)
* Windows Server 2003, Datacenter Edition, for 64-bit extended systems (available in English and Japanese)
* Windows XP 64-Bit Edition Version 2003 for 64-bit extended systems (available in English and Japanese)
* Windows XP 64-Bit Edition Version 2003 for Itanium-based systems (available in English and Japanese)

The availability of specific Windows operating systems depends on the language and the type of OEM license agreement.

### OEM Preinstallation Kit Goals

The goals of this guide are to

* Ensure a consistent user experience of the core functionality of the Windows operating system.
* Enable you to brand and customize any Windows product.
* Enable you to preinstall applications and device drivers that are not part of the operating system.
* Reduce illegal software piracy.
* Provide flexible methodology and tools to help optimize your manufacturing process, whether you build 10 or 10,000 computers per month.

### Preinstallation Requirements

It is important that you read this guide to ensure that you understand how to use the tools, and to ensure that you are aware of the preinstallation requirements that apply to your license agreement.

As a manufacturer who distributes Windows with new computers, you are required to preinstall the OEM-specific version of the Windows operating system. Do not preinstall a retail version of Windows XP or the Windows Server 2003 family. You must also run Sysprep.exe, one of the OPK tools, to enable Windows Welcome or Mini-Setup, which prompts the end user to read the Microsoft End-User License Agreement (EULA) and configure the computer.

For a complete summary of requirements, see the topics in the Preinstallation Requirements and Customization Guidelines section. The remainder of the Windows OPK User's Guide explains how to use the OPK tools and customize Windows to fulfill the specific needs of your customers.

The Windows Preinstallation Reference (Ref.chm) documents the syntax of the various answer files that you use when preinstalling Windows. The set of permitted OEM customizations corresponds to only a subset of the answer file entries documented in the Windows Preinstallation Reference.

---

OPK Guide at VRTS 316–17 (pp. 2–3 [8]).

Dr. Nichols' Exhibit G infringement chart relies in part on the OPK Guide. *See* Nichols Infringement Report, Exh. G at G–1.[9] That chart is reproduced below for claim 1 to the extent that it references the OPK Guide:

**8.** The upper right hand corner of the OPK Guide printout provides the page numbering used by Veritas.

**9.** *See* Nichols Infringement Report, Exh. G at G–1:

EXHIBIT G—CLAIM CHART VS. XP / SERVER 2003 SYSTEM DEPLOYMENT

| Asserted claims vs. | vs. Windows XP and Windows Server 2003 system deployment tools and procedures ■ claims 1, 10, 13, 14, 15, 16, 17, 30, 32 & 33 |
|---|---|
| Representative References | ■ OEM Preinstailation Kit (OPK) User's Guide for Windows XP Service Pack 2 (2005) ("OPK User Guide (2005)") (VRTS 01828315–571) |
| | ■ Business Desktop Deployment 2.5 Solution Accelerater Enterprise Edition, Computer Imaging System Feature Team Guide (2005) ("BDD Imaging Guide (2005)") (VRTS 01828202–98) |
| | ■ Windows Preinstallation Environment User's Guide (2004) ("WinPE User Guide (2004)") (VRTS 01828577–707) |

| Claim | Claim Language | Windows XP and Windows Server 2003 System Deployment Tools and Procedures |
|---|---|---|
| Claim 1 [a] | A method for loading a fully configured operating system onto a storage device of a data processing system, comprising the steps of: | Microsoft teaches the use of the following infringing components in their system deployment tools and procedures for Windows XP and Windows Server 2003.<br><br>• Windows Preinstallation Environment (WinPE), versions 1.x, 2004 and 2005<br>• Systems Management Server 2003 Operating System Deployment Feature Pack (SMS 2003 OSD FP)<br>• WIM file format<br>• Sysprep (System Preparation)<br>• Setup Manager<br><br>Microsoft recommends the use of these components in an infringing manner in several "tools" or scenarios, including, but not limited to:<br>• OEM Preinstallation Kit (OPK)<br>• Business Desktop Deployment Solution<br><br>For example, the OEM Preinstallation Kit (OPK) for Windows XP and Windows Server 2003[1] provides a method for loading a fully configured operating system onto a storage device, i.e., a device for storing software and other digital data, of a data processing system. The OPK "helps you preinstall, customize, and deploy" the follow versions of Windows: |
| | | • Windows XP Home Edition SP2<br>• Windows XP Professional SP2<br>• Windows Server 2003 Standard Edition SP1<br>• Windows Server 2003 Enterprise Edition SP1<br>• Windows Server 2003 Datacenter Edition SP1<br>• Windows Server 2003 Web Edition SP1<br>• Windows XP 64-Bit Edition Version 2003 for 64-Bit extended systems<br>• Windows XP 64-Bit Edition Version 2003 for Itanium-based systems.<br>[OPK User Guide (2005), p. 1 {VRTS 01828315}]<br><br>Microsoft teaches using OPK to customize Windows to provide a fully configured operating system. This customized version of Windows is "tailored" for the particular system on which it was pre-installed.<br><br>"You may customize Windows only as described by these specifications." [OPK User Guide (2005), p. 7 {VRTS 01828321}]<br><br>"In the classic build-to-plan method, you use imaging to quickly duplicate multiple computers with an identical configuration, without any additional configuration of the destination computers." [OPK User Guide (2005), p. 34 {VRTS 01828348}]<br><br>"Build-to-Order: Deploy an image of the master installation to the destination computers, which are started in Factory mode and customized to order" [OPK User Guide (2005), p. 34 {VRTS 01828348}]<br><br>"If you build only a small number of computers and it is not cost-effective for you to build and manage images of the operating system, the Network Setup method can be used to preinstall and still enable customizations to the destination computers." [OPK User Guide (2005), p. 35 {VRTS 01828349}] |

| [b] | providing a first media comprising operating system files for installing the fully configured operating system onto the storage device; | The OPK deployment tools and procedures provide a first media, i.e., a data storage material, to store operating system files for installing the fully configured operating system on "destination computers." The fully configured operating system is "tailored" for the particular system on which it was pre-installed.<br><br>"Store an image of this installation on a network share. This image can be either a copy of the complete set of files in the installation (a file-based image) or a single image file created by a third-party imaging tool."<br>[*OPK User Guide (2005)*, p. 34 (VRTS 01828348)] |
|---|---|---|
| | | "**master computer**<br>A fully-assembled computer containing a master installation."<br>[*OPK User Guide (2005)*, p. 33 (VRTS 01828347)]<br><br>"**master installation**<br>A customized installation of Windows that an OEM plans to duplicate onto one or more destination computers."<br>[*OPK User Guide (2005)*, p. 33 (VRTS 01828347)]<br><br>"Use a third-party tool to make an image of this master installation, and store this image in a network location." [*OPK User Guide (2005)*, p. 35 (VRTS 01828349)]<br><br>"Use Setup Manager to create a configuration set on a distribution share."<br>[*OPK User Guide (2005)*, p. 36 (VRTS 01828350)] |
| [c] | providing a second media comprising configuration-specific data files; | The OPK deployment tools and procedures provide Windows PE on a second media, i.e., data storage material from which the data processing system may be initialized. For example, the *WinPE User Guide (2004)* teaches that WinPE can contain configuration-specific data files, such as drivers, which can be used to configure the data processing system in a specific manner and collectively provide necessary information for loading data form the first media to the storage device (or disk drive) of that system.<br><br>"For more information on building a version of Windows PE customized to meet your manufacturing needs, see Creating a Customized Version of Windows PE." [*OPK User Guide (2005)*, p. 61 (VRTS 01828375)] |
| [d] | initializing the data processing system from the second media to provide a temporary operating system and using the configuration-specific data files to configure the data processing system; | The OPK deployment tools and procedures involve starting the operation of the data processing system, i.e., the "destination computer," from the second media, and adjusting the starting configuration of the data processing system, i.e., the "destination computer" using the configuration-specific data files, e.g., Winpeoem.sif, driver files, etc., to set up a temporary operating system, i.e., Windows PE, for use.<br><br>"**Build-to-Plan**<br>In the classic build-to-plan method, you use imaging to quickly duplicate multiple computers with an identical configuration, without any additional configuration of the destination computers.<br><br>The broad outline of this method is:<br>1. Build a master installation with as many customizations as desired, where these customizations apply across an entire product line or all the computers that you manufacture. Thoroughly test this installation.<br>2. Run sysprep -reseal (or click the Reseal button) to shut down the computer.<br>3. Store an image of this installation on a network share. This image can be either a copy of the complete set of files in the installation (a file-based image) or a single image file created by a third-party imaging tool.<br>4. Assemble the hardware for the destination computer.<br>5. *Start the destination computer with the Windows Preinstallation Environment (Windows PE).*<br>6. Connect to the network and copy the image of the master installation onto the destination computer."<br>[*OPK User Guide (2005)*, pp. 34-35 (VRTS 01828348-9) (*emphasis added*)]<br><br>"**Build-to-Order**<br>This method gives you the most flexibility in your manufacturing environment and enables you to meet the targeted needs of a specific order or a specific customer. However, fully implementing an automated version of this method does require more preparation time. |

When adjusted for your specific manufacturing environment, this method significantly decreases the time required to manufacture each computer. For example, if you give your customers a choice from a standardized range of applications, you can stage many or all of these applications in the master installation. In Factory mode (sysprep -factory), complete the installation of the desired applications, and delete the rest. This method is faster than installing each required application in the factory.

Each time you build a computer using this method, you start from a known, tested master installation. When the components change within your manufacturing environment, you need to test only those modifications on top of the known master installation, significantly reducing the testing time required for building and testing a completely new master installation.

The broad outline of this method is:
1. Build a master installation with as many customizations as desired, where these customizations apply across an entire product line or across all of the computers you manufacture. Thoroughly test this installation.
2. Run sysprep -factory to shut down the operating system, so that the next time the operating system starts, it will be in Factory mode.
3. Use a third-party tool to make an image of this master installation, and store this image in a network location.
4. Assemble the hardware for the destination computer.
5. *Start the destination computer using Windows PE.*
6. *Configure the hard disk of the destination computer and duplicate the image of the master installation onto the hard disk.*
7. Start the destination computer with the preinstalled operating system. Because of the way you configured the master installation, the destination computer runs in Factory mode.
8. In Factory mode, use Winbom.ini to automate the installation of additional Plug and Play drivers, additional applications, hot fixes, or other customizations, and test both the hardware and the customized operating system.
9. Run sysprep -reseal (or click the Reseal button in the Sysprep dialog box) to shut down the destination computer."
[OPK User Guide (2005), p. 35 (VRTS 01828349 (*emphasis added*)]

"Network Setup
If you build only a small number of computers and it is not cost-effective for you to build and manage images of the operating system, the Network Setup method can be used to preinstall and still enable customizations to the destination computers. In this case, the master computer is the destination computer.

This method is flexible and comparatively easy to maintain. It requires less time to set up any required infrastructure, but more time to build each computer.

The broad outline of this method is:
1. Use Setup Manager to create a configuration set on a distribution share.
2. Assemble the hardware for the destination computer.
3. *Start the destination computer using Windows PE.*
4. Connect to the network and preinstall the operating system from the configuration set.
5. If you want to test or customize the operating system, run sysprep -factory. Make your customizations in Factory mode.
6. Run sysprep -reseal (or click the Reseal button) to shut down the computer."
[OPK User Guide (2005), pp. 35-36 (VRTS 01828349-50) (*emphasis added*)]

"How can I still keep things as simple as possible and produce more basic systems in less time?

By building and reusing a configuration set.
1. Acquire a multi-pack of Windows from an authorized distributor.
2. Install the OPK Tools on the computer that you use as a server within your manufacturing environment.
3. Run Setup Manager and build a configuration set on this server.
4. Assemble the hardware for the new computer.
5. *Insert the Windows OPK CD into the new computer, start using the Windows Preinstallation Environment (Windows PE), and connect to your network.*
6. *At a command prompt, run factory -winpe with the floppy disk containing the Winbom.ini from the configuration set that you built.*
7. After Windows PE restarts and the installation finishes, the computer automatically starts into Factory Mode.
8. In Factory mode, test the computer to make sure all hardware peripherals work as expected.
9. Shut down using the buttons on the Sysprep tool."
[OPK User Guide (2005), p. 37 (VRTS 01828351) (*emphasis added*)]

"Setup Manager
A utility for creating and modifying answer files and configuration sets."

| | | [OPK User Guide (2005), p 246 {VRTS 01828560)]<br><br>"**answer file**<br> A text file that scripts the answers for a series of graphical user interface (GUI) dialog boxes. The answer file for Setup is commonly called Unattend.txt, but for a network preinstallation, you can name the file anything you like. For a CD-based Setup, the answer file must be named Winnt.sif. The answer files for Sysprep are Sysprep.inf and Winbom.ini. You can create or modify these answer files in a text editor or through Setup Manager."<br>[OPK User Guide (2005), p. 213 {VRTS 01828527)]<br><br>"**configuration set**<br> A file and folder structure that contains the necessary configuration settings that control the preinstallation process and define the manufacturers' custom information."<br>[OPK User Guide (2005), p. 33 {VRTS 01828347)]<br><br>"**distribution share**<br> A network folder that contains the source files for Windows products that you preinstall. It may also contain the OPK tools and your configuration sets. This folder can be manually created or created by Setup Manager."<br>[OPK User Guide (2005), p. 216 {VRTS 01828530)] |
|---|---|---|
| [c] | loading the fully configured operating system files from the first media to the storage device using the temporary operating system; and | The OPK deployment tools and procedures involve loading the fully configured operating system files from the first media to the storage device (of the "destination computer") using the temporary operating system, i.e., Windows PE.<br><br>"**Build-to-Plan**<br>In the classic build-to-plan method, you use imaging to quickly duplicate multiple computers with an identical configuration, without any additional configuration of the destination computers.<br><br>The broad outline of this method is:<br>1. Build a master installation with as many customizations as desired, where these customizations apply across an entire product line or all the computers that you manufacture. Thoroughly test this installation.<br>2. Run sysprep -reseal (or click the Reseal button) to shut down the computer.<br>3. Store an image of this installation on a network share. This image can be either a copy of the complete set of files in the installation (a file-based image) or a single image file created by a third-party imaging tool.<br>4. Assemble the hardware for the destination computer.<br>5. Start the destination computer with the Windows Preinstallation Environment (Windows PE).<br>6. *Connect to the network and copy the image of the master installation onto the destination computer.*"<br>[OPK User Guide (2005), pp. 34-35 {VRTS 01828348-9) (emphasis added)]<br><br>"**Build-to-Order**<br>This method gives you the most flexibility in your manufacturing environment and enables you to meet the targeted needs of a specific order or a specific customer. However, fully implementing an automated version of this method does require more preparation time.<br><br>When adjusted for your specific manufacturing environment, this method significantly decreases the time required to manufacture each computer. For example, if you give your customers a choice from a standardized range of applications, you can stage many or all of these applications in the master installation. In Factory mode (sysprep -factory), complete the installation of the desired applications, and delete the rest. This method is faster than installing each required application in the factory. Each time you build a computer using this method, you start from a known, tested master installation. When the components change within your manufacturing environment, you need to test only those modifications on top of the known master installation, significantly reducing the testing time required for building and testing a completely new master installation.<br><br>The broad outline of this method is:<br>1. Build a master installation with as many customizations as desired, where these customizations apply across an entire product line or across all the computers you manufacture. Thoroughly test this installation.<br>2. Run sysprep -factory to shut down the operating system, so that the next time the operating system starts, it will be in Factory mode.<br>3. Use a third-party tool to make an image of this master installation, and store this image in a network location.<br>4. Assemble the hardware for the destination computer.<br>5. Start the destination computer using Windows PE.<br>6. *Configure the hard disk of the destination computer and duplicate the image of the master installation onto the hard disk.* |

| | | |
|---|---|---|
| | | 7. Start the destination computer with the preinstalled operating system. Because of the way you configured the master installation, the destination computer runs in Factory mode. 8. In Factory mode, use Winbom.ini to automate the installation of additional Plug and Play drivers, additional applications, hot fixes, or other customizations, and test both the hardware and the customized operating system. 9. Run sysprep -reseal (or click the Reseal button in the Sysprep dialog box) to shut down the destination computer." [*OPK User Guide (2005)*, p. 35 (VRTS 01828349) *(emphasis added)*]<br><br>"**Network Setup**<br>If you build only a small number of computers and it is not cost-effective for you to build and manage images of the operating system, the Network Setup method can be used to preinstall and still enable customizations to the destination computers. In this case, the master computer is the destination computer.<br><br>This method is flexible and comparatively easy to maintain. It requires less time to set up any required infrastructure, but more time to build each computer.<br><br>The broad outline of this method is:<br>1. Use Setup Manager to create a configuration set on a distribution share.<br>2. Assemble the hardware for the destination computer.<br>3. Start the destination computer using Windows PE.<br>4. Connect to the network and preinstall the operating system from the configuration set.<br>5. If you want to test or customize the operating system, run sysprep -factory. Make your customizations in Factory mode.<br>6. Run sysprep -reseal (or click the Reseal button) to shut down the computer." [*OPK User Guide (2005)*, pp. 35-36 (VRTS 01828348-9) *(emphasis added)*]<br><br>The *OPK User Guide (2005)* and *BDD Imaging Guide (2005)* teach selecting imaging tool and formats, e.g., the WIM image-file format, that allow the retrieval and restoration of individual files from the backup media without loss of data, even if the hard disk has been replaced, reformatted or repartitioned.<br><br>"**Selecting Software Imaging Tools**<br>There are a variety of imaging tools that you can use to create your Windows image. To help ensure the greatest success when using these method with Windows, make sure that your imaging tools fulfill these requirements:<br>• Access NTFS file system (NTFS) file system partitions.<br>• Support long file names.<br>• Open packages to add or remove files (such as new or updated drivers) without recreating the entire package." [*OPK User Guide (2005)*, p. 64 (VRTS 01828379)] |
| [f] | reinitializing the data processing system from the storage device to install the fully configured operating system. | The OPK deployment tools and procedures involve restarting the operation of the data processing system, i.e., the destination computer, from the storage device to set up a fully configured operating system for use.<br><br>"A basic method for using the Windows Preinstallation Environment (Windows PE) is as follows:<br>1. Start the newly assembled computer with Windows PE.<br>2. Run any relevant hardware diagnostic applications.<br>3. Configure the hard disk.<br>4. Deploy the operating system to the computer by:<br>• Copying an image from the network.<br>--OR--<br>• Running Winnt32 at the command prompt in Windows PE and installing the operating system.<br>5. Restart into the installed operating system by using Sysprep in Factory mode, or seal the operating system by using Sysprep, and then shut down the computer." [*WinPE User Guide (2004)*, p. 5 (VRTS 01828581) *(emphasis added)*] |

Nichols Infringement Report, Exh. G at G–1—G–13. As is clear from the foregoing, Dr. Nichols does not rely on the OPK Guide for claim element 1[f]. The same appears to be true for the corresponding element in claim 33. *See id.* at G–22.

As cited by Dr. Nichols, page 1 of the OPK Guide explains, *inter alia,* that:

### Windows XP

The OPK helps you to preinstall, customize, and deploy:

| |
|---|
| ■ Windows XP Home Edition with Service Pack 2 (SP2) |
| ■ Windows XP Professional with Service Pack 2 (SP2) |

### Windows Server 2003 Family

You may also use this OPK to preinstall, customize, and deploy these versions of Windows:

| |
|---|
| ■ Windows Server 2003, Standard Edition, with Service Pack 1 (SP1) |
| ■ Windows Server 2003, Enterprise Edition, with Service Pack 1 (SP1) |
| ■ Windows Server 2003, Datacenter Edition, with Service Pack 1 (SP1) |
| ■ Windows Server 2003, Web Edition, with Service Pack 1 (SP1) |
| ■ Windows XP 64-Bit Edition Version 2003 for 64-bit extended systems |
| ■ Windows XP 64-Bit Edition Version 2003 for Itanium-based systems |

For additional support, visit the Microsoft System Builder OEM Web site or the Microsoft Royalty OEM Web site.

OPK Guide at VRTS –315. Page 7 of the OPK Guide provides hyperlinks to "Customization Guidelines:"

### Customization Guidelines

You may customize Windows only as described by these specifications:

- Customization Guidelines
- Branding Opportunities
- First-Run Experience
- Hardware Device Drivers
- Help and Support Center
- Internet Access and ISP Offers
- Internet Explorer and Outlook Express
- Preinstalled Applications
- Activation, Registration, and Product Key
- Security Center and Windows Firewall
- Windows Media Player
- Windows Messenger
- Windows Software Components
- Windows Start Menu and Desktop
- Windows Desktop Default Settings
- Control Panel Extensions

*Id.* at VRTS –321.

Page 34 provides a "Comparison of Preinstallation Methods," and explains:

## Comparison of Preinstallation Methods

There are many ways to preinstall Windows XP and Windows Server 2003. The licensing agreement, as summarized in Preinstallation Requirements and Customization Guidelines, specifies only the end result of the preinstallation process. How you achieve those results depends on you.

Every manufacturing process has tradeoffs. The right choice for you and your company depends on factors such as:

- The number and type of computers that you plan to manufacture
- Whether your manufacturing model is build-to-plan, build-to-order, or a combination of these models
- How much you customize the operating system
- How much you automate your processes
- The quality checks that you perform on both hardware components and manufactured systems
- Expected demand for customer support and the resources that you have available to meet that demand
- The existing infrastructure of your company
- Your company's growth rate and business goals

Page 34 also provides a chart comparing various methods according to speed, volume and customization:

| Method | Speed | Volume | Customization |
|---|---|---|---|
| Build-to-Plan: Deploy an image of the master installation without customization to the destination computers | Fast | Highest | None |
| Build-to-Order: Deploy an image of the master installation to the destination computers, which are started in Factory mode and customized to order | Fast | High | High |
| Network Setup: Start destination computers from a floppy disk and run Setup from a distribution share | Slowest | Medium | High |
| CD Boot: Run Setup from the destination computer using the Windows product CD; manually customize, audit, and reseal the installation | Slow | Lowest | Lowest |

OPK Guide at VRTS –348.

Additionally, pages 34–36 describe a number of different preinstallation methods, including "Build–to–Plan," "Build–to–Order," "Network Setup" and "CD Boot." *See* VRTS –348–50. Dr. Nichols focuses on those as teaching "using OPK to customize Windows to provide a fully configured operating system." *See* Nichols Infringement Report, Exh. G at G–2.

Dr. Nichols continues to rely primarily on the OPK Guide, pages 33–36, until reaching the limitation "providing a second media comprising configuration-specific data files" (claim element 1[c]). There, Dr. Nichols notes that the OPK Guide states at page 61 that "For more information on building a version of Windows PE customized to meet sure manufacturing needs, see Creating a Customized Version of Windows PE." It is not clear what section page 61 falls under, but the context for that statement is reproduced below:

## Using Winnt32.exe to Run Setup

You can run Winnt32.exe from a command prompt to start Windows Setup on a computer running any of these operating systems:

- Windows XP
- Windows 2000
- Windows NT
- Windows Millennium Edition
- Windows 98
- Windows 95

For a complete list of the Winnt32.exe command-line options, see Winnt32.exe Command-Line Options.

To install Windows from a network share, start the computer by using the Windows PE CD (or one of the operating systems in the preceding list), and then connect to the distribution share. Placing the distribution share and the configuration set on the network adds considerable flexibility to the preinstallation process.

**To run Setup using Winnt32.exe**

1. On the technician computer, prepare an Unattend.txt file to include in a configuration set built using Setup Manager.
2. Start the destination computer with one of the previously listed operating systems.
3. Click Start, click Run, and then type:

 path_to_winn32\winnt32 /unattend:filename

 path_to_winn32
 Specifies the path to the location of Winnt32.exe. For example: \\server\share\Lang\Eng\sku\pro\x86 \i386

 filename
 Specifies the name of the answer file, which contains answers to installation questions that you want to automate. The value of filename is usually Unattend.txt.

For more information on building a version of Windows PE customized to meet your manufacturing needs, see Creating a Customized Version of Windows PE.

After Setup finishes, preinstall applications, audit the system, and run Sysprep to convert the system to a customer-ready state. For more information, see Preinstalling Applications, Auditing Destination Computers, and Using Sysprep.

Notes

- To ensure a clean installation, do not install Windows XP or the Windows Server 2003 family as an upgrade.
- Another network-based system for preinstalling Windows XP and the Windows Server 2003 family is Remote Installation Server, which is discussed in the *Microsoft Windows Server 2003 Resource Kit*.

That section suggests that customization is optional, and Dr. Nichols indicates that to be the case, as his explanation in connection with 1[c] makes clear ("For example, the *WinPE User Guide (2004)* teaches that when PE *can contain* configuration-specific data files, such as drivers, which *can be used* to configure the data processing system in a specific manner and collectively provide necessary information for loading data form [*sic*] the first media to the storage disk (or disk drive) of that system." Nichols Infringement Report, Exh. G at G–3 (underlining added)). In any case, Dr. Nichols then relies on a different reference, WinPE User Guide (2004), as disclosing that method step.

Dr. Nichols then continues with the OPK Guide as indicated in the claim chart excerpts, and uses the OPK Guide similarly for other claims.

As with the WAIK Guide, the method steps Dr. Nichols relies on are not disclosed together, or even entirely in the OPK Guide. Moreover, Dr. Nichols indicates, and the OPK Guide teaches, that at least one method step is optional. And, once again, there is no dispute that the OPK Guide discloses a number of different non-infringing uses to which the customer may put the accused products without infringing the asserted claims. Dr. Nichols' approach thus once again indicates that the accused products are capable of performing the claimed methods—and that is not in dispute—but nothing in the OPK Guide indicates that Microsoft's customers have actually used the accused products in the manner that Dr. Nichols suggests. Thus, again, Veritas' *ad hoc* reliance on the OPK Guide to show that a user actually performed the claimed method is too speculative to raise a genuine issue of material fact in that regard. *See E–Pass Technologies,* 473 F.3d at 1222 ("[T]he evidence

here shows, at best, that the Palm defendants taught their customers each step of the claimed method in isolation. Nowhere do the manual excerpts teach all of the steps of the claimed method together, much less in the required order. Accordingly, it requires too speculative a leap to conclude that any customer actually performed the claimed method.").

**(4) BRC**

According to Veritas, BRC "instruct[s] customers how to perform the infringing recovery methods using the specified recovery scenarios." Veritas' Response at 9. The BRC is a 4–page printout (*see* Schallop Decl., Exh. J: VRTS 01843782–85):

Dr. Nichols' Exhibit H infringement chart relies in part on the OPK Guide, which is discussed above. *See* Nichols Infringement Report, Exh. H at H–1.[10] Ac-

<hr/>

10. *See* Nichols Infringement Report, Exh. H at H–1:

| Asserted claims vs. | Windows Vista and Windows Server 2008 system recovery tools and procedures |
| --- | --- |
| | ■ Claims 1, 2, 3, 5, 7, 8, 9, 10, 13, 14, 15, 16, 17, 18, 19, 22, 23, 24, 26, 27, 28, 29, 33 |
| References | ■ "Windows Backup and Restore Center—Complete PC Backup and Restore" ("Complete PC Backup and Restore") (VRTS 01843782–85) |
| | ■ "Backup and Restore in Windows Vista and Windows Server Longhorn" ("WinHEC 2006 Presentation") (VRTS 00943209–43) |
| | ■ "Windows Server 2008 Backup and Recovery Step–by–Step Guide" ("Server 2008 Backup and Recovery Guide (2007)") (VRTS 01843732–42) |
| | ■ Microsoft TechNet, "Windows PE 2.0 for Windows Vista Overview" |

("WinPE 2.0 Overview (2005)") (VRTS 00943130–38)

■ Microsoft TechNet, "Windows Recovery Technical Reference" (WinRE Technical Reference") (VRTS 01843379–90)

■ Windows Automated Installation Kit (Windows AIK) User's Guide ("WAIK User Guide (2006)") (VRTS 00943244–718)

■ Microsoft TechNet, "Mounting virtual hard disks at the command line" ("Mounting VHD") (VRTS 018843391–92)

■ Microsoft, "Block level Backup dev design document" ("MSFT Backup Design (2005)") (MS–VRTS 257423–68) (Confidential—Attorney Eyes Only )

■ Excerpts from deposition transcript of Desmond Tak Lee, Program Manager for Windows RE ("D. Lee Dep." )

cording to Dr. Nichols' chart, however, the BRC only discloses claim elements 1[a] (preamble), 1[b] ("providing a first media comprising operating system files for installing a fully configured operating system onto the storage device") and 1[e] ("loading the fully configured operating system files from the first media to the storage device using the temporary operating system."). Dr. Nichols relies on other references for the remaining disclosure. Thus, the BRC does not disclose every step of a claimed method, nor does the BRC otherwise provide sufficient detail to determine which backup method was used. As noted above, there is no dispute that the accused products are capable of substantial non-infringing uses, including non-infringing backup and restore operations. The BRC simply does not point to use of a sufficiently specific method such that a reasonable jury could identify an infringing method from the BRC, much less conclude that a Microsoft customer had actually used the accused products to perform a claimed method.

### (5) Presentation

As with the BRC, Veritas urges that the Presentation (*see* Schallop Decl., Exh. K: VRTS 00943209–43) "instruct[s] customers how to perform the infringing recovery methods using the specified recovery scenarios." Veritas' Response at 9. The presentation includes at least 28 slides (judging from Dr. Nichols' chart below). Veritas, however, has provided only 17 or so of those slides, and it is not clear which of the 28 (or more) slides Veritas has omitted.

According to Dr. Nichols' chart, the Presentation discloses most claim elements (chart reproduced in pertinent part below with respect to claim 1):

| Claim 1 [a] | A method for loading a fully configured operating system onto a storage device of a data processing system, comprising the steps of: | Windows Vista and Windows Server 2008 provide a system recovery method for loading a fully configured operating system onto a storage device (i.e., a device for storing software and other digital data, of a data processing system).<br><br>Microsoft teaches the use of the following infringing components in their system recovery tools and procedures for Windows Vista and Windows Server 2008, including, but not limited to:<br>• Windows Preinstallation Environment ("Windows PE"), version 2.0<br>• Windows Recovery Environment ("Windows RE") (based on Windows PE)<br>• Virtual Hard Disk (VHD) image file format<br>• Complete PC Backup and Restore (for Windows Vista)<br>• Windows Server Backup (for Windows Server 2008)<br>Upon information and belief, all versions of Windows Server 2008 will also provide similar system recovery tools and procedures that includes or interoperates with the above infringing components[1]: |
| | | "Windows Server Backup<br>...<br>• Same block-level engine as Windows Vista's CompletePC Backup<br> o Efficient incremental backups<br> o DVD, hard disk, or file server, but not tape<br>• Restore entire computer, system state, individual files, and application databases..."<br>[*WinHEC 2006 Presentation*, sl. 19 (VRTS 00943227)]<br><br>"Server Backup Details<br>...<br>• Restore directly from backup image<br> o Files, folders, and whole disks<br> o SQL Server, Exchange, SharePoint data<br>• Restore computer from Windows RE<br> o Bare metal or system state-only..."<br>[*WinHEC 2006 Presentation*, sl. 20 (VRTS 00943228)] |

| [b] | providing a first media comprising operating system files for installing the fully configured operating system onto the storage device; | In the Windows Vista and Windows Server 2008 system recovery tools and procedures, a first media, i.e., data storage material, is used to store a backup of the operating system files of a "fully configured operating system." This fully configured operating system is "tailored" for the particular system on which it was installed, i.e., it is not an operating system installed from the original operating system installation disks without any configuration to the computer system on which it is installed. |
|---|---|---|
| | | In the Windows Vista system recovery procedure, the operating systems files can be provided on an external hard disk, internal disk partition, or a set of CD/DVDs through the "CompletePC Image Backup" feature. Similarly, in the Windows Server 2008 system recovery procedure, the operating system files can be provided on an external hard disk, internal disk partition, a set of CD/DVDs, or a network drive through the "Windows Server Backup" feature. |
| | | "Backup Media<br>• Optical media (CDs, DVDs, beyond), hard disks, and file servers … but not tape<br>• Third-party backup applications can and will continue to support tape media<br> o No change in driver support<br> o NT Backup "reader" as Web download"<br>[WinHEC 2006 Presentation, sl. 4 (VRTS 00943212)] |
| | | "Backup Media<br>• Windows Vista and Windows Server "Longhorn" support new backup media<br> o CD, DVD, and larger via UDFS<br> o Hard disks, especially for block-level backup<br>• With these features, more customers will use hard disks and CDs/DVDs for backup"<br>[WinHEC 2006 Presentation, sl. 25 (VRTS 00943213)] |
| | | "CompletePC Image Backup – Block-level backup of the entire PC<br>• Great disaster recovery solution for consumers and small businesses<br>• Back up to an external hard disk, internal disk partition, or a set of DVDs<br>• Easy restore via Windows Recovery Environment (Windows RE)"<br>[WinHEC 2006 Presentation, sl. 11 (VRTS 00943219)] |
| | | "CompletePC Backup Details<br>• Block-level backup is very fast and efficient<br>• Clever way to do incremental backups: each backup is "full" but deltas are small<br>• Backup file is VHD format (Virtual PC)…"<br>[WinHEC 2006 Presentation, sl. 12 (VRTS 00943220)] |
| | | "Windows Server Backup<br>…<br>• Same block-level engine as Windows Vista's CompletePC Backup<br> o Efficient incremental backups<br> o DVD, hard disk, or file server, but not tape<br>• Restore entire computer, system state, individual files, and application databases…"<br>[WinHEC 2006 Presentation, sl. 19 (VRTS 00943227)] |
| | | "Server Backup Details<br>…<br>• Restore directly from backup image<br> o Files, folders, and whole disks<br> o SQL Server, Exchange, SharePoint data<br>• Restore computer from Windows RE<br> o Bare metal or system state-only…"<br>[WinHEC 2006 Presentation, sl. 20 (VRTS 00943228)] |

| [c] | providing a second media comprising configuration-specific data files; | In the Windows Vista and Windows Server 2008 system recovery tools and procedures, a second media containing the Windows Recovery Environment ("WinRE") (which is based on the Windows Preinstallation Environment ("WinPE")) is used to initialize the data processing system.<br><br>This second media containing WinRE and the configurations-specific data files is a separate media (e.g., setup or installation CD / DVD, network drive, RAM disk, a USB flash drive, or a recovery disk / CD/ |
|---|---|---|
| | | DVD), or optionally a separate partition of the hard drive. I understand that the Special Master has construed the second media to be physically distinct from the storage device; however, providing WinRE and the configuration-specific data files on a separate recovery partition of the hard drive of the storage device is equivalent to providing the same WinRE and configuration-specific data files on a separate media.[2] Specifically, the same functions (including the function of providing the configuration-specific data files to the temporary operating system) will be performed in the same way or sequence in order to achieve the same result of restoring the fully configured operating system using a configured temporary operating system, regardless of the type of media used to provide the configuration-specific data files. As long as the system can access the second media, one of ordinary skill in the art would understand that it is not important what type of media is used to store the configuration-specific data files.<br><br>The second media containing WinRE may also include device drivers and other configuration-specific data files for the WinRE operating environment.<br><br>"Windows RE Details<br> * Based on Windows PE<br> * Automatic Recovery using Startup Repair<br> o Auto-repairs >80% of boot failure causes<br> o Leverages system instrumentation to diagnose driver errors and boot status<br> * Manual recovery tools, including CompletePC Restore"<br>[WinHEC 2006 Presentation, sl. 16 (VRTS 00943224)] |

| [d] | initializing the data processing system from the second media to provide a temporary operating system and using the configuration-specific data files to configure the data processing system; | The Windows Vista and Windows Server 2008 system recovery tools and procedures involve starting the operation of the data processing system, i.e., the "destination computer," from the second media, and adjusting the starting configuration of the data processing system, i.e., the "destination computer" using the configuration-specific data files (e.g., device drivers) to set up a temporary operating system, i.e., Windows RE (based on Windows PE), for use.<br><br>"Windows Recovery Environment (Windows RE) is an extensible recovery platform based on Windows Preinstallation Environment (Windows PE). When the computer fails to start, Windows automatically fails over into this environment, and the Startup Repair tool in Windows RE automates the diagnosis and repair of an unbootable Windows Vista installation."<br>[WinRE Technical Reference (VRTS 01843379)]<br><br>"Integration Points<br>...<br> * CompletePC and Windows Server Backup<br> ...<br> o Windows RE can be customized..."<br>[WinHEC 2006 Presentation, sl. 28 (VRTS 00943236)]<br><br>"CompletePC Restore Details<br> * Can restore all disks, or just system disks<br> * Adapts to disk configuration changes..."<br>[WinHEC 2006 Presentation, sl. 13 (VRTS 00943221)] |
|---|---|---|

| [e] | loading the fully configured operating system files from the first media to the storage device using the temporary operating system; and | The Windows Vista and Windows Server 2008 system recovery tools and procedures involve loading the fully configured operating system files from the first media to the storage device (of the "destination computer") using the temporary operating system, i.e., Windows RE (based on Windows PE).<br><br>"...Windows Complete PC Backup and Restore is most useful for disaster recovery when your PC malfunctions. This feature helps you create complete PC backups and then in the event of a serious<br>The Windows Vista and Windows Server 2008 store the fully configured operating system files in the virtual hard disk (VHD) image-file format, which allows the retrieval and restoration of individual files from the backup media without loss of data, even if the hard disk has been reformatted or repartitioned. This can be accomplished via VHD drivers or by mounting the VHD image file.<br><br>"CompletePC Backup Details<br>...<br> * Backup file is VHD format (Virtual PC)..."<br>[WinHEC 2006 Presentation, sl. 12 (VRTS 00943220)] |
|---|---|---|

| IQ | reinitializing the data processing system from the storage device to install the fully configured operating system. | The Windows Vista and Windows Server 2008 system recovery tools and procedures involve restarting the operation of the data processing system from the storage device to set up a fully configured operating system for use.<br><br>"System Administrator Scenario<br>A system administrator for an enterprise is attempting to fix a client computer that cannot start. The administrator presses F8 during startup and selects the Recovery Environment entry, which boots the computer into Windows RE. He logs on by using a local administrator account and selects the full-volume restore application from the list of available tools. Once the restore has completed, the administrator clicks the Reset button in Windows RE, and the computer restarts."<br>[*WinRE Technical Reference* (VRTS 01843380)] |

Nichols Infringement Report, Exh. H at H–1—H–13.

In short, the Presentation suffers many of the same shortcomings as does the BRC. The Presentation provides many capabilities, but does not explain exactly how those capabilities are to be implemented. That is, the Presentation does not disclose sufficient detail to determine what backup method(s) the slides are referring to. Thus, there is no way to tell from the Presentation whether those methods are infringing, much less whether any Microsoft customer has actually performed those methods. Thus, the Presentation fails to show that any Microsoft customer has actually used the accused products in an infringing manner.

### (6) Remaining Product Manuals, Materials & Documentation

As is clear from Dr. Nichols' expert report,[11] Veritas relies on other product documents that are referenced in its brief. However, a review of each of the following documents provided by Veritas reveals

---

**11.** *See also* Nichols Infringement Report, Exh. D: Documents Considered at D–1 (items 9,

that for many of the foregoing reasons these documents likewise fail to show that Microsoft's customers have actually used the accused products in an infringing manner:

### *Windows Vista CompletePC help documentation*

This set of documents includes the following printouts: "Back up your programs, system settings, and files" (1 page), "Methods for backing up your files" (2 pages), "Restore your computer from a system image backup" (3 pages), and "What are the system recovery options in windows vista?" (2 pages). *See* Schallop Decl., Exh. I: VRTS 01196481–89. Those documents provide a general discussion of those topics, and indicate that the accused products are capable of backup and recovery, but do not provide sufficient detail to determine the method of backup and recovery.

For example, the document "Restore your computer from a system image backup" provides the following instructions:

11, 14, 18 and 29).

**To restore using a Windows installation disc**

Use this method if your computer came with a Windows installation disc.

1. Insert the installation disc, and then restart your computer by clicking the Start button, clicking the arrow next to the Lock button, and then clicking Restart.

 If your computer is not configured to start from a CD or DVD, see Start Windows from a CD or DVD for instructions about how to do this.

2. Press any key when prompted to do so.

3. Choose your language settings, and then click Next.

4. Click Repair your computer.

5. Select the operating system you want to repair, and then click Next.

 Note

 o If you are restoring a 64-bit system using a 32-bit Complete PC backup or a 32-bit system using a 64-bit Complete PC backup and have more than one operating system installed, you should not select an operating system. If an operating system is selected by default, clear the selection by clicking a blank area of the window, and then click Next.

6. On the System Recovery Options menu, click Windows Complete PC Restore, and then follow the instructions.

 Note

 o Insert the last CD or DVD of the backup set when prompted to do so.

**To restore using pre-installed recovery options**

If your computer did not come with a Windows installation disc, use this method.

1. Restart your computer.

 Click the Start button, click the arrow next to the Lock button, and then click Restart.

2. Do one of the following:

 o If your computer has only one operating system installed, repeatedly press the F8 key as your computer restarts. You need to press F8 before the Windows logo appears. If the Windows logo appears, you will need to try again.

 o If your computer has more than one operating system installed, use the arrow keys to highlight the operating system you want to start, and then press F8.

3. On the Advanced Boot Options menu, use the arrow keys to highlight Repair your computer, and then press ENTER.

4. Select a keyboard layout, and then click Next.

5. Select a user name and type the password, and then click OK.

6. On the System Recovery Options menu, click Windows Complete PC Restore, and then follow the instructions.

 Note

 o Insert the last CD or DVD of the backup set when prompted to do so.

*Id.* at VRTS –485–86. Nor does Veritas provide any analysis linking the disclosure to the asserted claims. And, the documents do not directly indicate or, given the broad discussion, circumstantially suggest that any customer has used the disclosed methods.

### *Windows Server 2008 Backup and Recovery Step–By–Step Guide*

This document appears to be a 12–page printout from the "Windows Server 2008 Technical Library." *See* Schallop Decl., Exh. L: VRTS 01843732–42. This document explains what "backup" is, and provides a number of scenarios:

**Scenarios presented in this guide**

This guide discusses the following key backup and recovery scenarios:

- Scenario 1: Running scheduled backups to external disks
- Scenario 2: Backing up a full volume to DVDs for volume recovery
- Scenario 3: Restoring files and folders
- Scenario 4: Restoring a full volume from a DVD
- Scenario 5: Performing an operating system volume recovery
- Scenario 6: Performing a full server recovery

*Id.* at VRTS –734.

Dr. Nichols relies on this document in his claim chart with respect to "Windows Vista and Windows Server 2008 system recovery tools and procedures," but only in connection with (using claim 1 as an example) the preamble:

"**Windows PE and the Windows Imaging Format**
The most powerful and flexible way to distribute Windows PE is within a Windows Imaging (WIM) file. WIM is the file-based imaging format that Windows Vista uses for rapid installation on a new computer. WIM files stores copies (known as images) of one or more operating systems, such as Windows Vista or Windows PE. Maintaining an operating system in a WIM file is easy, because you can add and remove drivers, updates, and Windows components offline, without ever starting the operating system. Maintaining Windows PE images in WIM files will be very similar to maintaining Windows Vista images."
[*WinPE 2.0 Overview (2005)*, p. 4 (VRTS 00943133)]

"**Windows PE Technology**
...
**Flexible**
If Windows Vista includes drivers for your computer hardware, your hardware will probably work with Windows PE, too, because Windows PE includes most Windows Vista drivers. You can also add new drivers to a Windows PE image. In enterprise environments, you could add every driver required by any computer in your organization to a single Windows PE image so that the image will work with any of your computers."
[*WinPE 2.0 Overview (2005)*, p. 6 (VRTS 00943135)]

"**Windows PE 2.0 Compared to MS-DOS Boot Disks**
...
- Load and access 32-bit and 64-bit device drivers for audio, video, motherboard chipsets, batteries, and other devices that use Window Vista drivers. Windows PE provides the ability to load Windows mass-storage, networking, audio, video, and other types of drivers."
[*WinPE 2.0 Overview (2005)*, p. 7 (VRTS 00943136)]

and 1[d] ("initializing the data processing system from the second media to provide a temporary operating system and using the configuration specific data files to configure the data processing system"):

"Windows Server Backup is a feature of the Windows Server® 2008 operating system that provides a basic backup and recovery solution for the server that it is installed on. This version of Backup replaces the Backup feature that was available with earlier versions of the Microsoft® Windows® operating system."
[*Server 2008 Backup and Recovery Guide (2007)* (VRTS 01843732)]

"Scenario 5: Performing an operating system volume recovery

This scenario explains how to recover your server operating system by using Windows Complete PC Restore and a backup that you created earlier by using Backup. (You access Windows Complete PC Restore from the Setup media disk for Windows Server 2008 Beta 3.)

To recover your operating system

1. Insert the Setup media disk into the CD or DVD drive and turn on the computer. It might take several minutes for the required files to load.

2. From the Setup Wizard, click Repair your computer.

3. Setup searches the hard disk drives for an existing Windows installation and then displays the results in the System Recovery Options dialog box. For a recovery onto separate hardware, the list should be empty. Click Next.

4. On the System Recovery Options page, click Windows Complete PC Restore.

5. Choose one of the following options, and then click Next:
 - Restore the following backup (recommended)
 - Restore a different backup

6. Depending on the option you choose, you may be asked to provide more details about the backup you want to restore. Click Next.

7. On the Choose how to restore the backup page, install any drivers that you need. Then choose one of the following options, and click Next:
 1. Format and repartition disks (to delete existing partitions and reformat the destination disks to be the same as the backup)
 2. Restore only system volumes

8. Click Exclude disks, and then clear the check boxes for any disks that are not needed for a system restore. Click Next.

9. Confirm the details for the restoration, and then click Finish."
[*Server 2008 Backup and Recovery Guide (2007)* (VRTS 01843739-40)]

*See* Nichols Infringement Report, Exh. H at H–3—H–4. Dr. Nichols provides no explanation of how this document discloses any of the claimed method steps. Also, it appears that the Windows Server 2008 product is "forthcoming," *see* Veritas' Response at 15, which suggests that Microsoft's customers would not have used that product yet. Accordingly, this document fails to show that a Microsoft user has used the accused products to perform an infringing method.

### Windows Vista Compare Editions

This document is a 2–page chart comparing the features of Basic, Home Premium, Business, and Ultimate versions of Windows Vista (*see* Schallop Decl., Exh. M: VRTS 01842472–73):

That chart indicates capabilities of the various Windows versions, and may indicate that Microsoft users have actually used those products. However, nothing in that chart suggests that Microsoft's users have used those products in an infringing manner.

*Windows Deployment Service (Longhorn)*

This 23–page document provides the following introduction (*see* Schallop Decl., Exh. EE: MS–VRTS 000000244359–81):

# Windows Deployment Service

You start with nothing... Leave with Windows
Last updated: 8/18/2006 4:05:00 PM

and the following table of contents:

Summary...........................................................................................5
Feature History...................................................................................6
Design Goals and Justification for the Service or Feature.............................8
 Release Plan.................................................................................8
 Included Goals..............................................................................9
 Business Justification.....................................................................10
 Other Documents and Specifications...................................................12
Scenarios.......................................................................................13
 Scenario 1 – End-to-end deployment of operating system image................13
 Scenario 2 – Network boot WinPE......................................................14
 Scenario 3 – Robust Management of WDS Servers.................................14
 Scenario 4 – WDS as a Platform........................................................15
Requirements..................................................................................15
Detailed Design Section......................................................................16
 Terminology................................................................................16
 Basic Architecture.........................................................................17
 Basic Process...............................................................................18
 Major Features – Within the scope of this effort...................................19
 Imaging Support...........................................................................20
 SIS and Groveler...........................................................................21
 When the original RIS solution was in development for release with Windows 2000, disk space was at a premium. To help preserve disk space on machines that would store many images, a file-system filter and file-system-crawling service were implemented. The thinking was that when storing images on a server, many of the files in the operating system images would be identical to each other. For example, if we had two Windows 2000 Pro images, one of HAL type ACPI and the other of HAL type APIC, there would be many like files between the two images. The file system driver, sis.sys, allowed the underlying data in the images to be stored once and duplicate data to be stored as a link to the original file. The Groveler, a windows service, crawled the images directory structure looking for duplicate files to single instance...................................21
 Since WDS images will be stored as WIMs, the SIS and Groveler will no longer be leveraged in the WDS solution. These services are unnecessary in WDS because ...................................................................................................21
 2) files within a WIM are single-instanced ......Error! Bookmark not defined.
 3) it is highly unlikely that two WIMs (which are simply files themselves) will be identical ....................................................Error! Bookmark not defined.
 That being said, the SIS file system driver will be required in the WDS solution for upgrade/migration purposes. WDS needs the SIS driver to access information in the Single Instance Store. Furthermore, WDS will need a way to un-grovel (or un-single-instance) the files in the SIS so that we can move/convert them into WIM format.......................................................................................21
 Management..............................................Error! Bookmark not defined.
 Other Features.............................................................................21
Security and Privacy...........................................Error! Bookmark not defined.
Performance Requirements.................................Error! Bookmark not defined.
Support.........................................................Error! Bookmark not defined.
Testability....................................................Error! Bookmark not defined.
Partner Opportunities and Worldwide Requirements...........Error! Bookmark not defined.
Win32 Setup..................................................Error! Bookmark not defined.
Service Deployment Procedures.............................Error! Bookmark not defined.

Risks and Open Issues.......................................Error! Bookmark not defined.
 CUTS....................................................................................22
 Issues...................................................................................22
 List of Open Issues.................................................................23
 Closed Issues.......................................................................23

*Id.* at MS–VRTS–359 and –361–62.

This document further discloses various deployment scenarios, *e.g.*:

## Scenarios

The master scenario list for the OS Deployment team is available at:
http://team/sites/wcpt/Deployment/OSE%20Scenario%20Review.doc

Please note that the scenarios listed below have been written to highlight WDS and its part in corporate and OEM deployment.

### Scenario 1 - End-to-end deployment of operating system image

Purpose: Customer has a bare-metal machine and wants to install a copy of Windows on it.
Customer: CORPs, OEMs, Microsoft Internal
Priority 0

Quentin Kelly is the desktop administrator at Trey Engineering. The company policy states that all desktops must run the same "standard" corporate image, consisting of Windows LH, Microsoft Office, and a custom Engineering application. The standard corporate image helps to reduce internal helpdesk support costs by ensuring that each desktop is similarly configured. Quentin would like to build this customized LH image and then upload it to his WDS Server so it may be deployed using WDS. He does this task using a WDS image capture tool and the WDS MGMT utilities.

Upon receiving a shipment of new hardware from his system builder, Quentin unpacks the machines and delivers them to the appropriate office/cubicle. From there, Quentin assembles the machines, connects them to the network, and flips the power switch. The machine network boots and discovers a WDS Server. A WinPE image containing helpful and intuitive UI aids Quentin through the image selection and deployment process. The look, feel, and functionality is very similar to that of regular LH Setup so Quentin doesn't need to learn a whole new technology area in order to use WDS as part of his deployment process. He selects the custom installation image built earlier and deploys it to the machine. Less than twenty minutes later a new image has been deployed and the machine is at the desktop. Though the process can be fully automated, Quentin decides he will image this small batch of computers manually. One by one, he completes the process with the remaining machines.

*Id.* at MS–VTRS –370. Veritas does not, however, particularly point to any of those scenarios as in fringing, or make any effort to link those scenarios to the asserted claims. Once again, there is no dispute that the accused products have substantial non-infringing deployment uses. And, this document contains a confidentiality notice on the front page. Accordingly, this document fails to show that a Microsoft customer has actually used the accused products in an infringing manner.

### *Windows Platform Design Notes—Preinstalling Microsoft Windows XP By Using the OEM Preinstallation Kit, Part 1*

This 23–page document provides the following introduction (*see* Schallop Decl., Exh. FF: MS–VRTS 000000439956–78):

# Windows Platform Design Notes

*Design Information for the Microsoft® Windows® Family of Operating Systems*

## Preinstalling Microsoft Windows XP by Using the OEM Preinstallation Kit, Part 1

### Abstract

This paper provides summary information and best practices for system builders who preinstall the Microsoft® Windows® XP operating system on new computers. It emphasizes network-based preinstallation of Windows.

> **IMPORTANT:**
> The Microsoft Windows Original Equipment Manufacturer (OEM) Preinstallation Kit (OPK) is provided under a license agreement that defines terms of use, customization of Windows, and other issues. There are two different types of license agreements: one for system builders and one for royalty OEMs. For a summary of licensing requirements and the differences between the two types of license agreements, see the OEM Preinstallation Kit User's Guide (OPK User's Guide). This white paper does not address the terms and conditions under which the OPK may be licensed to you. The information in your license agreement supersedes any conflicting information, terms, or conditions in this white paper.

### Contents

Introduction ......3
Preinstallation Methods ......4
 Build-to-Plan Method ......5
 Build-to-Order Method ......6
 Network Setup Method ......7
 CD Boot Method ......7
Preinstallation from a Network ......8
Phase 1 Planning Preinstallation ......8
 Minimum Network Requirements ......8
 Preparing to Build a Master Installation ......9
 Planning Images ......9
Phase 2 Installing the OPK Tools ......9
Phase 3 Creating the Image ......10
 Imaging ......11
Phase 4 Factory Floor – Remote Installation Operating System Service, Sysprep, and Auditing Destination Computers ......11
 Remote Installation Server—RIS ......12
 Sysprep Overview ......12
 How Sysprep Prepares the Installation for the End User ......13
 Answer Files ......14
 Using Sysprep in Factory Mode ......15
 Preinstalling Applications ......16
 Auditing Destination Computers ......17
 Winbom.ini Entries ......20
Tools and References ......22
 Resources ......22

*Id.* at MS–VRTS –956. That is, this docu- ment pertains to OPK:

**1224**

## Introduction

This paper describes recommended practices for system builders and original equipment manufacturers (OEMs) who preinstall the Microsoft® Windows® XP operating system on multiple new computers in the factory

The Microsoft Windows OEM Preinstallation Kit (OPK) provides tools and guidelines for preinstalling and configuring all Windows XP operating systems.

The OPK tools can be used to preinstall Windows by:

* Installing it manually.

* Using a network and unattended answer files.

* Creating an image of the complete Windows and application package to be preinstalled, and then copying the image to multiple hard disks by a network connection or hard disk duplication

**BEST PRACTICE:** Microsoft recommends that system builders use the image-based network model because it is faster and less cumbersome than the other models. Downloading Windows along with a complete application package is a complex process, but it can be streamlined if the image is customized before you copy it to the hard disks. You can also use OPK tools to customize after the image is built without any additional configuration of the destination computers. System builders who manufacture more than 20,000 systems per month can save significant time and manufacturing costs by using image-based network preinstallation. Information about this process is presented in "Network-based Preinstallation" later in this paper.

This paper can be used in the following ways:

* To help new OPK users become familiar with the Windows XP preinstallation process

* To begin planning for a new Windows preinstallation process

* To create a technician's checklist—together with the OPK User's Guide—for use during the actual Windows preinstallation process.

This paper provides a very high-level overview of the preinstallation process. For complete details, see the OPK User's Guide that is installed with the OPK tools

*Id.* at MS–VRTS–958.

This document then describes at that "very high level" various preinstallation methods:

## Preinstallation Methods

The basic process for preinstalling Windows is the same for all versions of Windows XP and the Windows Server™ 2003 family, with only minor differences for each product.

Your preinstallation process might differ from the one described here, depending on the specific version of Windows you are installing and other factors. The right choice of methods for your company depends on variables such as the following:

* Number and type of computers you plan to manufacture
* Whether your manufacturing model is build-to-plan, build-to-order, or a combination
* How much you customize the operating system
* How much you automate your processes
* Your company's quality assurance checks for hardware components and manufactured systems
* Your company's existing infrastructure
* Your company's growth rate and business goals
* Expected demand for customer support and resources for meeting that demand

Table 1 lists the basic preinstallation methods supported through the OPK, and compares them according to the following criteria:

* **Speed:** The time to manufacture and deliver
* **Volume:** The number of computers manufactured
* **Customization:** The degree of modification to the preinstalled software

The methods listed demonstrate the major differences in preinstallation made possible by the OPK tools. More details are described later in this section and in the OPK User's Guide. You can modify the methods to fit your business needs.

Table 1. Comparison of Preinstallation Methods

| Method | Speed | Volume | Customization |
|---|---|---|---|
| Build-to-Plan<br>Image of master installation is deployed without customization to destination computers. | Fast | Highest | None |
| Build-to-Order<br>Image of master installation is deployed to destination computers, which are run in Factory mode and customized to order. | Fast | High | High |
| Network Setup<br>Destination computers are booted with Windows PE and Windows is preinstalled from a network distribution share. | Slowest | Medium | High |
| CD Boot<br>Setup is run on the destination computer using the Windows product CD. Manually customize, audit, and reseal the installation. | Slow | Lowest | Lowest |

OPK User's Guide topics:
Planning and Preparation
Preinstallation Requirements and Customization Guideline

*Id.* at MS–VRTS –959–60. Veritas does not link this document's disclosure to any of the asserted claims. Presumably, therefore, Veritas relies on this document as it does the OPK Guide, the primary reference to which this document refers. For reasons discussed above in connection with the OPK Guide, this document fails to show that Microsoft's customers have actually used the accused products in an infringing manner. Again, there is no dispute that the accused products have substantial non-infringing uses.

*BDD Guide (2005)*

This document is a lengthy (~100 pages) reference that discloses BDD in like manner as the WAIK Guide discloses WAIK and the OPK Guide discloses OPK. *See* Schallop Decl., Exh. II: VRTS 01828202–298. Dr. Nichols relies on this document in his infringement chart with respect to "Windows XP and Windows Server 2003 System Deployment Tools And Procedures." *See* n. 9 *supra.* Presumably, Dr. Nichols relies on this document in the same way that he relies on the WAIK Guide, but he does so only in connection

with (using claim 1 as an example) claim element 1[e]: "loading a fully configured operating system files from the first media to the storage device using the temporary operating system:"

> "Capturing the Image
> Once an image has been successfully created, it must be captured before it can be deployed. In the Enterprise edition of the Solution Accelerator for BDD, two mechanisms are available to accomplish this task:
> - Capture the disk image by using the SMS 2003 OSD FP Image Capture Wizard for deployment using SMS 2003.
> - Capture the disk image using third-party imaging tools, such as PowerQuest PQIDeploy, Symantec Ghost, and others. These tools are run after preparing the image using Sysprep, described previously. Various deployment mechanisms are available depending on the product."
> [BDD Imaging Guide (2005), p. 81 (VRTS 01828282)]
>
> "The SMS 2003 OSD FP can be used to deploy operating system images to existing or new computers. These images use the Advanced WIM image-file format, a file-based format that is highly compressed to minimize the network traffic generated when replicating or deploying an image." [BDD Imaging Guide (2005), p. 83 (VRTS 01828284)]

Nichols Infringement Report, Exh. G at G–12–G–13. Specifically, Dr. Nichols relies on the discussion of "Capturing the Image" on page 81 of that document. As noted above, there is no dispute that BDD relies on WAIK. Nevertheless, given that limited reliance, Dr. Nichols provides insufficient analysis to reasonably conclude that any Microsoft customer has used BDD in an infringing manner. According-ly, this document also fails to show that a Microsoft customer has actually used the accused products in an infringing manner.

*WinPE User Guide (2004)*

As with the WAIK and OPK Guides, this 131–page document provides various deployment scenarios. *See* Schallop Decl., Exh. JJ: VRTS 01828577–707. For example, this document provides:

### Deployment Scenarios

The Windows Preinstallation Environment (Windows PE) is commonly used for two scenarios:

- Standalone deployment
- Network Deployment

### Desktop and Server Deployment

Windows PE was developed specifically to address desktop and server deployment scenarios. In the past, MS-DOS boot disks were used to handle system configuration and operating system installation. With support for MS-DOS becoming more difficult to find, Windows PE brings a lightweight 32-bit environment that leverages the drivers and basic features as the Windows operating system.

### Usage Example: Standalone Deployment

In a standalone deployment scenario, you create a CD or DVD that contains both Windows PE and the operating system to install. You can distribute this removable media to users or to technicians who install or upgrade machines at the remote site.

The following is a typical standalone deployment scenario.

1. Start the computer from the CD or DVD into Windows PE.
 STARTNET.CMD loads the appropriate network services, and then passes control to a custom batch file. The custom batch file inspects the computer to ensure it is the proper make/model to deploy to. If the computer is a valid target, a process backs up user data from the system. Because Windows PE has full NTFS access to the hard disk drive, the data can be moved to a remote location or to another location in the computer.
2. If necessary, use DISKPART to create the partitions of the hard disk drive.
3. After creating the partitions, use Windows Setup or a third-party disk-imaging utility to restore an image to the destination drive.

*Id.* at VRTS –580.

Dr. Nichols relies on this document in his infringement chart with respect to "Windows XP and Windows Server 2003 System Deployment Tools And Procedures," but only in connection with (using claim 1 as an example) claim element 1[c] ("providing a second media comprising configuration-specific data files"):

The OPK deployment tools and procedures provide Windows PE on a second media, i.e., data storage material from which the data processing system may be initialized. For example, the *WinPE User Guide (2004)* teaches that WinPE can contain configuration-specific data files, such as drivers, which can be used to configure the data processing system in a specific manner and collectively provide necessary information for loading data form the first media to the storage device (or disk drive) of that system.

"For more information on building a version of Windows PE customized to meet your manufacturing needs, see Creating a Customized Version of Windows PE." [*OPK User Guide (2005)*, p. 61 (VRTS 01828375)]

"The Microsoft Windows Preinstallation Environment (Windows PE) Version 2004 is a minimal Win32 subsystem with limited services, based on the Windows kernel running in protected mode. It contains the minimal functionality that you need to run Windows Setup, install an operating system from a network share, automate basic processes, and perform basic hardware validation." [*WinPE User Guide (2004)*, p. 2 (VRTS 01828578)]

"You can easily add or remove network drivers from a customized version of Windows PE." [*WinPE User Guide (2004)*, p. 3 (VRTS 01828579)]

"As new devices become available, you can easily remove unnecessary drivers or incorporate additional drivers into a customized version of Windows PE." [*WinPE User Guide (2004)*, p. 3 (VRTS 01828579)]

"You may want to create a version of Windows PE or configure Windows PE to use a different set of drivers. To support these needs, the OPK and Windows PE build tools include a collection of scripts and utilities that enable you to build a version of Windows PE customized for your environment." [*WinPE User Guide (2004)*, p. 10 (VRTS 01828586)]

"The standard version of Windows PE is released on the Windows OPK CD and the Windows PE CD. You can use either CD to create an image of Windows PE that you can customize and burn to a CD.

You can also place the customized Windows PE image on a hard disk, as described in Placing Bootable Windows PE on a Hard Disk, or on a Remote Installation Server (RIS). Although not explicitly discussed in this guide, you can also place Windows PE on bootable media other than CDs or hard disks." [*WinPE User Guide (2004)*, p. 11 (VRTS 01828587)]

"To reduce boot time, you may configure a custom version of Windows PE to load a limited set of mass-storage drivers, instead of loading the entire set of mass-storage drivers that are natively supported in Windows XP. You may also configure Windows PE to load additional third-party drivers.

To control which mass-storage drivers are loaded in Windows PE, customize the Winpeoem.sif file Modifying this file changes the list of drivers that Windows PE loads when it starts, which affects the start time of Windows PE." [*WinPE User Guide (2004)*, p. 13 (VRTS 01828589)]

"By default, Windows PE loads the system boot drivers and mass-storage drivers by using Setup Loader. You can install network adapter drivers by running the Factory.exe tool. You can also build a Windows PE image, and then install Plug and Play device drivers.

To add Plug and Play device drivers to a Windows PE image, complete the three procedures outlined in this topic:
* Adding Plug and Play Device Driver Support to Windows PE
* Adding Drivers to an Offline Windows PE Image
* Placing a Windows PE Image on a Hard Disk Driver or CD-ROM."

> [WinPE User Guide (2004), p. 14 (VRTS 01828590)]
>
> "To add support for mass-storage controllers using Windows PE
>
> 1. Copy your driver package to a directory under %WINPEROOT%\System32. For example:
>
> %WINPEROOT%\System32\Driver1
>
> 2. Edit the %WINPEROOT%\System32\Winpeoem.sif to remove the semicolons from the [OemDriverParams] section and add the name of the directory into which you copied your driver package to the OemDriverDirs entry. For example:
>
> [OemDriverParams]
> OemDriverRoot = ""
> OemDriverDirs = Driver1
>
> 3 Optional: If the mass-storage device requires any supporting *.dll files, copy those to the appropriate directory. You can determine if these files are required by examining the Txtsetup.oem file."
> [WinPE User Guide (2004), p. 14 (VRTS 01828590)]
>
> "Winpeoem.sif
>
> The Winpeoem.sif file modifies the set of mass-storage drivers that a custom version of the Windows Preinstallation Environment (Windows PE) loads. Additional drivers must be located in %WINPEROOT%\System32.
>
> The following table lists the sections that you can include in a Winpeoem.sif file.
>
> | Section | Description |
> | --- | --- |
> | [MassStorageDrivers.Append] | Specifies one or more third-party mass-storage drivers that a custom version of Windows PE loads, in addition to the entire set of drivers that Microsoft® Windows® XP natively supports. |
> | [MassStorageDrivers.Replace] | Specifies one or more third-party mass-storage drivers that a custom version of Windows PE loads instead of the entire set of drivers that Windows XP natively supports. |
> | [OEMDriverParams] | Specifies non-Plug and Play drivers for Windows PE to load, in addition to the drivers that Windows XP natively supports. |
> | [Version] | Required section for all .inf files that identifies the version of Windows. |
>
> " [WinPE User Guide (2004), p. 178 (VRTS 01828704)]

1[e] ("loading the fully configured operating system files from the first media to the storage device using the temporary operating system"):

> "A basic method for using the Windows Preinstallation Environment (Windows PE) is as follows:
> 1. Start the newly assembled computer with Windows PE.
> 2. Run any relevant hardware diagnostic applications.
> 3. Configure the hard disk.
> 4. Deploy the operating system to the computer by:
> * *Copying an Image from the network.*
> *–OR–*
> * *Running Winnt32 at the command prompt in Windows PE and installing the operating system.*
> 5. Restart into the installed operating system by using Sysprep in Factory mode, or seal the operating system by using Sysprep, and then shut down the computer."
> [WinPE User Guide (2004), p. 5 (VRTS 01828581) (emphasis added)]

and 1[f] ("reinitializing the data processing system from the storage device to install the fully configured operating system"):

> The OPK deployment tools and procedures involve restarting the operation of the data processing system, i.e., the destination computer, from the storage device to set up a fully configured operating system for use.
>
> "A basic method for using the Windows Preinstallation Environment (Windows PE) is as follows:
> 1. Start the newly assembled computer with Windows PE.
> 2. Run any relevant hardware diagnostic applications.
> 3. Configure the hard disk.
> 4. Deploy the operating system to the computer by:
> • Copying an image from the network.
> –OR–
> • Running Winnt32 at the command prompt in Windows PE and installing the operating system.
> 5. *Restart into the installed operating system by using Sysprep in Factory mode, or seal the operating system by using Sysprep, and then shut down the computer.*"
> [*WinPE User Guide (2004)*, p. 5 (VRTS 01828581) *(emphasis added)*]

*See* n. 9 *supra;* Nichols Infringement Report, Exh. G at G–3—G–6 & G–9—G–13. Given that limited reliance, Dr. Nichols provides insufficient analysis to reasonably conclude that WinPE has been used in an infringing manner. Accordingly, this document also fails to show that a Microsoft customer has actually used the accused products in an infringing manner.

### *WinPE 2.0 for Vista Overview*

This 9–page document begins as follows (*see* Schallop Decl., Exh. KK: VRTS 00943130–38):

**Windows PE 2.0 for Windows Vista Overview**

Published: November 14, 2006 | Updated: January 31, 2007
By Tony Northrup

Windows PE 2.0 is the core deployment foundation for Windows Vista. It is designed to make large-scale, customized deployments of the new Windows Vista operating system notably easier. With the release of Windows Vista, Windows PE 2.0 is available to all Windows business customers to assist in deployments of Windows Vista as well as downlevel operating systems such as Windows XP. Windows PE enables users to inject drivers, configure Windows Vista offline, provide recovery solutions as well as diagnose and troubleshoot system problems.

Windows PE 2.0, built for Windows Vista, is available for download as part of the Business Desktop Deployment (BDD 2007) solution, available here.

**Abstract**

Microsoft Windows Preinstallation Environment (Windows PE) 2.0 provides powerful preparation and installation tools for the Microsoft Windows Vista operating system. With Windows PE, you can start a subset of Windows Vista from a network or removable medium, which provides network and other resources necessary to install and troubleshoot Windows Vista. This document is an introduction to Windows PE, its capabilities, and its improvements over earlier pre-installation technologies.

**On This Page**

• Introduction
• Using Windows PE for Installation
• Using Windows PE for Troubleshooting
• Windows PE Technology
• Comparing Windows PE 2.0 to Earlier Technologies
• Summary

*Id.* at VRTS –131.

Dr. Nichols relies on this document in his claim chart with respect to "Windows Vista and Windows Server 2008 system recovery tools and procedures," *see* n. 10 *supra*, but only in connection with (using claim 1 as an example) claim element 1[c] ("providing a second media comprising configuration-specific data files"):

> "Windows PE and the Windows Imaging Format
> The most powerful and flexible way to distribute Windows PE is within a Windows Imaging (WIM) file. WIM is the file-based imaging format that Windows Vista uses for rapid installation on a new computer. WIM files stores copies (known as images) of one or more operating systems, such as Windows Vista or Windows PE. Maintaining an operating system in a WIM file is easy, because you can add and remove drivers, updates, and Windows components offline, without ever starting the operating system. Maintaining Windows PE images in WIM files will be very similar to maintaining Windows Vista images."
> [WinPE 2.0 Overview (2005), p. 4 (VRTS 00943133)]
>
> "Windows PE Technology
> …
> Flexible
> If Windows Vista includes drivers for your computer hardware, your hardware will probably work with Windows PE, too, because Windows PE includes most Windows Vista drivers. You can also add new drivers to a Windows PE image. In enterprise environments, you could add every driver required by any computer in your organization to a single Windows PE image so that the image will work with any of your computers."
> [WinPE 2.0 Overview (2005), p. 6 (VRTS 00943135)]
>
> "Windows PE 2.0 Compared to MS-DOS Boot Disks
> …
> * Load and access 32-bit and 64-bit device drivers for audio, video, motherboard chipsets, batteries, and other devices that use Window Vista drivers. Windows PE provides the ability to load Windows mass-storage, networking, audio, video, and other types of drivers."
> [WinPE 2.0 Overview (2005), p. 7 (VRTS 00943136)]
>
> "Windows PE 2.0 Compared to Earlier Versions of Windows PE
> …
> Windows PE 2.0 now supports driver injection, which enables you to load drivers either before or after Windows PE has launched. Now, if you start Windows PE and discover that it lacks a necessary driver, you can load the nonstandard driver from removable media and immediately use the hardware without rebooting."
> [WinPE 2.0 Overview (2005), p. 8 (VRTS 00943137)]
>
> "Summary
> …
> For troubleshooting purposes, Windows PE replaces MS-DOS boot disks for troubleshooting when Windows Vista cannot start properly. In fact, Windows PE will automatically load and launch the Windows Recovery Environment if Windows Vista fails to start. IT departments can use Windows PE for manual troubleshooting, too, can leverage either the built-in tools or add tools to the Windows PE image."
> [WinPE 2.0 Overview (2005), pp. 8-9 (VRTS 0094313708)]

and 1[d] ("initializing the data processing system from the second media to provide a temporary operating system and using the configuration specific data files to configure the data processing system"):

> "Windows PE 2.0 is the core deployment foundation for Windows… Windows PE enables users to inject drivers, configure Windows Vista offline, provide recovery solution as well as diagnose and troubleshoot system problems."
> [WinPE 2.0 Overview (2005), p. 2 (VRTS 00943131)]
>
> "Introduction
> …
> * Troubleshooting. Windows PE is also useful for both automatic and manual troubleshooting. For example, if Windows Vista fails to start because of a corrupted system file, Windows PE can automatically start and launch the Windows Recovery Environment. You can also manually start Windows PE to use built-in or custom troubleshooting and diagnostic tools.
>
> * Recovery. Original Equipment Manufacturers (OEMs) and Independent Software Vendors (ISVs) can use Windows PE to build customized, automated solutions for recovering and rebuilding computers running Windows Vista. For example, users could start their computers from Windows PE recovery CDs or recovery partitions to automatically reformat their hard disks and re-install Windows Vista with the original drivers, settings, and applications."
> [WinPE 2.0 Overview (2005), p. 3 (VRTS 00943132)]

See Nichols Infringement Report, Exh. H at H–6—H–11. This document discloses certain capabilities of the accused products, but does not appear to disclose any particular method for backup and recovery, at least none that Dr. Nichols points to. Accordingly, this document fails to show that Microsoft customers have actually used WinPE to perform a claimed method.

### WinPE Technical Reference

This set of documents includes a "Windows Recovery Technical Reference" jump page (half-page) that links to "What is Windows RE" (~2 pages), "How Windows RE Works" (6 pages), and "Windows RE Scripts" (half-page) (*see* Schallop Decl., Exh. LL: VRTS 01843379–90).

> **Windows Recovery Technical Reference**
>
> Windows Recovery Environment (Windows RE) is an extensible recovery platform based on Windows Preinstallation Environment (Windows PE). When the computer fails to start, Windows automatically falls over into this environment, and the Startup Repair tool in Windows RE automates the diagnosis and repair of an unbootable Windows Vista installation. Furthermore, Windows RE is a starting point for various tools for manual system recovery. The primary audience of this technology includes original equipment manufacturers (OEMs), original device manufacturers (ODMs), and corporate IT professionals.
>
> **In this Section**
>
> What is Windows RE? [http://technet2.microsoft.com/WindowsVista/en/library/36da2251-0565-4c1b-8b7a-56c9cf325c7d1033.mspx]
>
> How Windows RE Works [http://technet2.microsoft.com/WindowsVista/en/library/d507a490-90ce-4457-923a-359ill2c9b9bf1033.mspx]
>
> Windows RE Scripts [http://technet2.microsoft.com/WindowsVista/en/library/b58e1db8-ef28-4219-a967-a3bd22a27351c33.mspx]

*Id.* at VRTS –379.

Dr. Nichols relies on these documents in his claim chart with respect to "Windows Vista and Windows Server 2008 system recovery tools and procedures," *see* n. 10 *supra,* but only in connection with (using claim 1 as an example) claim element 1[c] ("providing a second media comprising configuration-specific data files"):

> **"Technologies Related to Windows RE**
> Windows RE is related the following technologies:
>
> Windows Preinstallation Environment (Windows PE)
> Windows Preinstallation Environment (Windows PE) is a minimal Win32 operating system with limited services. Windows RE is built from Windows PE."
> [*WinRE Technical Reference* (VRTS 01843380-81)]

1[e] ("loading the fully configured operating system files from the first media to the storage device using the temporary operating system"):

> **"User-created Recovery Image**
> Windows Vista provides end users with the ability to create a backup image of their entire system. End users can do this by using the Backup tool. The system image can be stored on an external hard disk, a hard disk partition other than those imaged, or a DVD. To restore the computer by using this system image, users must launch the restore interface from the Windows RE manual tools list."
> [*WinRE Technical Reference* (VRTS 01843381)]

and 1[f] ("reinitializing the data processing system from the storage device to install the fully configured operating system"):

> **"System Administrator Scenario**
> A system administrator for an enterprise is attempting to fix a client computer that cannot start. The administrator presses F8 during startup and selects the Recovery Environment entry, which boots the computer into Windows RE. He logs on by using a local administrator account and selects the full-volume restore application from the list of available tools. Once the restore has completed, the administrator clicks the Reset button in Windows RE, and the computer restarts."
> [*WinRE Technical Reference* (VRTS 01843380)]

Nichols Infringement Report, Exh. H at H–11—H–13. This document discloses certain capabilities of the accused products, but does not appear to disclose any particular method for backup and recovery, at least none that Dr. Nichols points to. Accordingly, this document fails to show that Microsoft customers have actually used WinPE to perform a claimed method.

### Getting Started with OPK (2006)

This document discloses "a basic end-to-end deployment scenario" for OPK, much

as the WAIK Getting Started reference does for WAIK. This document comprises approximately 11 pages, and begins as follows (*see* Schallop Decl., Exh. MM: VRTS 01828299–309).

# Getting Started with the Windows OEM Preinstallation Kit (OPK)

Last Updated: May 2006

Applies to: OEMs and System Builders

Abstract: This document covers a basic end-to-end deployment scenario. This document demonstrates how to create, capture, and deploy an installation in a network environment.

This information applies to the following operating systems:
 Windows Vista™

Disclaimer

This document supports a preliminary release of a software product that may be changed substantially prior to final commercial release, and is the confidential and proprietary information of Microsoft Corporation. It is disclosed pursuant to a non-disclosure agreement between the recipient and Microsoft. This document is provided for informational purposes only and Microsoft makes no warranties, either express or implied, in this document. Information in this document, including URL and other Internet Web site references, is subject to change without notice. The entire risk of the use or the results from the use of this document remains with the user. Unless otherwise noted, the companies, organizations, products, domain names, e-mail addresses, logos, people, places, and events depicted in examples herein are fictitious. No association with any real company, organization, product, domain name, e-mail address, logo, person, place, or event is intended or should be inferred. Complying with all applicable copyright laws is the

responsibility of the user. Without limiting the rights under copyright, no part of this document may be reproduced, stored in or introduced into a retrieval system, or transmitted in any form or by any means (electronic, mechanical, photocopying, recording, or otherwise), or for any purpose, without the express written permission of Microsoft Corporation.

Microsoft may have patents, patent applications, trademarks, copyrights, or other intellectual property rights covering subject matter in this document. Except as expressly provided in any written agreement with Microsoft, the furnishing of this document does not give you any license to these patents, trademarks, copyrights, or other intellectual property.

© 2006 Microsoft Corporation. All rights reserved.

Microsoft, MS-DOS, Windows, Windows Server, and Windows Vista are either registered trademarks or trademarks of Microsoft Corporation in the United States and/or other countries.

All other trademarks are property of their respective owners.

## Contents

Introduction .................................................................... 1
 Deployment Scenario ...................................... 1
 Requirements .............................................. 2
Build a Lab Environment ........................................ 2
Build an Answer File ............................................. 2
Build a Master Installation ..................................... 6
Create an Image .................................................. 6
Deploy an Image .................................................. 8
Summary .......................................................... 9

## Introduction

The Windows OEM Preinstallation Kit (OPK) is designed to help original equipment manufacturers (OEMs) and system builders deploy Windows Vista onto new hardware.

This document covers a basic end-to-end deployment scenario, specifically how to create, capture, and deploy an installation in a network environment. This document demonstrates one example of a deployment. For a comprehensive description of all the tools and deployment methods, see the *Windows OEM Preinstallation Kit User's Guide* (Opk.chm).

## Deployment Scenario

In this example, you will implement basic image-based deployment, illustrated below.

This process includes:

1. Building a lab environment.
2. Creating an answer file by using Windows System Image Manager (Windows SIM).
3. Building a master installation by using the product DVD and your answer file.
4. Creating an image of the master installation by using the Windows Preinstallation Environment (Windows PE) and ImageX technologies.
5. Deploying the image from a network share onto a destination computer by using Windows PE and ImageX technologies.

At the end of this example, you will have a working lab environment that includes a technician computer, a valid answer file, a bootable Windows PE CD, and your first custom Windows image. You will have a basic understanding of how to use the OPK tools to deploy a new installation. You can go back and modify your answer file to include additional customizations, or automate parts of the process by scripting some of the manual steps in this scenario.

For more information on the tools and different deployment techniques, see the *Windows OEM Preinstallation Kit User's Guide* (Opk.chm).

*Id.* VRTS –299–301.

Just as the WAIK Getting Started reference, this document provides the following list of requirements:

### Requirements

To complete this scenario, you need the following:

- Window Vista product DVD.
- Windows OPK DVD.
- A technician computer.
- A master computer.
- Network connectivity to simulate deployment.
- Floppy disk or Universal Flash Device (UFD), such as a USB memory key.
- One blank CD-R/RW disc.

The *technician computer* is the computer in your lab on which you install the OPK. The technician computer can be any computer running Windows XP, Windows Server 2003, or Windows Vista. This computer requires a DVD-ROM drive and CD-R/RW-capable drive, or a combo drive that supports both.

A *master computer*, also known as a reference computer, is a fully assembled computer on which you install a customized installation by using the Windows product DVD and your custom answer file. Once installed, you capture and store an image of the installation on a network share. There are no software requirements for this computer. Both technician and master computers require a network card and a working network environment.

Note For the purposes of this example, the master computer will serve as your master and destination computer. The master/destination computer represents the computer you are about to deploy. After you build a master installation, you will capture and store an image of that installation on a network share. You will then reformat the hard drive, returning it to a blank state. The computer now becomes your destination computer. You will then deploy the image from the network share back onto the same computer. This process simulates an image-based deployment.

*Id.* at VRTS –301–302.

Veritas makes no effort to link the disclosed deployment scenario to the asserted claims. Once again, there is no dispute

that the accused products have substantial non-infringing deployment uses. Accordingly, this document fails to show that a

Microsoft customer has actually used the accused products in an infringing manner.

Furthermore, as does the WAIK Getting Started reference, the front page of this document contains a disclaimer that indicates that the reference had limited release, if at all, and may not have been available to Microsoft customers:

### Requirements

To complete this scenario, you need the following:

* Window Vista product DVD.
* Windows OPK DVD.
* A technician computer.
* A master computer.
* Network connectivity to simulate deployment.
* Floppy disk or Universal Flash Device (UFD), such as a USB memory key.
* One blank CD-R/RW disc.

The *technician computer* is the computer in your lab on which you install the OPK. The technician computer can be any computer running Windows XP, Windows Server 2003, or Windows Vista. This computer requires a DVD-ROM drive and CD-R/RW-capable drive, or a combo drive that supports both.

A *master computer*, also known as a reference computer, is a fully assembled computer on which you install a customized installation by using the Windows product DVD and your custom answer file. Once installed, you capture and store an image of the installation on a network share. There are no software requirements for this computer. Both technician and master computers require a network card and a working network environment.

Note For the purposes of this example, the master computer will serve as your master and destination computer. The master/destination computer represents the computer you are about to deploy. After you build a master installation, you will capture and store an image of that installation on a network share. You will then reformat the hard drive, returning it to a blank state. The computer now becomes your destination computer. You will then deploy the image from the network share back onto the same computer. This process simulates an image-based deployment.

That is, this documents pertains to a version of OPK for a product that had not yet been commercially released. Overall, therefore, this document fails to show that a Microsoft customer actually used the accused software to perform the claimed method.

### *Vista Deployment Tools Overview (2007)*

This 27–page document appears to provide just what its title suggests, namely, an overview of the Vista deployment tools. *See* Schallop Decl., Exh. OO: VRTS 01837060–86. Dr. Nichols relies on this document in his infringement report with respect to "Windows Vista and Windows Server 2008 System Deployment Tools and Procedures." *See* n. 6 *supra;* Nichols Infringement Report, Exh. F. This document, and the parts relied on by Dr. Nichols, describes what Windows Vista and its various components are, and describes various capabilities of Windows Vista. This document does not, however, describe any methods for using them, nor does Dr. Nichols point to any. Accordingly, this document does not show that Microsoft's customers have actually used the accused products in an infringing manner.

### 4. "Microsoft's own witnesses"

Veritas relies on testimony of three witnesses: John MacIntyre, Mark Myers and Wes Miller. Veritas' Response at 9–13. According to Microsoft, however, "[n]one of this testimony describes nearly enough detail to support a funding of infringement. Two employees did not know exactly how Microsoft customers deploy, because customers treat their deployment methods is proprietary, and the third expressly gave a high level description." Microsoft's Reply at 6–7 (citations omitted).

### a) John MacIntyre

Veritas states that Mr. McIntyre "was asked in more detail concerning his knowledge, and he reaffirmed that the typical factory installation process used by Microsoft's OEM customers infringes the asserted claims of the '573 Patent." Veri-

tas' Response at 10. Microsoft, on the other hand, contends that Veritas' representation that Mr. McIntyre testified that "OEMs 'use the identified combinations *to perform the infringing method of claim 30* (as well as other claims),"' and that he "'reaffirmed that the typical factory installation process used by Microsoft's OEM customers *infringes the asserted claims of the '573 Patent"'* is "wildly false." Microsoft's Reply at 8 (Microsoft's emphases).

According to Veritas, Mr. MacIntyre "testified that he was familiar with the 'typical' factory deployment process used by OEM's for deployment of the Vista operating system, particularly that of HP and Dell." Veritas' Response at 9–10. Veritas points to the following deposition testimony:

Q. Okay. What is your current position with Microsoft?

A. I am a lead program manager.

Q. Can you tell me generally what your current responsibilities are as a lead program manager?

A. Sure. I work on deployment technology for a product that has not been released yet, called Windows Live Core.

Q. How long have you been in your current position?

A. Since October of 2006.

Q. And prior to taking that position in October 2006 you have another position at Microsoft?

A. Yes.

Q. What was that?

A. I was working in the Windows Core Operating System Division, specifically on deployment technology for the Windows operating system.

Q. When you say deployment technology for the Windows operating system, can you explain to me a little bit more what you mean by that?

A. The charter of the team—I'm not sure exactly what you want me to expand on, but I can tell you that the charter of the team was to build technology that would help customers deploy Windows to machines, and be that OEM customers, IT customers or consumers.

Q. And was this—the work that you are doing in that position prior to October 2006 specific to the Vista operating system?

A. Correct.

Q. And I'm sorry, but—you told me but I missed it. What was your specific title during that period of time prior to October 2006?

A. I was also a lead program manager.

Q. In that role as lead program manager on the deployment technology—working on the deployment technology that you described, was there any specific aspect of the deployment technology that you were responsible for?

A. I was responsible for what was— what is referred to as clean installation, and that inclusive—I was specifically responsible for imaging technology, and there were a group of people who work for me that had—were responsible for other technology contributing to clean installation of the operating system.

Q. And when you say "clean installation" do you mean installation of the operating system in a machine that doesn't already have an operating system?

A. When I refer to "clean installation" I mean, where were not migrating the contents of an existing operating system to a new operating system. It does not mean that there isn't the existence of a pre-existing operating system; it means that we're not going to carry the contents of that operating system forward.

Schallop Decl., Exh. C: Deposition Excerpts of John MacIntyre ("MacIntyre

Dep.") at 6:23–8:24. Veritas particularly relies on the italicized portion below:

Q. Okay. If you could look it slide 23 of Exhibit 183. The Bates number on the slide is 244074. This is a slide that says "IBS Clean install—OEM/corp." Do you see that?

A. Yes.

Q. Are you familiar with the—the typical factory deployment project that's used by the OEMs? Process, rather.

A: I'm familiar with—or I will say I've had conversations with Dell and HP about their factory deployment process.

Q. Okay. In the—in slide 23, the first slide here says, "Computer is booted from CD—boots to Win PE." See that?

A. Yes.

Q. the—we talked a little bit earlier about booting from the CD, and I think you said that your understanding was that wasn't typically how the factory installation process was done by OEMs; is that right?

A. Correct.

Q. *The—can you explain to me—walk me through your understanding, at least, of what the—the steps are in the typical factory installation process for the OEMs?*

A. *So a—a **typical factory deployment process** entails a—a bare machine coming out, it—booting from the network via PXE, PXE—over PXEPXE downloading the WinPE image, the WinPE image coming up into an operating environment, and then doing things like hardware configuration of that particular system,—this is all in the automated process—and eventually, once that's complete, laying down operating system image to the system. Some **OEMs** reboot the system into the operating systems, others ship them out as is.*

Q. Okay. So then you'd have the—the OEM would have the bare-metal machine, and by "bare-metal machine," that's just the hardware; is that right?

A. Correct.

Q. Then there would be a network connection for that machine; is that right?

A. Yes.

Q. And the OEM would turn on the machine, I guess, and that would—through—it would communicate back to the PXE server; is that right?

A. Yes.

Q. And do a network boot;—

A. Yes.

Q. —is that right? Download the WinPE image from the PXE server; is that right?

A. Yes.

Q. And then the bare-metal machine would boot to WinPE; is that right?

A. Yes.

*Id.* at 42:18–44:24.

According to Veritas, "[i]n summary fashion, that is exactly the deployment method of the asserted claims of the '573 Patent. To confirm that Mr. McIntyre [sic] was, in fact, describing his direct knowledge of the use of the infringing method by Microsoft's OEM customers, Mr. McIntyre [sic] was asked in more detail concerning his knowledge, and he reaffirmed that the typical factory installation process used by Microsoft's OEM customers infringes the asserted claims of the '573 Patent." Veritas' Response at 10. In support of that argument, and in addition to the foregoing, Veritas points to the following deposition testimony:

Q. You said then there would be hardware configuration at that stage; is that right?

A. Yes.

Q. And what you mean by that?

A. So specifically I mean disk configuration, so setting up the hard drive for the operating system, possibly formatting.

Q. Would there be any testing at that point of the hardware devices themselves?

A. There may be. I'm not aware of any OEMs that do extensive testing of hardware on the factory floor.

Q. Then the—the WinPE image that's downloaded from the PXE server would include the drivers and things that would operate the hardware that comprises the bare-metal machine; is that right?

A. That is possible. In not all cases.

Q. What you mean when you say it's possible and not in all cases?

A. If there is hardware that is new to—to a line, then that hardware—those drivers may be downloaded from the network through WinPE.

Q. But if the—if WinPE included the drivers for the hardware configuration already—that they had for the bare metal configuration. Already, than those drivers would be loaded when WinPE is booted to enable the—that bare metal configuration—the harbor of that bare metal configuration?

A. Yes.

Q. Then the Win—WinPE, then, environment would be used to download the end-user operating system image at that point; is that right?

A. Yes.

Q. And where would that come from?

A. That would come from a network location, a network server.

Q. Then I think you said at that point some—or strike that—that when it downloads it would write that image to the hard drive of the—the machine that is being set up; is that right?

A. Yes.

Q. Then I think at that point, you said that some OEMs would reboot the machine; is that right?

A. After application of the imaging system may be rebooted before sending it to the customer.

Q. And that rebooting would—would then put the system under control of the operating system that came in the image that was downloaded from the network?

A. Yes.

Q. Okay. In a case where it's rebooted, is there anything else that's done before—other than turning it off, I suppose, before that machine is shipped out to the customer? The end-user.

A. So—again, I'll say, I'm not—some of the details that OEMs share are—are often incomplete and not always accurate, but in discussion with OEMs—I can't speak to exactly what they do, but in discussions with OEMs, OEMs have always talked about doing further customization to the operating system before—once it is applied to disk but before it is rebooted.

Q. Now, whether the—once the operating system images downloaded from the network, whether the system's rebooted at that point, or simply shipped to the customer, in order for that system to operate under the control of the operating system that was downloaded in the image, it needs to be rebooted; is that right?

A. So as part of the deployment process—maybe I'll just speak to where—where reboot is necessary to transition to the Vista operating system. After an image is applied, a system—and a system is running—the hardware is running WinPE, a reboot must happen for Vista to initialize and to start running.

MacIntyre Dep. at 44:24–47:25 (objections omitted).

Contrary to Veritas' assertion, Mr. MacIntyre was not "describing his direct knowledge of the use of the infringing method by Microsoft's OEM customers." *See* Veritas' Response at 10. Rather, Mr. MacIntyre's testimony is classic hearsay, *i.e.*, "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *See* Fed.R.Evid. 801(c). Here, the declarant, Mr. MacIntyre, testified about the typical OEM deployment process based on "conversations with Dell and HP about their factory deployment process" and "discussion with OEMs." Veritas offers Mr. MacIntyre's testimony about what the OEMs said to prove that OEMs actually perform that process.

▆▆▆ And, although Mr. MacIntyre is Microsoft's employee, and Veritas offers Mr. MacIntyre's testimony against Microsoft, Mr. McIntyre's statement does not qualify as an "admission by a party opponent" under Rule 801(d)(2).[12] Veritas relies on the third-party OEMs' statement, not the statement of Microsoft through Mr. MacIntyre. Mr. MacIntyre had expressly questioned the truth of OEM's statements to him ("some of the details that OEMs share are—are often incomplete and not always accurate, but in discussion with OEMs"). There is no evidence that either the OEMs or Mr. MacIntyre are authorized by Microsoft to make any statement about the typical OEM deployment process. Nor is there any evidence that the OEMs are Microsoft's agents or employees such that their statements regarding the typical OEM deployment process would concern matters within the scope of their agency or employment.

Furthermore, the evidence of record does not support admitting Mr. MacIntyre's testimony under Rule 807.[13] Again, Mr. MacIntyre has expressly questioned the trustworthiness of the OEMs' state-

---

12. Rule 801(d)(2) provides:

(2) *Admission by party-opponent.* The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator * * *. The contents of the statement shall be considered but are not alone sufficient to establish the declarant's authority under subdivision (C), the agency or employment relationship and scope thereof under subdivision (D), or the existence of the conspiracy * * * under subdivision (E).

13. Rule 807 provides:

A statement not specifically covered by Rule 803 or 804 [hearsay exceptions] but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

ments to him. There is no evidence that Veritas at all attempted to discover the typical OEM deployment process from the OEMs themselves—despite learning from Mr. MacIntyre two OEMs (HP and Dell) to question.

Under Rule 802, "hearsay is not admissible," and thus may not be considered in determining whether Veritas has met its burden on summary judgment. *See Orr v. Bank of Am., NT & SA,* 285 F.3d 764, 773 (9th Cir.2002)("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). Accordingly, Mr. MacIntyre's testimony is not considered in evaluating whether Veritas has raised a genuine issue of material fact regarding use of the patented process by Microsoft's customers.

Even if Mr. MacIntyre's testimony was admissible for the purpose for which Veritas wishes to use it, Mr. MacIntyre's testimony simply does not support Veritas' contention. In asserting that "[i]n summary fashion, that is exactly the deployment method of the asserted claims," Veritas points to the expert report of Dr. Nichols. The portion of Dr. Nichols report referred to by Veritas, however, makes no reference to Mr. MacIntyre's testimony. The only apparent link between the foregoing testimony and the asserted claims is in Exhibit F of Dr. Nichols' report, where Dr. Nichols relies on Mr. MacIntyre's testimony as disclosing the preambles of the asserted claims. *See* Nichols Infringement Report, Exh. F at F–4—F–5. In other words, according to Dr. Nichols, Mr. MacIntyre's testimony describes, for example, in claim 1, "a method for loading a fully configured operating system onto a storage device of a data processing system." Dr. Nichols does not link any of the foregoing testimony to the method steps recited in the asserted claims. As is clear from the

WAIK Guide "deployment walkthroughs," for example, there are a number of different ways to deploy the Windows operating system that Dr. Nichols has not identified as infringing. Even accepting as true that the OEMs deployed WinPE in the manner described by Mr. MacIntyre, his testimony does not suggest which deployment method was used. Given the broad nature of Mr. MacIntyre's testimony and number of the undisputed substantial non-infringing uses of the accused products, no reasonable juror could conclude from Mr. MacIntyre's testimony that the typical OEM deployment process performed the claimed methods.

Veritas also contends that Mr. MacIntyre "testified concerning his knowledge of the use of the specified recovery scenarios to recover an operating system in a manner that infringes the claims of the '573 Patent." Veritas' Response at 11. Mr. MacIntyre testified (the portion particularly relied upon by Veritas is italicized below (boldface emphasis by Veritas)):

Q. Now, you—your roles as the lead program manager for deployment technologies for Vista did not, other than some discussions that we talked about earlier, involve the use of WinPE in recovery scenarios, correct?

A. Correct. I've had—well,—I've had discussions with WinPE in the recovery context in the area of licensing but not specifics on—in terms of what—how people are using—specifically using the WinPE technology.

Q. *Do you know how WinPE is used in the recovery context?*

A. *I—I'm familiar with a couple applications of WinPE in the recovery context.*

Q. *Can you tell me what your understanding is of those applications with which you're familiar, at least?*

*A. So Win—Win RE, specifically we worked closely with that team to enable a recovery solution, where they—they build an application on top of WinPE to enable recovery of images, and I don't recall specific ISVs but there were a **number of other ISVs building recovery solutions where the recovery environment was WinPE**, so WinPE was used as a—a temporary OS to restore an operating system.*

Q. And were there any other app—recovery applications for WinPE with which you're familiar?

A. I—other than custom OEM solutions, I don't recall any specific recovery products.

MacIntyre Dep. at 51:14–52:14. Here, as well, Mr. MacIntyre's testimony is far too broad and vague to support any reasonable inference that the "other ISVs" performed the claimed methods. Thus, Mr. MacIntyre's testimony fails to show that Microsoft's customers used the accused products as called for in the asserted claims.

**b) Mark Myers**

Veritas also contends that Mark Myers "confirmed under oath his knowledge of the use of the accused deployment scenarios to perform the methods claimed by the '573 patent." Veritas' Response at 10. Microsoft again responds that this representation of Mr. Myers' testimony is "wildly false." Microsoft's Reply at 8. Veritas cites the following testimony:

Q. Okay. The—in the—when you are in the incubation area did you have a specific title?

A. No. Senior program manager is my title.

Q. How long were you in that role?

A. Three years.

Q. Prior to that role with Microsoft did you have a different position?

A. I did.

Q. And what was that?

A. That was [an] OEM manufacturing program manager.

Q. Can you describe for me a little bit what your responsibilities were in that role?

A. My responsibilities were to gather requirements from our OEMs and ODMs regarding tool sets that we create for OEM preinstall of our operating system, called the OPK.

Schallop Decl., Exhibit F: Deposition Excerpts of Mark Myers ("Myers Dep.") at 9:5–20.

A. So there are several phases that an OEM goes through. I don't have a white board. So—the first phase is they received the RTM media—released to manufacturing media from Microsoft, in the form of, you know, digital bits.

Q. And that RTM media, that would be the Vista operating system disk?

A. Correct. Well, it will either be a disk or we're shipping images to them electronically, not even on disk, so we can deliver, right, digital bits over the network to our OEM partners now.

Q. Okay.

A. They receive that, they then install at operating system on many of their makes and models systems, and they test that operating system on those makes and models for several weeks to months. After that phase, they create images that they then use to install on the PCs in the factory as they go down the factory line.

Q. And when you say, they create images, they'll create images for the various makes and models that you referred to in the testing?

A. They create generic images that work on many of their makes and models, so it's not a—you know, I can't say

its a specific, this is for an IBM T60, you know, with a DVD, you know, thing. So it's generic enough that it works and can be installed on many of the makes and models.

Q. Okay.

A. Then, once it's deployed—or, you know, installed, they boot into that operating system on the factory floor on each PC, because it is not customized to that specific PC, and so they'll load additional, you know, drivers. This is where they'll install additional software. If you ordered Office and Todd ordered Works, you would get that split there in the factory, along with, you know, additional value-add software, they call it. And then they test that to make sure that it's all good and everything has been done, and then they Sysprep it, and then they pack it in the box, and it goes out the door. That's about as general as I can be. Or as specific.

*Id.* at 38:5–39:22.

Mr. Myers does not say what Veritas urges. Veritas nowhere links Mr. Myers' testimony to any of the asserted method steps, whether through expert testimony or otherwise. Again, there is no dispute that the accused products have substantial non-infringing uses, and that there are other ways to deploy the Windows operating system than those identified by Dr. Nichols. Veritas has provided no evidence that the process described by Mr. Myers is that of an asserted claim. Accordingly, Mr. Myers testimony fails to show use by Microsoft's customers of the claimed methods.

#### c) Wes Miller

██ According to Veritas, Wes Miller "also confirmed under oath his knowledge of numerous instances of customers (both in the United States and abroad) using WinPE to deploy the Windows operating

system." Veritas' Response at 10–11. Mr. Miller testified as follows:

Q. When you left Microsoft, what was your position?

A. My position when I left was as a products manager.

Q. And which products were you responsible for?

A. I was responsible for Windows Longhorn Enterprise Deployment. And at that time Longhorn comprised both the client and server products.

Q. And the client product is called Vista now, correct?

A. Correct. And the server product is called Server 2008.

Q. Thank you. Are you familiar with Windows PE technology?

A. Yes, I am familiar with it.

Q. What does the PE stand for?

A. Pre-installation environment.

Q. And to your knowledge do you know whether Win PE technology is used in the Enterprise Deployment product for Windows Longhorn?

A. Can you clarify specific—specifics on the question?

Q. Sure. You're familiar with Windows PE, correct?

A. Correct.

Q. Is that technology used in any way in the product that you managed called Windows Longhorn Enterprise deployment?

A. It can be used for deployment of Windows Longhorn Enterprise.

* * *

Q. You are one of the developers who's working on Windows PE technology, correct?

A. I was not a developer. I was never a developer at Microsoft. I was a program manager for most of my tenure at

Microsoft, which meant I never wrote code, per se.

Q. Thank you for the clarification. As a program manager, one of your responsibilities was to work on Windows PE technology, correct?

A. One of my responsibilities was to help provide prescriptive guidance to customers about utilizing Windows PE.

Q. Did you also provide guidance to Microsoft employees about how to design Windows PE?

A. We did provide—one of—part of my job was to provide clarification to the development and test teams to ensure that the direction was the direction that we had hoped the product would grow in.

Schallop Decl., Exh. D: Deposition Excerpts of Wesley Miller ("Miller Dep.") at 8:23–11:3 (objections omitted).

Q. To your knowledge sitting here today, Mr. Miller, do you know of any U.S. customers who have, in fact, deployed Windows operating systems using Windows PE technology?

A. I can't explicitly point to one customer and say they've used Windows PE, and I can't conclusively say they've used it across their entire organization.

Q. That's not my question. My question is, do you know of any U.S. customers who have, in fact, deployed any Windows operating system using Windows PE technology?

A. I know customers who have, but I can't specifically speak to one, one customer. I know customers have, yes.

Q. Okay. And those customers would be actually customers in the United States, correct?

A. Customers in the United States and abroad, yeah.

* * *

Q. And my question to you then is, you would need to look through your records including e-mails to determine which specific customer in the United States had, in fact, deployed Windows operating systems using Windows PE, correct?

A. What I'd have in my e-mail is a reflection on customers who had driven by. I tended to be more of a small town with a freeway that drove by. If a customer mentioned we've used Windows PE, I'd hear about it, but, you know, with hundreds of millions of customers, it's always hard for us to tell who's used what. But I could probably—you know, if you were to look through my e-mail, there may be instances where customers have mentioned we've used Windows PE for deployment.

Miller Dep. at 34:6 to 35:21 (objection omitted). Veritas also cites 131:21 to 163:10, which is reproduced in pertinent part below:

A. Dell, as any OEM, appreciates anything Microsoft does to make deployment faster and easier. It reduces their manufacturing costs. So anything we can do to do that would be input they would give us.

Q. And as we talked about earlier, Windows PE was one of the technologies that Microsoft developed to achieve that objective, correct?

A. Windows PE was a technology we developed to reduce the overall cost of ownership of Windows, for deployment, for management, recovery, etcetera, and part of that was for the OEM manufacturing process.

Q. And, in fact, some of the slides that you presented on Windows PE described the time savings for OEM and Enterprise customers when they decide to use Windows PE and related tools for

deploying Windows operating systems, correct?

A. I believe at different times I may have presented PowerPoint presentations that made assumptions since I wasn't privy to actually how OEMs deployed, it was all secondhand. I can't really speak to how it did or didn't save them, but it was an assumption on my part.

Q. And it was a reasonable assumption as far as you were concerned, correct?

A. I would hope.

Q. And in some of the slides you talked about actual minutes in terms of savings and also the benefit of saving certain number of minutes in terms of preparing a system for deployment on the factory floor; do you recall that?

A. I don't recall a specific instance, but I do recall at different times maybe quantifying time equals dollars.

Q. And what steps did you take a quantify it?

A. I didn't actually draw it down to literal dollar equals minute, but did mention money we would save by helping OEM's ease the development process.

Q. And did you have conversations with OEM customers or others who were familiar with the OEM process to arrive at those conclusions.

A. Yes, either talking with sometimes individuals, but predominantly through others.

Miller Dep. at 133:7—135:1 (objections omitted). During the remainder of the portion indicated by Veritas, Mr. Miller responded to questions about various e-mails and documents that had been produced by Microsoft.

Mr. Miller's testimony is hearsay for the purposes for which Veritas wishes to use it. According to Mr. Miller, Microsoft's customers told him that they used Windows PE for deployment. Mr. Miller does not know firsthand that they used Windows PE for deployment. Rather than seek the testimony of the OEMs directly, Veritas relies on Mr. Miller's testimony to establish that customers actually used Windows PE for deployment. Under Rule 802, however, and for much the same reasons discussed above in connection with Mr. MacIntyre's testimony, Mr. Miller's testimony is not admissible for that purpose.

Even if Mr. Miller's testimony was admissible for the purpose urged by Veritas, Mr. Miller's testimony does not indicate which deployment method Microsoft's customers used. Veritas points to the expert report of Dr. Nichols, but Dr. Nichols does not link Mr. Miller's testimony to the infringing claims, whether in his report or in the particular exhibit (Exh. G) urged by Veritas (actually, Dr. Nichols does not refer to Mr. Miller's testimony at all in his report or in exhibit G thereto). Again, there is no dispute that the accused products have substantial non-infringing uses, including other non-infringing deployment methods. As noted above, mere use of the accused products is insufficient to raise a genuine issue of material fact that Microsoft customers used the accused products in an infringing manner.

Veritas further contends that "Mr. Miller testified as to his direct knowledge of Windows deployment by himself while working at Microsoft, * * *." Veritas' Response at 11. Veritas points to the following deposition testimony:

Q. And when you were at Microsoft, you in fact did use Windows PE for deploying Windows operating systems, correct? Personally.

A. I used, I used Windows PE for everything.

Q. Including for deploying Windows operating systems?

A. For deployment, for recovery, for troubleshooting, for resizing partitions, anything.

Q. Are you familiar with the phrase eating your own dog food?

A. Intimately.

Q. What does that mean?

A. It means feeling the pain of developing software by feeling the pain. You iterate through builds that may or may not be stable everyday and keep going.

Q. And did you employ that process in terms of the deployment tools and documentation that we discussed today for windows?

A. I used the tools I evangelized, I used them a lot, so, in that sense, yes.

Miller Dep. at 69:1–23. Aside from whether Mr. Miller used the deployment processes accused by Veritas, what Mr. Miller personally did is immaterial to the question of whether Microsoft's customers actually used the accused products to infringe.

 Furthermore, even assuming that Microsoft itself directly infringed the accused asserted claims, Microsoft's infringement cannot—in this case—support holding Microsoft vicariously liable for the infringement of Microsoft's customers. As the Federal Circuit has explained, "[a] defendant's liability for indirect infringement must relate to the identified instances of direct infringement. Plaintiffs who identify individual acts of direct infringement must restrict their theories of vicarious liability—and tie their claims for damages or injunctive relief—to the identified act." *Dynacore*, 363 F.3d at 1274. If Microsoft has directly infringed, Microsoft must be liable for its infringement. However, Microsoft's vicarious liability must relate to direct infringement by the party for which it is vicariously liable, namely, Microsoft's customers. That is, Veritas must show whether Microsoft's sale of its products led to an instance of direct infringement by Microsoft's customers. Microsoft's direct infringement is immaterial in that regard.

Veritas also contends that "Mr. Miller testified as to his direct knowledge of Windows deployment * * * by Microsoft test organizations, * * *." Veritas' Response at 11. Veritas points to the following deposition testimony:

Q. And, in fact, you had some communications for some of these test organizations regarding the use of Windows PE for deployment purposes, correct?

A. I had many communications with many organizations, and I know some of them were test organizations that were using Windows PE and they were using it for deployment.

Miller Dep. at 71:1–6. Again, aside from whether those test organizations used the deployment processes accused by Veritas, what Microsoft's test organizations did with Win PE is immaterial to the question of whether Microsoft's users actually used the accused products to infringe.

Finally, Veritas contends that "Mr. Miller testified as to his direct knowledge of Windows deployment * * * by Microsoft Consulting Services to assist customers in deployment." Veritas' Response at 11. Veritas points to the following deposition testimony:

Q: And you know that MCS field service personnel had access to the Windows PE documentation and tools for deployment and recovery and other purposes, correct?

A: In time we did provide access to Windows PE for the field service organizations.

Miller Dep. at 94:5–9. At best, Mr. Miller's testimony here suggests that Microsoft Consulting Services had access to

Windows PE. That testimony does not indicate that MCS actually used Windows PE. Even assuming actual use, Mr. Miller's testimony does not suggest that such use was in connection with deployment, or that deployment was done in the manner described by Dr. Nichols as infringing. As noted above, mere use of the accused products is insufficient to raise a genuine issue of material fact that Microsoft's customers actually used the accused products in an infringing manner. The same may be said for the remainder of Mr. Miller's testimony that Veritas relies on. *See* Miller Dep. at 81:9–24 ("Q. Do you recall the specific customers that are—that were on the technical advisory Council during your tenure at Microsoft? A. I can't recall every customer, but the customer names that I associate in my head would be Shell, Chevron, Ford. I believe Daimler Chrysler came in at one point in time, RJR, Nabisco, or RJR—I can never remember the naming of it, but the company. Those are the companies that come to mind. I want to say that there were 10 to 12 different customers there any given time. Q. And these are some of the largest customers of Microsoft, correct? A. These generally would be some of the larger customers that we would ever have, yes. Q. And many of them were U.S. based companies, correct? A. I believe so, yes."), 93:7–17 ("Q. Thank you. And many of those field service employees of the MCS organization are based in the United States, correct? A. Many of them. Q. And many of them would be helping U.S. based customers in terms of deploying Windows operating systems, correct? A. I imagine any based in the United States would most likely be helping Enterprise customers in the United States with whatever service needs they had."), 121:14–122:20 (objections omitted) ("Q. Okay. And if you go to page 10519, which is the third page, the subject reads Caterpillar, Win PE licens-

es, 2R7QQN9MK. That's a reference to the Caterpillar company, correct? A. I would believe so based on the fact that it says on behalf of the customer Caterpillar. Q. And Caterpillar is a US-based company, as far as you know, correct? A. I honestly can't speak to its ownership, so I don't know. Q. Well, do you know that it has operations in the United States? A. I'm certain they have operations in the United States. Q. And do you see the issue description there, it reads customer has licensed system management server for approximately 45,000 seats, but is not eligible to license Win PE because they're not a software assurance member; do you see that? A. Uh-huh, yes, I see that. Q. So this is a reference again to the software assurance agreement that we had talked about earlier; us that correct? A. Software assurance here would refer to the software assurance program. Q. And we talked earlier today about how access to Win PE at the earlier point in time was conditioned upon a customer having signed up to a software assurance agreement or something similar, correct? A. We did discuss that."), 140:1–12 (objection omitted) ("Q. And one of the things that Hershey Foods could have done was they obtained access to Windows PE is to use Windows PE to deploy Windows operating systems, correct? A. That is one of the things that they could have done, among recovery, deployment, maintenance, etcetera. Q. Okay. You can put this one aside. And Hershey Foods is a US-based company, correct? A. That's my understanding, yes. Q. Do you know where they're located? A. I would assume its Hershey, Pennsylvania."), 144:1–10 ("Q. And Boeing is a US-based company, correct? A. Yes. Q. And Rocket Dyne is also a US-based company, a division of Boeing; is that correct? A. I actually am not familiar with it outside the context of this e-mail. Q. At this time do you know, where Boe-

ing is located? A. Headquartered in Chicago, Illinois. Q. Do they have operations in Seattle? A. Yes, they do.") and 161:20–162:23 (objection omitted) ("Q. Put that one aside. And my next exhibit is Exhibit 353. This is another set of e-mails dated to and from you, August 12, 2002, Bates labeled MSWM 10384. My first question to you will be whether you have any reason to dispute that this is an accurate copy of such e-mail correspondence? A. No, I do not. Q. And did you see the reference to Johnson & Johnson and J and J in this? A. Yes, I do. Q. That's a reference to the Johnson & Johnson, the consumer-products company, correct? A. I would assume so, yes. Q. Johnson and Johnson is a U.S. based company, correct? A. Yes. Q. And it says—there is an e-mail from Mr. Salerno, I would like to get that a copy of Win PE for evaluation purposes, but they may not fulfill the requirements we're looking at this as a possible solution for their worldwide deployments in the future. The number of desktop is worldwide would be nearing 95,000. J and J is working MCS on an MS sponsored white paper for in place migrations and if not a Win PE may be very helpful in their environment. Do you see that? A. Yes, I do. Q. Do you have any reason to dispute the accuracy of the statements? A. I can't really say one where the other, no reason to disagree with what he wrote.").

\* \* \* \* \* \*

Overall, therefore, the witness testimony proffered by Veritas fails to show that Microsoft customers have used the accused products in an infringing manner.

### 5. "e-mails, customer specifications and other documents"

▮ As noted above, Veritas also points to "hundreds of e-mails, customer specifications and other documents establishing that customers use the Accused Products as instructed by Microsoft to perform the claimed recovery and deployment methods." Veritas' Response at 12. Veritas also points to a number of other documents in support of its argument that Microsoft induced infringement, and those documents are discussed below to the extent they may reflect customer use of the accused products. Microsoft objects to Veritas' reliance on those documents, asserting that the emails are inadmissible hearsay and that Veritas misrepresents the content of the communications. Microsoft's Reply at 5.

#### a) Nike Email

Veritas first refers to an "email from Jon Class to Wes Miller discussing Nike's use of WinPE to deploy Windows XP." Veritas' Response at 12 (*see* Schallop Decl., Exh. U: MS–WM 000000011125–27):

From: Wes Miller
Sent: Monday, May 19, 2003 8:54 AM
To: Jon Class
Subject: RE: Next Version Of WinPE To Support 3rd Party Drivers?

No worries. I understand – just finished my coffee. ☺

From: Jon Class
Sent: Monday, May 19, 2003 8:46 AM
To: Wes Miller
Subject: RE: Next Version Of WinPE To Support 3rd Party Drivers?

Make that:
I'll be sure to follow up with him to make sure all goes well.

It's not all *that* early - I don't know what my problem is...

From: Jon Class
Sent: Mon 5/19/2003 8:44 AM
To: Wes Miller
Subject: RE: Next Version Of WinPE To Support 3rd Party Drivers?

Awesome! Many thanks for the help. I'll be sure to follow up to make sure all is well. -)

-Jon

From: Wes Miller
Sent: Mon 5/19/2003 8:42 AM
To: Jon Class
Subject: RE: Next Version Of WinPE To Support 3rd Party Drivers?

The Intel net driver has been no shortage of pain for me. They don't just require the SYS and inf files, as most do – it requires bunch of others. I've put the steps below. But this will work fine beginning with the 1.1 version we shipped last year (there was an issue with factory before that).

This NIC has additional file requirements beyond a traditional driver. Grabbing the driver set from:
http://downloadfinder.intel.com/scripts-df/Detail_Desc.asp?strState=LIVE&ProductID=401&DwnldID=4275

Insure that you have copied:

| | | |
|---|---|---|
| Net8254x.inf | to | <WINPE>\system32\inf |
| E1000325.sys | to | <WINPE>\system32\drivers |
| Net8254x.din | to | <WINPE>\system32 |
| Prounstl.exe | to | <WINPE>\system32 |
| IntelNic.dll | to | <WINPE>\system32 |

In general adding drivers to WinPE "just works". In the case of this driver, "it doesn't" and requires additional (careful) placement of the above files or the NIC will fail to install. If they still can't get it working using the above, let me know and we'll help.

From: Jon Class
Sent: Monday, May 19, 2003 8:28 AM
To: Wes Miller
Subject: RE: Next Version Of WinPE To Support 3rd Party Drivers?

I was just talking with an MCSE buddy of mine this weekend. He's working with Nike & Intel on a redeployment scheme for Nike's desktops to get them all up & running WinXP. However, despite following the WinPE docs on loading 3rd party drivers, the Intel net driver wasn't working with the flavor of WinPE that they were using. (He said they have both a Select agreement and the full MSDN.)

Based on what I had read coming through this DL, I told him that I believed there was a newer version of WinPE that was available that should address the successful loading of 3rd party drivers. I couldn't remember if it was called WinPE 1.1 or 1.2, or if it was a service pack offering that was to be applied to the OPK.

Can you give me a clue-fairy in terms of what we've released recently to fix OPK / WinPE bugs?

Thanks!

-Jon
x61268

Microsoft argues that this email "in fact shows no actual use. Rather, Mr. Class reports (hearsay) a conversation with his 'buddy' (hearsay within hearsay) who purportedly had attempted and failed to use WinPE for deployment. Mr. Miller provided a suggestion to Mr. Class, but there is no indication that: 1) the suggestion was passed on to his 'buddy,' 2) it was followed, 3) it worked, or 4) any actual deployments were conducted by Mr. Class's unnamed 'buddy.' Nor does the e-mail detail the specific method the 'boddy' was attempting, so there is no basis for concluding that it would have infringed." Microsoft's Reply at 5.

It is not clear that the Nike e-mail constitutes hearsay with respect to the purpose for which Veritas uses it. Veritas relies on this e-mail to establish that Nike used WinPE to deploy Windows XP, not that Mr. Class's buddy was working with Nike and Intel on a redeployment scheme or that the Intel net driver was not working. Hearsay issues aside, however, nothing in this e-mail suggests that Nike used the accused products to deploy Windows XP in an infringing manner, or even that the redeployment scheme was implemented successfully. As noted above, there is no dispute that the accused products have substantial non-infringing uses, including various deployment scenarios that Dr. Nichols does not accuse as infringing. Even if Nike had successfully deployed Windows XP using the accused products, Veritas does not link that deployment to any of the asserted claims. The statements in this e-mail are too broad for a jury to reasonably conclude that Microsoft used an infringing deployment method. Indeed, the only part of the email exchange that even references a possible use of the WinPE software in an infringing manner is Mr. Class' statement that his friend is "working with Nike & Intel on a re/deployment scheme for Nike's desktops to get them all up & running WinXP." Thus, this e-mail is insufficient to show that Nike used the accused products in an infringing manner.

### b) Boeing Email

Veritas also relies upon an "email thread between Wes Miller and Richard Carpenter concerning Boeing's use of OPK and WinPE for Windows deployment." Veritas' Response at 12 (*see* Schallop Decl., Exh. V: MS–WM 000000004971–73):

-----Original Message-----
From: Richard Carpenter
Sent: Wednesday, December 18, 2002 1:16 PM
To: Linda Greenlaw; Developer Support WIn OPK Team
Cc: Madhurika Narayan
Subject: RE:

This is for Rocketdyne a division of Boeing. They have the RTM version, but do not have the SP1 version. We are working of a deployment mechanism using WinPE on a secondary partition to allow us to deploy a new image remotely.

Thanks again for the assistance.

*Richard M. Carpenter*
Senior Consultant
Microsoft Consulting Services
MCSD, MCSE
HTTP://www.microsoft.com/us

Cell: (805) 258-9316
Phone: (310) 449-7359
Fax. (310) 829-1412

From: Linda Greenlaw
Sent: Wednesday, December 18, 2002 12:24 PM
To: Richard Carpenter; Developer Support Win OPK Team
Cc: Madhulika Narayan
You should talk to Madhulika. Who is this for?
-----Original Message-----
From: Richard Carpenter
Sent: Wednesday, December 18, 2002 10:56 AM
To: Developer Support Win OPK Team
Subject:

Hi I am looking for the OPK kit for Windows PE. Where can I find the code or who do I need to talk to get access to the code.

Thanks in advance for any assistance you can provide

*Richard M. Carpenter*

Senior Consultant
Microsoft Consulting Services
MCSD, MCSE
HTTP://www.microsoft.com/usa

Cell: (805) 298-9116
Phone: (310) 419-7389
Fax: (310) 829-1412

*Id.* at MS–WM–972–73.

Microsoft contends that "[t]he 'Boeing' email is a hearsay statement of a failed attempt to implement a deployment technique 'using WinPE on a secondary partition.' There is no indication that the technique was ever successfully implemented. Nor is there sufficient description to conclude that it would have infringed." Microsoft's Reply at 5–6.

Again, hearsay issues aside, the Boeing e-mail does not indicate that Boeing was working on the "deployment mechanism," or that Boeing actually implemented that "deployment mechanism." Nor does the Boeing e-mail contain sufficient specificity to reasonably determine which deployment method Boeing was using. Veritas does

not link the reference to "deployment mechanism" to any of the asserted claims. In short, the Boeing e-mail provides no basis for any reasonable juror to conclude that Boeing used the referenced "development mechanism," much less that the referenced "deployment mechanism" constituted one of the claimed methods.

### c) Hershey Email

Veritas further points to an "email thread between Wes Miller and Alan von Weltin indicating that Hershey foods 'would also be willing to do a case study or endorsement on how PE helped with their deployment of XP"'. Veritas' Response at 12 (*see* Schallop Decl., Exh. W: MS–WM 000000003952–53):

---- Original Message ----
From: Alan von Weltin
Sent: Tue 6/4/2002 4:04 PM
To: Wes Miller
Cc:
Subject: Hershey WinPE Request

Wes – I just left you a voice mail regarding this customer. We had spoke a few weeks back about a similar customer (CMAC) who was denied but you were able to make an exception so that they can use PE to deploy XP.

I'm asking you to consider a similar arrangement for Hershey Foods - Since they are refreshing all of their desktops (they have a 3-year refresh cycle) they chose not to put the desktop OS on maintenance right now. They placed all other components (Office, CAL's, Win2K server, Exchange server, Project, and Visio) on 2 yr maintenance, but not the desktop OS. Our YTD sales with them exceed $2.3M. This is a large amount considering they only have 5300 PC's. If the client was only 1 year in their desktop pc lease they would have put their PC's on desktop maintenance. Since they are in the last months of their lease it just makes sense to refresh the PC's rather than buy SA at this time. This customer is moving toward Windows 2K/.Net server, Exchange 2K, and even is moving their external hersheygifts.com to Commerce Server 2002 and will be doing PR for us.

They would also be willing to do a case study or endorsement on how PE helped with their deployment of XP. Worst case scenario, we could ask Hershey to provide a case study on MCS services in exchange for the tool.

Thanks very much for your consideration,

*Id.* at MS–WM–952.

Microsoft argues that "[t]he 'Hershey' e-mail asks for help in using WinPE for deployment. There is no indication that assistance was provided or that deployments were actually performed, and no description of a specific method for any such deployments." *See* Microsoft's Reply at 6.

Microsoft is correct. There is no evidence from the Hershey e-mail that Hershey ever actually used WinPE to deploy Windows XP, nor, if they had, any suggestion regarding the specific deployment process used. Accordingly, this e-mail also fails to show actual use of the accused products in an infringing manner by a Microsoft customer.

#### d) DaimlerChrysler Documents

Veritas additionally relies on the "DCX PCGlobal Client Deployment Process" document authored by DaimlerChrysler which, according to Veritas, describes "[DaimlerChrysler's] infringing WinPE-based deployment of Windows in the United States and abroad, stating 'only standard Microsoft tools used ... Windows PE, SYSPREP, DISKPREP, IMGDEPLOY' "for very fast machine deployment" with "[s]ite specific settings ... integrated into Configuration Templates." " Veritas" Response at 12 (*see* Schallop Decl., Exh. X: MX–WM 000000000161–72):

# DCX PCGlobal
# Client Deployment Process

Confidential – Only for internal use at DaimlerChrysler

Frank Kaleck on behalf of DaimlerChrysler
Karlheinz Blank, ITI/GO

**DAIMLERCHRYSLER**

---

## Initial image deployment process DAIMLERCHRYSLER

- No central configuration database required
- Only standard Microsoft tools used (Without any license fee):
 - WindowsPE, SYSPREP, DISKPREP, IMGDEPLOY
- Initial system boot-up options:
 - CDROM, DVD, USB
 - PXE
 - Preinstalled HDD maintenance partition with Windows PE
- Site specific settings can be integrated into Configuration Templates very fast (~5min)
- Custom deployment scripts can be integrated
- Zero touch installation
- Very fast machine deployment (<40min)
- Site/user specific load can be installed during a "Post-processing" phase (No need for SW distribution platform at this time)

### New image deployment process DAIMLERCHRYSLER

1. - Provide bootable CDROM, USB or DHCP/PXE
 - Boot up with DCX WinPE OS environment

2. - Select site specific configuration template (CT)
 - Enter computer name (and IP address)
 - Disk partitioning, download image to disk
 - Save machine's CT to disk and reboot

3. - Windows XP Mini Setup
 - Apply OS, language, regional & network settings
 - AD Domain Integration
 - Reboot

4. - Installation of additional packages

### System Configuration during Mini Setup DAIMLERCHRYSLER

- Customized version of deployment scripts of original PCG systems are used
- ALL settings provided by XML file Configuration template CT:
 - Language and regional settings
 - Time zone
 - Computer name
 - DHCP or non-DHCP provided network settings
 - Other network settings (APIPA, NBT, ...)
 - Active Directory domain and OU integration
 - ...

## Configuration Template:
## Image selection & post-processing

```
<ImageDeploymentTemplate>
 <ImageFilePath MethodIDDescription="1 - Manually;2 - Fixed">
 <MethodID>2</MethodID>
 <Value>\\SxxxF001\Exxx_Images\Exxx.img</Value>
 </ImageFilePath>
 <ApplicationPath>
 <UNCName>\\SxxxF001\ipc$</UNCName>
 <AccountName>SxxxF001\Exxx_a_SWInstall</AccountName>
 <AccountPassword>Password</AccountPassword>
 </ApplicationPath>
 <PostProcessings>
 <PostProcessing>
 <CommandLine>\\SxxxF001\Exxx_MSI\App0\INSTALL.CMD</CommandLine>
 </PostProcessing>
 <PostProcessing>
 <CommandLine>\\SxxxF001\Exxx_MSI\App1\INSTALL.CMD</CommandLine>
 </PostProcessing>
 </PostProcessings>
</ImageDeploymentTemplate>
```

## Configuration Template:
## Network & AD integration

```
<NetworkConfigurationTemplate>
 <ComputerName><MethodID>1</MethodID>
 <Value>CxxxG#########</Value>
 </ComputerName>
 <SystemPrimaryDNSSuffix><MethodID>2</MethodID>
 <Value>xxx.daimlerchrysler.com</Value>
 </SystemPrimaryDNSSuffix>
 <ADDomain><MethodID>2</MethodID>
 <Value>emea.corpdir.net</Value>
 </ADDomain>
 <ADTopLevelOU><MethodID>2</MethodID>
 <Value>Exxx</Value>
 </ADTopLevelOU>
 <ADComputerOU><MethodID>2</MethodID>
 <Value>OU=Clients,OU=_GlobalResources,OU=Exxx,DC=EMEA,DC=CORPDIR,DC=NET</Value>
 </ADComputerOU>
 <ADComputerJoinAccountName><MethodID>2</MethodID>
 <Value>EMEA\ELBE_a_WksAdm</Value>
 </ADComputerJoinAccountName>
 <ADComputerJoinAccountPassword><MethodID>2</MethodID>
 <Value>Password</Value>
 </ADComputerJoinAccountPassword>
```

## Where to provide install scripts, CTs and images

DAIMLERCHRYSLER

## Various methods of data & media provisioning

DAIMLERCHRYSLER

| | Boot CD | Network Share | Pre-Installed on HDD | USB Storage Device |
|---|---|---|---|---|
| Install scripts (DCXINSTALL.CMD) | ✓ | ✓ | ✓ | ✓ |
| Configuration Templates | ✓ | ✓ | ✓ | ✓ |
| Images (e.g. Site specific) | ✓ (DVD) | ✓ | ✓ | ✓ |
| Applications | ✓ | ✓ | ✓ | ✓ |

1256

How to build custom site „Images" DAIMLERCHRYSLER

- Install "DCX Core Image" 70% 1

- Customize machine based on location needs
- Install additional site specific standard applications 95% 2

- Prepare a cloneable machine (SYSPREP)
- Upload the Image to local site Image server (IMGDEPLOY) 100% 3

Only for internal use within DaimlerChrysler DRAFT - Version Page 11

---

DCX "Wish List" DAIMLERCHRYSLER

- IMGDEPLOY should support partitioning of image on CDs
- Need for multicast image distribution (ADS)
- Better support for boot-up problems after restoring the image (e.g. blinking cursor). Windows XP setup does!
- WinPE should be able to detect USB devices attached after startup
- WinPE should support virtual RAM disks (Temp. store for deployment data e.g. log files)
- IMGMOUNT should be supported on Windows XP platform

Only for internal use within DaimlerChrysler DRAFT - Version Page 12

---

*Id.*

Microsoft contends that "[t]he unauthenticated, hearsay DaimlerChrysler 'Client Deployment Process' document, marked 'draft,' does not show that the described process was ever actually used. Further, it is silent on many details necessary for a comparison to the asserted claims. And, it describes several configuration steps *after* the operating system is applied and re-booted, suggesting that the applied operating system was *not* 'fully configured.' Veritas has provided no information or analysis of an *actual* DaimlerChrysler process sufficient to conclude that it infringed." Microsoft's Reply at 6 (Microsoft's emphases) (citations omitted).

Hearsay issues aside, the DaimlerChrysler document suffers the same deficiencies of the foregoing documents. Even assum-

ing that DaimlerChrysler used the deployment method described in the slides, Veritas has not linked that deployment method to any of the asserted claims. Given the number of undisputed non-infringing deployment scenarios, Veritas must do more than simply show that DaimlerChrysler used the deployment method described in the slides. Veritas must further show that the described deployment method was that called for in the claims. Without such a showing, the DaimlerChrysler document fails to show that DaimlerChrysler used the accused products to deploy an operating system in an infringing manner.

### e) "dogfood" Documents

Veritas also relies upon a 2006 Microsoft document that, according to Veritas, "explains that images of Vista test builds are available from Microsoft's WDS servers (which uses WinPE in an infringing manner) and encourages Microsoft employees to participate in the effort to 'dogfood' Vista by installing these images." Veritas' Response at 12. That document is reproduced below (see Schallop Decl., Exh. Y: MS–WM 000000477940–42):

From: Sven Hallauer
Sent: Tuesday, May 09, 2006 8.05 PM
To: Windows Project Status
Subject: Longhorn Project Status, 050906

Microsoft Confidential - Do Not Forward

**Key Message: On Track To Release Beta2!**

**Executive Overview**
As planned we increased the Beta2 build numbers to 5382 over the weekend to facilitate additional servicing testing for Beta2 (we will do this at least one more time before we ship). Please keep self hosting the latest Beta2 builds from \\winbuilds\release\winmain\latest.IDWCANDIDATE\x86fre\media & \\winbuilds\release\winmain\latest.IDWCANDIDATE\amd64fre\media. As always, you get product keys from http://mspkd, and don't forget to try the latest Office 12 Beta2 build shared out at \\winbuilds\release\applications\office\office12\latest.

**Running Stress on Vista**
Stress participation over the last couple of days has been great with over 1,000 runs each day. In fact, we're now exceeding the capabilities we had in the old stress harness. This is great by the WTT & Stress teams as well individual stress testers and stress labs. Please keep up the great effort till we ship Beta2!!!

**Selfhost Vista off WDS**
Windows Deployment Services (WDS) is the LH-wave replacement for Remote Installation Services (RIS). For those that don't know, RIS/WDS is a deployment technology that allows a client machine to network boot (via PXE) in order to install an operating system. It also has additional applications in terms of system recovery – please see the FAQ by browsing to http://wosd/wds. This program is currently available to buildings 26, 27, 28, 9, 10, 40, 41, 42, 43, and 44.

The WDS servers allow for clean installs only (no upgrades) of Windows Vista. As an incentive to using this new deployment technology we have made things easy – the images uploaded to the WDS Server contain both a Vista staged build + pre-installed applications. These applications include Office 12, Office Communicator, Product Studio, and E-Trust. A fresh WinMain build, with applications, will be published every Monday night from now until Vista RTM. You can see what the latest available build is by browsing to http://wosd/wds.

Steps to use the technology:
1. Boot your machine.
2. At the network boot prompt, press F12. (See FAQ below if you don't see the F12 prompt)
3. You will see a boot menu similar to the attached. Select the appropriate option based on which operating system you want to install.
4. Complete the setup wizard.

The WDS dogfood effort is supported as follows:

**Schedule**

| Date | Notes |
|---|---|
| July 27, 2005 | Beta1 Release – done |
| 7/27 – 10/12 | Beta2 Feature RIs –done |
| 10/24 – 11/11 | Beta2 Bug Smash – done |
| 11/21 – 12/14 | December CTP Drive – done |
| 11/14/05 – 1/11/06 | Beta2 DCR approved Feature RIs – done |
| 1/16/06 – 1/27/06 | BravoV approved Feature RIs – done |
| 1/12/06 – 2/19/06 | Beta2 Bug Fix RIs – done |
| 2/20/06 – 3/14/06 | Beta2 Lockdown (Bug Bar Level 3) – done |
| 3/17/06 – 3/26/06 | Beta2 Lockdown (Bug Bar Level 5, except long pole teams, which stay at Level 3) – done |
| 5/01/06 – 5/22/06 | Beta2 Escrow (Bug Bar Level 5+) – in progress |
| 5/23/06 | Final Beta2 CTP release |

- Issues related to the boot menu or network boot in general → http://wsd/setuphot
- Issues related to deployments of Windows Vista, including booting Vista WinPE → http://wsd/setuphot
- Issues related to RIS (choosing Remote Installation Service from the boot menu) → normal MSIT helpdesk or call x65000
- Issues related to WinRE → <http://reliability/team/WinRE SelfHost>
- Issues related to Office 12
 - File all your Office12 bugs directly at http://offbug.
 - Please send your critical Office12 questions to CYBERDOG

**Cross Product Initiatives**
**New Product in Windows OS Bugs**
It's time to make tough decisions for the Longhorn project about which bugs are must fix and which once are not. We want all teams to complete triaging of all these bugs before Memorial Day and only keep Longhorn must fix bugs assigned to one of these two milestones:
- RC1 – All bugs that are must fix for Windows Vista
- Server Beta3 – All bugs that are must fix for Windows Server Longhorn (all of these have to be in either in a server only binaries or affect server only scenarios to qualify)

We need to triage all other bugs out of the Longhorn product now in order to be able to focus properly on the customer feedback we're going to get when we ship Beta2 at the end of this month! We've created three options when triaging these bugs out:
- Resolve the bug as 'Won't Fix' or 'By Design' if you believe that a fix is not necessary or your feature works as expected
- Move the bug to the Vienna product if it does not need get fixed for Longhorn (Vista, Vista SP1 and Longhorn Server)
- Move the bug to the WLV product if the fix is nice to have for Longhorn, but you don't have the data to justify fixing it in time.

The following statements about WLV and bugs moved to it are bil true:
- WLV is not a real product/project, it will never ship
- WLV is only a placeholder to provide triaging teams with more options if they need them (don't use it if you don't need to)
- By default, bugs against WLV won't be fixed for Vista or Vista SP1
- All bugs against WLV are not-critical-path for Vista, this means they don't block a key customer scenario and are not blocking any of the exit criterion we've established
- Bugs in this category can be easily and centrally fixed as additional resources become available and if time permits

Lastly, there are no must fix bugs for Windows Vista SP1 till we branch for RC1 in July – every bug you believe to be must fix for SP1 needs to be fixed for Vista!

**Basics Beta 2 Blockers**
The remaining Beta 2 Basics blocking bugs must be fixed and in WinMain_Beta2 by the end of this week to meet our exit criteria.
- Basics Beta 2 Bugs – My Team View – Immediately go to your personal view, which shows bugs assigned to you and those reporting to you in your org
 - Please work with your VBL Owner to determine the best way to propagate your Beta 2 fix to Winmain
- Basics Beta 2 Bugs – All Basics (PSQ)

**Basics RC1 Blockers**
For RC1, a new, single tab has been created at http://phl that displays all known bugs blocking Basics exit criteria for RC1. We are no longer tracking monthly fixes for RC1 (the May-15 and June-15 tabs have been removed). Teams, please plan accordingly to address these bugs for RC1.

Thanks for reading this far and please keep the feedback coming.

Thanks,
 Sven

Did you find this email useful in performing your job? YES NO

**Process and Tool Suggestions**
If you have a great idea on improving our processes or tools, let us know: http://windowsvista/process.

Microsoft Confidential – Do Not Forward

| Date | Milestone |
|---|---|
| 5/1/06 – 5/13/06 | RC1 Bug Fix RM (Bug Bar Level 1) |
| 5/15/06 – 6/30/06 | RC1 Lockdown (Bug Bar Level 3) |
| 7/2/06 – 7/19/06 | RC1 Lockdown (Bug Bar Level 5, except long pole teams, which stay at level 3) |
| 7/20/06 – 8/16/06 | RC1 Escrow (Bug Bar Level 5) |
| 8/17/06 – October '06 | Windows Vista RTM (Bug Bar Level 5+) |
| Q1 CY07 | Windows Server Longhorn Beta3 |
| Q2 CY07 | Windows Server Longhorn RC2 |
| H2 CY07 | Windows Server Longhorn RTM |

**Key Project Resources**
Longhorn Home Page
Longhorn Schedule
Longhorn RI Schedule
Installing Longhorn
Longhorn Product Map
LH Project Documentation
Windows Acronyms
Longhorn Metrics
Longhorn Q&A
Longhorn BASICS
Longhorn Customer Feedback
Vista/Longhorn Heroes
Windows Quality Story

**Key Project Contacts**
Central SvenH
Client DonFi
Server AlexBI
Shared Teams llinzen
NDT AHodason
SBU HCota & Alvinph
International EnkMu

Partners StellaYa
BASICS ChuckAre

---

*Id.*

Microsoft on the other hand, contends that this document "is merely an invitation for Microsoft's employees to install and use the latest build of the Vista Beta. There is no indication that the 'Vista staged build + pre-installed applications' is a fully configured operating system. Veritas concludes, with no analysis or support, that WDS servers 'use[ ] WinPE in an infringing manner,' but Dr. Nichols provides no infringement analysis of WDS." Microsoft's Reply at 6 (alteration in original).

Although this document may raise a genuine issue of material fact whether Microsoft used the described deployment method, Veritas provides no analysis or other showing that the described deployment method is covered by one or more of the asserted claims. As Microsoft points out, Dr. Nichols does not appear to provide any infringement analysis of WDS. Again, given the existence of non-infringing deployment scenarios for the accused products, a mere showing of deployment is insufficient to show that the described deployment method infringes the asserted

claims. Even if the described method does infringe the asserted claims, Microsoft's direct infringement cannot, for the same reasons discussed above, support holding Microsoft vicariously liable for the infringing use of the accused products by Microsoft customers.

### f) Windows Vista CompletePC Restore Documents

Veritas also points to "emails that demonstrate use of Windows Vista CompletePC Restore by Microsoft test organizations (Schallop Decl., Exh. Z: MS–VRTS 000000363234–65), by Microsoft customers (Schallop Decl., Exh. AA: MS–VRTS 000000360980–85), and by outside product viewers (Schallop Decl., Exh. BB: MS–VRTS 000000361013–14 & Exh. CC: MS–VRTS 000000256092) in an infringing manner." Veritas' Response at 12.

Exhibit Z is a 33–page string of e-mails that reflect discussions about various bugs and error messages related to the "Longhorn Server Backup & Server Cluster (MSCS)."

Exhibit AA is a 7 page string of e-mails between Microsoft and a customer in the Netherlands. Mr. Rijn's initial email is reproduced below:

From: Jos van Rijn – Informatique [mailto:Jos@informatique.nl]
Sent: Tuesday, January 16, 2007 4:56 AM
To: Windows Recovery & Backup Partner Alias
Cc: Hugo Leijtens
Subject: Vista recovery questions

Dear Sir/Madam,

My contact at Microsoft Netherlands (Hugo Leijtens) gave me this address. He told me this was the best way to get an answer to my questions. So here goes.

I'm currently using the OPK 6000 build with Vista RTM. I created a WinRE image and successfully applied it on my secondary partition. I then launched the setautofailover.cmd /target d: (my recovery partition) batch file. This works without error. I'm able to launch the system recovery options through F8 from the Windows boot manager. So far, so good and no complaints about that.

Here's my problem: the partition is still visible and the customer can easily delete it. I want it to be hidden for the customer. Can this be done through the setautofailover.cmd preferably? Can it be done at all with my current build since there are more features not working at the moment?

Furthermore, I would like to know in case you have a hidden partition and you create a full backup of your system to another disk with Vista backup, will the hidden partition have any negative effect on restoring the image? How will this be handled? With a visible recovery partition I seem to be losing the recovery partition during a restore and I have to completely reinstall my system. Perhaps I did something wrong somewhere, but restoring just one partition instead of multiple partitions worked great. This was when I booted from DVD and selected a recovery. I haven't been able to successfully recover an image from the (visible) recovery partition itself.

And one last thing: I want to create a recovery partition with both a WinRE image and an installation image (install.wim) on it so the customer can easily restore his Windows version by selecting to boot from the install.wim by means of pressing F8 in case of a virus or something. Can this be done? Is there any (simple) documentation available? Just to be clear, I want the customer to run an (preferably unattended) installation from the recovery partition instead of using the dvd.

Could you guys help me out here? I hope I made myself clear. If not, ask away!

Thanks.

Kind regards,
Informatique computers en componenten BV

Jos van Rijn

jos.vanrijn@informatique.nl
www.informatique.nl

Schallop Decl., Exh. AA: MS–VRTS: – 984–85. This e-mail indicates use of the accused products out-side the United States, and, in light of the substantial non-infringing uses of the accused products, among other things, is immaterial to infringement of Veritas' U.S. patent.

Exhibit BB is an e-mail with Microsoft's response to an article reviewing the back-up functionality of Vista:

---

**From:** Dan Stevenson
**Sent:** Thursday, August 24, 2006 7:22 PM
**To:** Darwin Ou-Yang; Ivan Pashov, Eduardo Laureano
**Cc:** Ron Kalach; Amit Amit
**Subject:** RE: :( :( :(

Darwin, thanks for sharing. I actually liked the review -- he gave us a lot of credit, and agrees it's better than XP and good for the basic users, which was our goal. Everything he outlined is on the list for SP1 or Vienna, so we definitely know what needs to be fixed.

Let's deconstruct a little:

*really isn't much fun to use. At all.*

We're not Apple. Fun is not our goal. Backup is our goal.

*Vista has backup baked into it, and in some great ways too: Volume Shadow Copy means you can roll back to previous versions of individual files, CompletePC creates a hard drive image you can mount in Virtual PC, and the backup service actually runs in the background so you don't have to leave the PC grinding away unattended while archiving*

Yes. Thank you

*It's designed to be easy to use, and it is: witness the options to set what you back up.*

Yes. Thank you.

*One problem: it doesn't tell you what, exactly, it monitors. And there is no way to find out. I can't believe that it's going to include every last image file on the hard drive - random program elements and all - so what is it including? Am I going to find my photos weren't included because I stashed them somewhere deep in System Files? And just what are "Additional Files?" Are my precious savegames and Leonardo-esque email templates included? How about log files? And hey, how about just giving me the option to specify specific locations? This is actually a backup tool that doesn't let you choose what to back up. Fine, conceal the complexity, but don't bury it so deep I've got no idea what I'm saving.*

A recognized issue for advanced users. More reason to take this for SP1.

*Going through the backup itself to check this presents a new problem: the restore window is stupidly fiddly. You're presented with a blank list and have to browse through the backup to populate it, which is clunky, inelegant, and confusing as the browse options are individual buttons that open individual windows, none of which have the master list in. It's cumbersome, totally unexplained and just not very easy to understand, a problem which isn't helped by the fact that the browse feature looks just like Windows Explorer.*

*That should make things easier, but it actually works against it - it just feels like you're browsing your hard drive, which is weirdly confusing and makes you think you've pressed the wrong button. Just having an information bar across the top saying BACKUP BROWSER would help.*

*The best bit about it is the search function although this too gets another screen just to confuse things a bit more. I can't see why that isn't the starting point with the restore list stuck on the side, rather than scattering everything in different windows. In fact, if you're wedded to the Windows Explorer design (which is a great idea) go the whole hog and go drag-and-drop.*

A great list of suggestions. Many of which will require Vienna. But there are probably some non-loc-breaking cosmetic changes that can be made for SP1, like decorating the browser

And shipping a backup viewer is certainly a top item for SP1/Vienna

Dan

**From:** Darwin Ou-Yang
**Sent:** Thursday, August 24, 2006 5:45 PM
**To:** Ivan Pashov; Dan Stevenson, Eduardo Laureano
**Subject:** :( :( :(

:( :( :( ( http://www.windowsvistamagazine.co.uk/page/windowsvista?entry=i_hate_vista_s_backup

Schallop Decl., Exh. BB: MS–VRTS–013–14.

Exhibit CC is reproduced below, and also appears to be related to an article comparing Vista CompletePC with Veritas' Norton Ghost.

> **From:** Dan Stevenson
> **Sent:** Tuesday, May 30, 2006 12:33 PM
> **To:** Windows Backup Marketing; Vista Backup PSS Community; CFS Backup Triage; Brian Dewey; Ron Kalooh; Paul Lubar; LHB Team; Barry Golfic; Desmond Lee; Elsie Nelipogu; Leo Linden; Jeff Goldner; Catharina van Ingen
> **Subject:** Vista vs. Ghost – ZDNet review and Symantec's boardroom going nuts
>
> See http://blogs.zdnet.com/Bott/?p=68&more-68 for a favorable comparison of CompletePC (aka SafeSystem, aka Julep) and Norton Ghost, the gold standard for image backup.
>
> I am following up directly with the reviewer to address the technical questions/issues he raised. Also, note that some of the missing functionality he mentioned will be addressed by the next release. I'll keep my comments about the sanity of Symantec's boardroom to myself :)
>
> Excerpts:
>
> Windows Vista takes on Norton Ghost
>
> …The well-hidden XP Backup program won't win any awards, but it gets the job done in its plodding way. That's all changed in Windows Vista. As I noted a few months ago, Vista has a full featured Backup program that includes the capability to schedule backups of important files. In some premium editions of Windows Vista, a new option allows you to create an image-based backup – a la Norton Ghost – rather than a file-by-file backup. In Vista Beta 2, the new image backup feature has a name: CompletePC Backup. Yesterday, after deliberately making a thorough mess of a new Vista installation, I put it to the test. It worked much better than I expected.
>
> …In Symantec's boardroom, they must be going nuts over Microsoft. First it was OneCare Live, which significantly undercuts the price of Norton AntiVirus. Then it was a patent brouhaha that led Symantec to file suit to block the release of Vista. And now comes this utility, which is free with Vista and should be good enough for most casual users who might otherwise have purchased a copy of Ghost.

Schallop Decl., Exh. CC: MS–VRTS–092.

Microsoft contends that while "these remaining exhibits suggest that aspects of the accused software have been used," they nonetheless "provide insufficient detail about the manner of such use to conclude that there was infringement." Microsoft's Reply at 6. Microsoft also argues that "[b]ecause the accused software can be used in ways that do not infringe, merely showing use is not enough." *Id.*

Microsoft is correct. Exhibit AA aside (foreign use addressed above), while the foregoing documents suggest use of the accused products, those documents do not provide any indication of whether those products were used as called for in the asserted claims. Even accepting everything in those documents as true, Veritas provides no analysis or other link between those documents and the asserted claims. As noted above, the accused products have substantial non-infringing uses with respect to both deployment and restoration. Thus, a mere showing of use, without more, of the accused products for deployment and backup is insufficient to show direct infringement.

### g) "14 bugs" Email

Veritas notes that "by January 2007, Microsoft had already identified at least 14 bugs related to the CompletePC Backup and Restore software, that it hoped to fix in Windows Vista Service Pack 1" and that "these bugs could only have been found if users or Microsoft testers had actually used the software." Veritas' Response at 12–13. Veritas relies on the following email (*see* Schallop Decl., Exh. DD: MS–VRTS–000000365666–67):

From: Eduardo Laureano
Sent: Thursday, January 18, 2007 6:49 PM
To: Ran Kalach; Yan Zhang; Ivan Pashov
Subject: backup solutions SP1 bug status
Attachments: Active SP1 bugs 2007.psq; windows7bound.psq

After some serious bug handling, below are our current stats as of 1/18/07 – 6:45PM

Open bugs Total: 24

To be Approved: 7 = 6 (ours) + 1 (setup – dcr support work)

1931800 SafeDocs (File Backup) CENTRAL PREFIX RUN:
base\fs\utils\restore\safedocs\sdcll\restorewiz.cpp: leaking memory 'pwszPath'
1941049 SafeSystem (Complete PC Backup) DCR supporting work: EFI support in
Complete PC backup and Restore
1945347 SafeSystem (Complete PC Backup) Create Recovery Disk launches even if
Complete PC Backup failed
1941363 SafeSystem (Complete PC Backup) BMR restore will place back bad clusters
that existed at backup time
1805062 SafeSystem (Complete PC Backup) BMR UI doesn't work if WinRE run from
GPT
1933913 Complete PC Backup (SafeSystem) OEMTAP: NEC: NEC %SRV IA64: BMR
fails on Server IA64 EFI machine
1938598 DCR supporting work: Create Rec Disc for EFI machines: Include elfsboot.com and
cdboot.efi in the product

Already Approved: 8 = 6 (assigned to dev) + 2 (need spec)

1867287 jingbowu SafeSystem (Complete PC Backup) BMR UI: Backups can't
be restored because drivers are not available in WinRE
1867294 jingbowu SafeSystem (Complete PC Backup) INTEROP: Restoring
Domain Controller can break Active Directory because of automatic reboot (can't set AD Recovery
Mode)
1867265 jingbowu SafeSystem (Complete PC Backup) INTEROP: Lack of
support for non-auth restore causes data loss when restoring FRS replicas on Longhorn Server
1911563 jingbowu SafeSystem (Complete PC Backup) SUPPORT: Server bare
metal restore fails to restore machines with corupted system partitions
1666934 jingbowu SafeSystem (Complete PC Backup) SECURITY: BitLocker
encryption is removed post-restore
1878194 darwou SafeDocs (File Backup) SECURITY: CENTRAL PREFAST RUN:
base\fs\utils\restore\zip\dzs\l\deflate.c : '((long)lisptr->strstart)-lisptr->block_start' may be greater than
'lisptr->strstart'. This can be caused by integer underflow.
1867269 edlaure SafeSystem (Complete PC Backup) BMR UI: restoring
shared disks in a cluster can break apps that depend on that disk
1284677 edlaure SafeSystem (Complete PC Backup) INTEROP: Server
backups to network share cannot be restored "data loss"

Triaged In Progress: 6 = 2 (investigating) + 4 (dependent on a DynaZIP engine fix)

1937659 jingbowu SafeSystem (Complete PC Backup) Complete PC
backup crashes
1942166 ivalinj SafeDocs (File Backup) Check boxes are missing next to files in
the Search box during restore (using File Backup)1939829 darwou SafeDocs
(File Backup) CENTRAL PREFAST RUN: base\fs\utils\restore\zip\dzsll\deflate.c: '((long)tisptr-
>st\rstart)-tisptr->block_start' may be greater than 'tisptr->st\rstart'. This can be caused by integer
underflow. This could yield an incorrect buffer access size '((long)tisptr
1939884 darwou SafeDocs (File Backup) CENTRAL PREFAST RUN:
base\fs\utils\restore\zip\dzsll\zipfile.c: Read overflow using expression 's[n - 1]'
1940806 darwou SafeDocs (File Backup) CENTRAL PREFIX RUN:
base\fs\utils\restore\zip\duzsll\dunzip.c: using uninitialized memory 'dh'
1935185 ivanpash SafeDocs (File Backup) zip engine bug can allow silent
backup corruption

<u>To be Triaged</u>: 3

1949268 System Restore After a restore the directory %systemdrive%\System
Volume Information\SystemRestore\System Volume Information is created
1948269 System Restore Assert in SxDeleteDirectoryRetry when directory fails to
delete
1947462 SafeSystem (Complete PC Backup) cpc UI shows (n-1)th backup after
restoring nth backup

<u>No Longer Among Us (punted to Windows 7)</u>: 12 + 10 (bogus prefix bugs – not shown here)

1159231 SUPPORT: System Restore failures are impossible to diagnose, yet could be user-
recoverable
1549259 Backup fails with meaningless error message when an offending filter driver (e.g.
antivirus apps) is running
1829859 SUPPORT: Backup fails completely if a bad file is encountered, but the user has NO
IDEA which is the bad file
1856738 Performance while analyzing files to suggest if Full backup is needed based on files.
1887215 SUPPORT: Complete PC Backup fails on PCs with FAT system partitions (which is
supported)
1882243 SUPPORT: DATA LOSS: Bona fide user data files under Windows.old are excluded
from the backup
1898291 SUPPORT: Files to restore can't be found via wildcard search (perceived as data
loss)
1904289 Tracking: Online Restore (German):: Encryption not restored and Data File Deleted
1906246 SUPPORT: Scheduled backup fails forever if no files are found the first time it runs
(found by selfhoster)
1910056 SUPPORT: Backup is permanently broken when a source disk goes missing ("new
full backup" is not enforced, so all subsequent backups fail)
1911313 WINPE: Offline Restore Fails with ERROR_OUTOFMEMORY or E_UNEXPECTED
1929374 Latest backup set cannot be found

Thanks,
Eduardo

*Id.*

Microsoft contends that while this evidence suggests that the accused software has been used, there is insufficient detail to conclude that there was infringement. Microsoft's Reply at 6. The master agrees.

### h) Zions Bank Email

According to Veritas, an "example of assistance to customers to practice the patented deployment methods using the accused Microsoft software is an e-mail thread produced by Microsoft project manager Wes Miller in April 2003. According to that e-mail thread, a customer wanted to know if it could use WinPE to access DVD–ROM discs as part of its 'Image deployment for windows XP,' and Mr. Miller responded by explaining specifically how they could do so." Veritas' Response at 14. That e-mail thread is reproduced below in pertinent part (*see* Schallop Decl., Exh. GG: MS–WM –000000010101–04):

**From:** Wes Miller
**Sent:** Monday, April 28, 2003 9:28 AM
**To:** Brad Beadles; Michael Acosta (DENVER)
**Subject:** RE: Win PE - Zions Bank

Software Assurance Membership – there are three types – Systems, Servers, and Applications.

**From:** Brad Beadles
**Sent:** Monday, April 28, 2003 9:08 AM
**To:** Wes Miller; Michael Acosta (DENVER)
**Subject:** RE: Win PE - Zions Bank

Wes and Michael,

Thanks for your help on this. I'm not sure what SAM customers are?

Regards,

BDB

**From:** Wes Miller
**Sent:** Monday, April 28, 2003 9:41 AM
**To:** Michael Acosta (DENVER)
**Cc:** Brad Beadles

It was included for EA and Select SAM customers in the October Select/EA media kits. http://corpdeploy has more info.

**From:** Michael Acosta (DENVER)
**Sent:** Monday, April 28, 2003 9:30 AM
**To:** Wes Miller
**Cc:** Brad Beadles
**Subject:** RE: Win PE - Zions Bank

Wes:

Thank you for your insight, I really appreciate it. Can you add any background on the process by which a customer actually licenses WinPE for these purposes? Please let me know if you have any questions. Thanks!

Michael

**From:** Wes Miller
**Sent:** Monday, April 28, 2003 8:54 AM
**To:** Michael Acosta (DENVER)
**Cc:** Brad Beadles

I don't believe what they are looking to do is possible. In order for a standard internal CD-ROM or DVD-ROM drive to be bootable, the BIOS must implement el-torito boot functionality. Even if a system has that support, that doesn't mean that you can plug in an external drive of any type (other than SCSI) and have it also be el-torito bootable. That also requires support in the BIOS of every PC you intend to do so — and USB boot support of optical drives is still pretty rare (as most computers have internal optical drives, so don't need it). There is no way (via floppy or any other means) to bootstrap the optical drive and initiate a boot (a specialized BIOS update from the PC vendor would be the only way). For a PC to boot from an external CD or DVD drive requires that it support both el-torito booting (which most will) and USB boot (which most won't). That said, if these PC's have an internal CD-ROM, I'd recommend booting WinPE from that, and having the USB DVD-ROM attached at boot time with the DVD with their image in that. You should be able to access it fine from under WinPE — you just can't boot WinPE from it

---

From: Michael Acosta (DENVER)
Sent: Monday, April 28, 2003 7:20 AM
To: Wes Miller
Cc: Brad Beadles
Subject: FW: Win PE - Zions Bank
Importance: High

Wes:

Would you please take a minute to help answer this question for Zion's Bank, a Corporate Account based in Salt Lake City?

Part of our image deployment for Windows XP is to use DVD ROM disks to store the images onto. We would like to make these bootable so we can use a desktop or laptop as a deployment server. As our portable DVD readers use USB we knew we would have difficulty in using the USB drives to boot with.
It is our hope to use WIN PE to provide that function even if we have to put it on a boot floppy disk to get the USB drivers to see the portable DVD drive.

Is this something WIN PE can help us with? If so it would make our deployment easier if we can use this application as part of our strategy.

Please let me know if you have any questions. Thanks!

Michael

*Id.* at MS–WM 101–02.

Microsoft contends that this email has "similar defects" to the foregoing e-mails. Microsoft's Reply at 5. The e-mails show that Microsoft customer used the accused products for deployment, but does not describe which deployment method was used. Veritas does not provide any showing or other analysis linking Zions Bank's use to the asserted claims. Thus, this e-mail string is insufficient to show that Zions Bank used the accused product in an infringing manner.

### i) Dr. Nichols Report, Exh. L

Finally, Veritas relies on Exhibit L to the Nichols' expert report as establishing infringing use by Microsoft's customers. Exhibit L is a table entitled "Supplemental Evidence of Infringement," is 11 pages long, and appears to have been appended to Dr. Nichols validity report. The first three pages of that exhibit illustrate the sort of detail found throughout the chart.

EXHIBIT L – SUPPLEMENTAL EVIDENCE OF INFRINGEMENT

| Dates | Source / Author | Document Title | Date | Description |
|---|---|---|---|---|
| MS-VRTS 243547 – MS-VRTS 243565 (Microsoft) | Madhulika Navagan (Microsoft) | "Driver-led Setup" | 5-5-04 | • Specifications for a new, automated, image-based driver-led setup in an attempt to simplify the complex process and enable the new image based setup." [MS-WM 243543] • Describes usage scenarios by internal Microsoft customers, OEMs, and corporate customers |
| MS-VRTS 213032 – MS-VRTS 213114 | Wen Miller (Microsoft) | "Longhorn Deployment Technologies" | N/A | • PowerPoint presentation discussing Longhorn image-based deployment tools |
| MS-VRTS 244410 – MS-VRTS 244411 | Ryan Burkhardt, Mahbub Narayan, Jason Cohen (Microsoft) | "Imaging Scenarios for OEMs" | N/A | • Describes various OEM imaging scenarios that Microsoft needs to address |
| MS-VRTS 246249 – MS-VRTS 246265 | Patrick Azzarello, Wen Miller (Microsoft) | "Longhorn Goals" | 7/2004 | • Describes planned Longhorn imaging goals • Subtitled "Evaluating and showcasing deploying Microsoft operating system products" |
| MS-VRTS 258549 – MS-VRTS 258582 | Dev Wadhwa, Pat Azzarello, Wen Miller, John Macken (Microsoft) | "WinPE Component Definition Spec" | 8-13-03 | • Specification for the Longhorn version of WinPE without some components consumers may not have access to |
| MS-VRTS 261464 – MS-VRTS 261465 | Pat Azzarello (Microsoft) | "Windows Core Setup Overview" | 8-29-04 | • For "Dell Visit – August 2004" • Explains that Microsoft's is to "[p]rovide a solid imaging solution on how to deliver and extend deployment solutions for OEM's and Corp." [MS-WM 261465] |
| MS-VRTS 435952 – MS-VRTS 435956 | J. Peter Bruzzese (Redmondmag.com) | "Top 5 Cool Vista Tricks" | May 2, 2005 | • Teaches users how to boot individual files from within a Complete PC backup VHD file either by mounting the file with a Virtual PC virtual cy device or by using Microsoft's VHDmount tool. • Says to "check out an article by Ben Armstrong, manager on the Virtual Machine Team at Microsoft. He tells you how to configure your system to mount VHD files by simply double clicking." [MS-VRTS 435952] |
| MS-VRTS 435957 – MS-VRTS 435958 | Microsoft | "Download WAIK 'To Beta 2 now'" | 5-31-05 | • Announces and encourages users to download Beta 2 of BDD 2007. The announcement describes BDD's imaging and deployment features. |
| MS-VRTS 441462 – MS-VRTS 441463 | Dan Croat (PC Network Advisor) | "How to Deploy Windows" | Dec. 1, 2001 | • Article explains that Microsoft's Sysprep tool enables deployment of Windows XP using disk cloning |

| | | | | |
|---|---|---|---|---|
| MS-VRTS 439926 – MS-VRTS 439934 | Microsoft | "Deploying Windows XP Part II: Implementing" | 6/1/01 | • Teaches image deployment as one way of deploying Windows XP and explains that the Sysprep.exe tool facilitates image deployment. • Advises that customers "[u]se sysprep to deploy clean installations in large organizations where hundreds of computers need the same application and desktop configurations." [MS-VRTS 439928] • Notes that "Sysprep greatly reduces deployment time, because nearly every component, including the operating system, applications, and desktop settings, can be configured without user interaction." [MS-VRTS 439929] |
| MS-VRTS 439956 – MS-VRTS 439978 | Microsoft | "Preinstalling Microsoft Windows XP by Using the OEM Preinstallation Kit" | 2003 | • "This paper provides summary information and best practices for system builders who preinstall the Microsoft Windows XP operating system on new computers." [MS-VRTS 439956] • "BEST PRACTICE: Microsoft recommends that system builders use the image-based network model because it is faster and less cumbersome than the other models. . . . System builders who manufacture more than 20,000 systems per month can save significant time and manufacturing costs by using image-based network preinstallation." [MS-VRTS 439958] • "RIS should be used to download WinPE, prepare the hard disk, and download the images to the destination computers on the factory floor. . . . If you use a model that uses a network to preinstall Windows using Windows PE, you will also be ready for the tools planned for future releases of the client version of the Windows operating system." [MS-VRTS 439967] |
| MS-VRTS 440013 – MS-VRTS 440032 | Microsoft | "Windows Preinstallation Environment Technical Overview" | March 2004 | • "[A]s new devices become available, you can easily add or remove drivers into a customized version of Windows PE. And customizing Windows PE to support additional mass-storage devices is easier because it uses standard Windows device drivers that are readily available." [MS-VRTS 440014] • "Drvinst. This command enables you to add device drivers, such as audio, video, and motherboard chipsets, to a Windows PE image." [MS-VRTS 440021] • "Windows PE Scenarios. You can think of Windows PE as a powerful replacement for MS-DOS in your deployment and troubleshooting processes." [MS-VRTS 440022] • "Configuring a limited set of mass-storage drivers can reduce the boot time of Windows PE. Instead of loading the entire set of mass-storage drivers that the Windows product CD natively |

| | | | | |
|---|---|---|---|---|
| | | | | supports, Windows PE just loads the drivers that you specify in the Winpeoem.sif file, which is in %SYSTEMROOT%\System32. You can also configure this file to support additional mass-storage drivers that the Windows product CD doesn't natively support." [MS-VRTS 446029] |
| | | | | "All Enterprise Agreement, Software Assurance Membership, School Agreement, and Campus Agreement customers will receive Windows PE. By taking advantage of it, you are better able to deploy and support Windows desktops and servers." [MS-VRTS 440031] |
| MS-WM 000112 – MS-WM 000127 | Wes Miller (Microsoft) | "Windows Preinstallation Environment (Windows PE)" | N/A | WinPE was "[o]riginally d...signed to provide cross-architecture deployment platform" |
| | | | | "Released simultaneously in 2001 with Windows XP, updated with Windows XP Service Pack 1" |
| | | | | "Updated again with Windows Server 2003" [MS-WM 115] |
| | | | | "Built in support of the devices in the version of Windows you build from " |
| | | | | "New network controller support can be easily added" [MS-WM 117] |
| | | | | "New mass-storage support can be easily added" [MS-WM 118] |
| | | | | "Deployment (broadest use today)" [MS-WM 122] |
| MS-WM 000161 – MS-WM 000172 | Frank Kaleck (DaimlerChrysler) | "DCX PCGlobal Client Deployment Process" | N/A | "Initial image deployment process... Only standard Microsoft tools used (Without any license fee): WindowsPE, SYSPREP, DISKPREP, IMGDEPLOY" [MS-WM 162] |
| | | | | "New image deployment process... Boot up with DCX WinPE OS environment... download image to disk" [MS-WM 163] |
| MS-WM 000433 – MS-WM 000466 | Wes Miller and Imaging Team (Microsoft) | "Image-based setup" | 1/3/03 | "In previous JimAll reviews where imaging came up, he said that we shouldn't do anything here unless the companies who are building products today are screwing the customer. Since that isn't really the case, we should go into why we are doing this. Things around customer need to lower deployment costs and increasing consistency as well as wanting one MS solution that all teams can leverage." [MS-WM 436] |
| | | | | "Meeting OEM Reqs" |
| | | | | ○ "Built in imaging" |
| | | | | ◄ "XImage.exe command-line tool for creation of custom images" |
| | | | | "Top Imaging Solutions" |
| | | | | ○ "PowerQuest" |

Supplemental Evidence of Infringement Exhibit L – 3

Nichols Infringement Report, Exh. L at L–1—L–3. While the exhibit provides a description of the documents relied upon, many of the actual documents referenced in the exhibit do not appear to have been made of the record. Thus, the master has no way of evaluating those documents. Nevertheless, Dr. Nichols' discussion of the evidence referenced in the chart does not indicate infringing use of the accused products. Even assuming that a jury could reasonably conclude from the chart that Microsoft's customers had used the accused products, Dr. Nichols does not provide any detailed discussion of which deployment method was used, and whether that deployment method infringed the asserted claims. Thus, the evidence discussed in Dr. Nichols' Exhibit L fails to show that Microsoft's customers used the accused products in an infringing manner.

### F. Recommendation

In view of the foregoing, the Master recommends that the Court GRANT Microsoft's motion for summary judgment with respect to non-infringement.

### V.

## Software as a Material or Apparatus Under § 271(c)

### A. The Parties' Arguments

Microsoft argues that "[a]s a matter of law, Microsoft cannot contributorily infringe the '573 Method Patent without selling, offering to sell, or importing a computer or hard disk or other *physical* material or apparatus actually used in a patented process." Microsoft urges that it is "a publisher of software information," and achieves this by publishing "software electronically (e.g., via Web downloads) or on DVDs used for transport," and provides "retail DVDs with its operating systems." According to Microsoft, "neither Veritas nor its expert have identified any physical material or apparatus, sold by Microsoft, that is used in the accused deployment or

backup and restore processes." Microsoft's Brief at 16 (Microsoft's emphasis).

Microsoft further argues that "[m]erely providing information that may be copied onto other physical devices that are then used in the patented method is no more sufficient to trigger Section 271(c) liability than it is to trigger Section 271(f) [export infringement] liability." Microsoft asserts that "[t]he materials and apparatus referenced in Section 271(c) are physical matter, not information," citing *Microsoft Corp. v. AT & T Corp.,* 550 U.S. ——, ——, 127 S.Ct. 1746, 1761, 167 L.Ed.2d 737 (2007), whereas "the transmission of information, like the production of information, does not entail the manufacturing of a physical product," citing *NTP,* 418 F.3d at 1323, Microsoft contends that its "intangible software information" cannot be "used in practicing a patented computer-implemented process, as required by Section 271(c)," and that "as a matter of law, the accused software information published by Microsoft cannot be considered 'a material or apparatus for use in practicing a patented process,' as required by Section 271(c)." Microsoft's Brief at 16–17 (quotations omitted).

Veritas responds that "Microsoft distorts the holding of the Supreme Court in a manner that would reform U.S. Patent Law to effectively grant immunity to all Microsoft products for any potential contributory infringement liability." Veritas' Response at 20. Veritas further argues that it "has *not* accused *exported* Microsoft golden masters (or any exported Microsoft software) as infringing under § 271(f)," but rather, "has accused U.S. related infringing sales activities under §§ 271(b) and (c) and has apportioned its damages claim accordingly based on available evidence for U.S.—only infringing activities and associated U.S. revenue." Veritas' Response at 20–21.

Microsoft replies that "Veritas cites no case holding that information is a 'material or apparatus' as required by Section 271(c)." Microsoft's Reply at 4.

**B. Discussion**

 At issue here is whether Microsoft "offers to sell or sells within the United States or imports into the United States * * * a material or apparatus for use in practicing a patented process." *See* § 271(c).

There appears to be no dispute that Microsoft sells the accused products (1) via electronic publication, *e.g.,* download, (2) on "DVDs used for transport" and (3) on "retail DVDs with its operating systems." There also is no dispute that installing the accused products from retail DVDs does not infringe the asserted '573 patent claims. *See* Nichols Dep. at 102:9–104:23 (Dr. Nichols' deposition testimony that installation of a "retail Vista DVD operating system" onto his computer would not infringe because he would not be installing a fully configured operating system).

Also, there appears to be no dispute that the accused products cannot infringe the '573 patent unless the accused products are loaded onto a computer for execution and thereby rendered capable of performing as called for in the asserted claims. *See* Microsoft's Brief at 16 ("providing information that may be copied onto other physical devices that are then used in the patented method"); *cf. AT & T Corp.,* 127 S.Ct. 1746, 1750. ("AT & T holds a patent on an apparatus for digitally encoding and compressing recorded speech. Microsoft's Windows operating system, it is conceded, has the potential to infringe AT & T's patent, because Windows incorporates software code that, when installed, enables a computer to process speech in the manner claimed by that patent. It bears emphasis, however, that

uninstalled Windows software does not infringe AT & T's patent any more than a computer standing alone does; instead, the patent is infringed only when a computer is loaded with Windows and is thereby rendered capable of performing as the patented speech processor.").

Microsoft relies heavily on the Supreme Court's decision in *AT & T*. However, *AT & T* was decided in connection with § 271(f),[14] not § 271(c), and dealt with the relatively narrow issue of extraterritoriality. *See AT & T*, 127 S.Ct. at 1751 ("Recognizing that § 271(f) is an exception to the general rule that our patent law does not apply extraterritorially, we resist giving the language in which Congress cast § 271(f) an expansive interpretation. Our decision leaves to Congress' informed judgment any adjustment of § 271(f) it deems necessary or proper."). That is not to say that *AT & T* does not bear some factual similarity to this case. In *AT & T*, the Supreme Court explained that "Windows is designed, authored, and tested at Microsoft's Redmond, Washington, headquarters. Microsoft sells Windows to end users and computer manufacturers, both foreign and domestic. Purchasing manufacturers install the software onto the computers they sell. Microsoft sends to each of the foreign manufacturers a master version of Windows, either on a disk or via encrypted electronic transmission. The manufacturer uses the master version to generate copies. Those copies, not the master sent by Microsoft, are installed on the foreign manufacturer's computers. Once assembly is complete, the foreign-made computers are sold to users abroad." *Id.* at 1752–53.[15] Foreign aspect aside, that appears to be similar to how Microsoft creates and distributes the accused products, at least on the present record.

The ultimate issue before the Supreme Court in *AT & T* was: "Does Microsoft's liability extend to computers made in another country when loaded with Windows software copied abroad from a master disk or electronic transmission dispatched by Microsoft from the United States?" *Id.* at 1750–51. The Court answered no. *See id.*

The Supreme Court's resolution of that issue turned on two questions: (1) "when, or in what form, does software qualify as a 'component' under § 271(f)?" and (2) "were 'components' of the foreign-made comput-

---

**14.** Section § 271(f)(1) provides:

Whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

**15.** More specifically, the Court explained that:

AT & T's patent ('580 patent) is for an apparatus (as relevant here, a computer) capable of digitally encoding and compressing recorded speech. Windows, the parties agree, contains software that enables a computer to process speech in the manner claimed by the '580 patent. In 2001, AT & T filed an infringement suit in the United States District Court for the Southern District of New York, charging Microsoft with liability for domestic and foreign installations of Windows. Neither Windows software (e.g., in a box on the shelf) nor a computer standing alone (i.e., without Windows installed) infringes AT & T's patent. Infringement occurs only when Windows is installed on a computer, thereby rendering it capable of performing as the patented speech processor. Microsoft stipulated that by installing Windows on its own computers during the software development process, it directly infringed the '580 patent. Microsoft further acknowledged that by licensing copies of Windows to manufacturers of computers sold in the United States, it induced infringement of AT & T's patent. *Id.* at 1753 (paragraphing omitted).

ers involved in this case 'supplie[d]' by Microsoft 'from the United States'?" *Id.* at 1753–54 (alteration in original). The first question is of particular interest here. In that regard, the Supreme Court observed that:

> Software, the "set of instructions, known as code, that directs a computer to perform specified functions or operations," *Fantasy Sports Properties, Inc. v. Sportsline.com, Inc.,* 287 F.3d 1108, 1118 (C.A.Fed.2002), can be conceptualized in (at least) two ways. One can speak of software in the abstract: the instructions themselves detached from any medium. (An analogy: The notes of Beethoven's Ninth Symphony.) One can alternatively envision a tangible "copy" of software, the instructions encoded on a medium such as a CD–ROM. (Sheet music for Beethoven's Ninth.)

*Id.* at 1754. AT & T argued that software in the abstract qualified as a "component" under § 271(f); Microsoft argued that only a physical embodiment of software could be a component. *Id.*

In resolving that question, the Supreme Court concluded that § 271(f)(1) "applies only to 'such components' as are combined to form the 'patented invention' at issue." *Id.* at 1755. In *AT & T,* the patented invention was "AT & T's speech-processing computer." *Id.* The Supreme Court reasoned that:

> Until it is expressed as a computer-readable "copy," e.g., on a CD–ROM, Windows software—indeed any software detached from an activating medium—remains uncombinable. It cannot be inserted into a CD–ROM drive or downloaded from the Internet; it cannot be installed or executed on a computer. Abstract software code is an idea without physical embodiment, and as such, it does not match

§ 271(f)'s categorization: "components" amenable to "combination." Windows abstracted from a tangible copy no doubt is information—a detailed set of instructions—and thus might be compared to a blueprint (or anything containing design information, e.g., a schematic, template, or prototype). A blueprint may contain precise instructions for the construction and combination of the components of a patented device, but it is not itself a combinable component of that device. AT & T and its amici do not suggest otherwise. *Cf. Pellegrini v. Analog Devices, Inc.,* 375 F.3d 1113, 1117–1119 (C.A.Fed.2004) (transmission abroad of instructions for production of patented computer chips not covered by § 271(f)).

*Id.*

AT & T had argued that "software, at least when expressed as machine-readable object code, is distinguishable from design information presented in a blueprint" because software was, in AT & T's view, modular, *i.e.,* "it is a stand-alone product developed and marketed 'for use on many different types of computer hardware and in conjunction with many other types of software,'" persistent, *i.e.,* "it can be updated or removed (deleted) without affecting the hardware on which it is installed," and dynamic, *i.e.,* "contained in and continuously performed by a computer." *Id.*

The Supreme Court responded that:

> The distinctions advanced by AT & T do not persuade us to characterize software, uncoupled from a medium, as a combinable component. Blueprints too, or any design information for that matter, can be independently developed, bought, and sold. If the point of AT & T's argument is that we do not see blueprints lining stores' shelves, the same observation may be made about

software in the abstract: What retailers sell, and consumers buy, are copies of software. Likewise, before software can be contained in and continuously performed by a computer, before it can be updated or deleted, an actual, physical copy of the software must be delivered by CD–ROM or some other means capable of interfacing with the computer. Because it is so easy to encode software's instructions onto a medium that can be read by a computer, AT & T intimates, that extra step should not play a decisive role under § 271(f). But the extra step is what renders the software a usable, combinable part of a computer; easy or not, the copy-producing step is essential. Moreover, many tools may be used easily and inexpensively to generate the parts of a device. A machine for making sprockets might be used by a manufacturer to produce tens of thousands of sprockets an hour. That does not make the machine a "component" of the tens of thousands of devices in which the sprockets are incorporated, at least not under any ordinary understanding of the term "component." Congress, of course, might have included within § 271(f)'s compass, for example, not only combinable "components" of a patented invention, but also "information, instructions, or tools from which those components readily may be generated." It did not In sum, a copy of Windows, not Windows in the abstract, qualifies as a "component" under § 271(f).

*Id.* at 1755–56. The Supreme Court thus concluded that software *per se* was not a combinable "component" under § 271(f),

but software [16] embodied on some media was. Here, Microsoft would have this court extend that holding to § 271(c).

It is worth noting that the Supreme Court's holding applied to § 271(f)(1) and (2). *See id.* at 1757 n. 16 ("Our analysis, while focusing on § 271(f)(1), is equally applicable to § 271(f)(2)."). The Supreme Court noted that Congress had enacted § 271(f)(1) and (2) in response to *Deepsouth Packing Co. v. Laitram Corp.,* 406 U.S. 518, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972), in which Deepsouth made parts of a patented deveiner and sold those parts abroad for assembly and use. Deepsouth, the Court had concluded, "could not be charged with inducing or *contributing to* an infringement." *AT & T,* 127 S.Ct. at 1751 (emphasis added). Section 271(f)(2) provides:

> Whoever without authority supplies or causes to be supplied in or from the United States any component of a patented invention that is especially made or especially adapted for use in the invention and *not a staple article or commodity of commerce suitable for substantial noninfringing use,* where such component is uncombined in whole or in part, knowing that such component is so made or adapted and intending that such component will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

and parallels § 271(c):

> Whoever offers to sell or sells within the United States or imports into the

---

**16.** The Supreme Court noted that "Microsoft and the United States stress that to count as a component, the copy of software must be expressed as "object code." * * * It is stipulated that object code was on the master disks and electronic transmissions Microsoft dis-

patched from the United States." *Id.* at 1754 n. 8. Here, the parties do not dispute whether the accused software is expressed on the transport DVDs in object code. The master assumes *arguendo* that the accused software is so expressed.

United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and *not a staple article or commodity of commerce suitable for substantial noninfringing use,* shall be liable as a contributory infringer.

in that both sections exclude "staple article[s] or commodity[ies] of commerce suitable for substantial noninfringing use."

Also, § 271(f)(2) provides for "any component of a patented invention" while § 271(c) provides for "a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process." In other words, § 217(c) expressly encompasses both tangible patented things and intangible patented processes. However, the Federal Circuit has concluded that the "patented invention" of § 271(f)—both (1) and (2)—includes both physical components and intangible processes, as well. *See Union Carbide Chem. & Plastics Tech. Corp. v. Shell Oil Co.,* 425 F.3d 1366, 1379 (Fed.Cir.2005); *Eolas Techs. v. Microsoft Corp.,* 399 F.3d 1325, 1339 (Fed. Cir.2005).[17] In *Union Carbide,* Shell sold catalysts abroad that were used to perform a patented process. The Federal Circuit rejected Union Carbide's argument that § 271(f)—and specifically § 271(f)(2)—was not directed to process claims, relying on *Eolas:*

This case again questions the meaning of the phrase "any component of a patented invention" in the statute. In other words, does this phrase apply to components used in the performance of patented process/method inventions? *Eolas Techs. v. Microsoft Corp.,* 399 F.3d 1325, 1339 (Fed.Cir.2005) recently answered this question in the affirmative, holding that every component of every form of invention deserves the protection of 35 U.S.C. § 271(f); i.e., that "components" and "patented inventions" under § 271(f) are not limited to physical machines. In *Eolas,* this court stated:

Section 271(f) refers to "components of a patented invention." This statutory language uses the broad and inclusive term "patented invention." Title 35, in the definitions section, defines "invention" to mean "invention or discovery"—again broad and inclusive terminology. 35 U.S.C. § 100(a) (2000). The next section in Title 35, section 101, explains that an invention includes "any new and useful process, machine, manufacture or composition of matter."

*Id.* at 1338–39. Thus, as *Eolas* explained, the statute makes no distinction between patentable method/process inventions and other forms of patentable inventions.

Moreover, *Eolas* and this case featured similar facts. In *Eolas,* Microsoft exported a master computer disc with program code that caused a computer to perform various method steps. See U.S. Patent No. 5,838,906, col. 17, ll. 58–col. 18, ll. 30. Thus, both this case and *Eolas* feature the exportation of a component (i.e., a computer disc with program code in *Eolas* and a catalyst in this case) used in the performance of a patented process or method (i.e., the meth-

---

17. The Federal Circuit also distinguished *NTP, Inc. v. Research In Motion, Ltd.,* 418 F.3d 1282 (Fed.Cir.2005) because "RIM itself did not supply any component to a foreign affiliate." *Union Carbide,* 425 F.3d at 1380.

od steps executed by the computer in response to the computer readable program code in *Eolas* and the commercial production of EO in this case). In that setting, *Eolas* applied § 271(f) to Microsoft's exported component. Similarly, § 271(f) applies to Shell's exportation of catalysts (i.e., a "component") used in the commercial production of EO abroad (i.e., a "patented invention").

*Union Carbide,* 425 F.3d at 1378–79. *Compare Pellegrini v. Analog Devices, Inc.,* 375 F.3d 1113 (Fed.Cir.2004)(Defendant did not infringe § 271(f) by transmitting instructions abroad for foreign production and disposition of the accused IC chips.). The Supreme Court in *AT & T* noted the Federal Circuit's decision in *Eolas,* but was unable to determine whether the Federal Circuit had made the abstraction vs. copy distinction. *See AT & T,* 127 S.Ct. at 1754 n. 10 ("The Federal Circuit panel in this case, relying on that court's prior decision in *Eolas Technologies Inc. v. Microsoft Corp.,* 399 F.3d 1325 (2005)[sic], held that software qualifies as a component under § 271(f). We are unable to determine, however, whether the Federal Circuit panels regarded as a component software in the abstract, or a copy of software.").[18] Under *AT & T* and *Eolas,* therefore, software embodied on some media may be a "component"—at least under § 271(f).

Under current case law, it is unclear how far that rationale may apply to the statutory provision at issue in this case, namely, § 271(c). The master is not prepared to broadly equate § 271(c)'s "material or apparatus for use in practicing a patented process" to § 271(f)(2)'s "compo-nent of a patented invention" on the present briefing. Nevertheless, under the reasoning of *AT & T* and *Eolas,* it is reasonable to view software embodied in some media as a "material or apparatus" that may be used in practicing a patented process. *But see Lucent Techs. Inc. v. Gateway, Inc.,* 509 F.Supp.2d 912, 929–30 (S.D.Cal.2007)(Responding to Microsoft's motion for new trial in light of *AT & T*: "Microsoft contends that the AT & T holding addressing foreign sales under 35 U.S.C. § 271(f) also should be applied infringement under § 271(c) for domestic sales. This court has no reason to interpret AT & T so expansively. One of the key concerns regarding § 271(f) is the effect of U.S. patent law on extraterritorial activities. 'The traditional understanding that our patent law operates only domestically and does not extend to foreign activities ... is embedded in the Patent Act itself, which provides that a patent confers exclusive rights in an invention within the United States.' *Id.* at 1758. (internal quotations and citations omitted). This concern does not infect § 271(c). While domestic patent laws more readily govern facilitation and inducement of infringement, § 271(f) is limited to components supplied for a combination that will be made outside the United States. There is no precedent for limiting the scope of § 271(c) to the limits placed on § 271(f). Just as the Supreme Court declined to remedy potential inconsistencies or loopholes and patent laws and left such issues for Congress to address, here too, this court leaves the Legislature to consider whether supplying software as an 'intangible' should be exempted from § 271(c).").

---

18. The Supreme Court also noted that "We need not address whether software in the abstract, or any other intangible, can *ever* be a component under § 271(f). If an intangible method or process, for instance, qualifies as a "patented invention" under § 271(f) (a question as to which we express no opinion), the combinable components of that invention might be intangible as well. The invention before us, however, AT & T's speech-processing computer, is a tangible thing." *Id.* at 1756 n. 13.

Thus, a copy of the accused product on transport DVD is a "material or apparatus" that may be used in practicing a patented process, and "electronically published" software is not such a "material or apparatus"—at least under the rationale of *AT & T* and *Eolas.*

It is unclear on the present record, however, whether the copy of the accused product on transport DVD is actually used. In *AT & T*, AT & T "charg[ed] Microsoft with liability for domestic and foreign *installation* of Windows." 127 S.Ct. at 1753 (emphasis added). As noted above, Microsoft supplied a master version of Windows, either via disk or electronic transmission, to foreign manufacturers. The foreign manufacturers then made copies of Windows from the master version and installed those copies on computers that were sold outside the U.S. *See id.* at 1752–53. Microsoft avoided liability under § 271(f) because (1) the foreign manufacturers did not actually install the master version and (2) Microsoft did not "supply" the actual copies that were installed. With respect to the transport DVD, there remains a question about whether the copies supplied by Microsoft are actually installed and used, *i.e.*, whether what Microsoft supplies is actually combined with other elements, or whether the accused software is copied from the transport DVD to a computer. Thus, the present record does not permit broad exclusion of the accused products as published on transport DVDs from the scope of § 271(c) under the rationale of *AT & T* and *Eolas.* Microsoft's argument with respect to transport DVDs must therefore be rejected.

## C. Recommendation

Under the rationale of *AT & T* and *Eolas,* the master recommends that the Court GRANT Microsoft's motion with respect to accused "electronically published" products.

## VI.

### Inducing Infringement—Intent

#### A. The Parties' Arguments

Microsoft contends that "[a] patent owner can no more control commerce, in unpatented products having substantial non-infringing uses, under Section 271(b) than under Section 271(c)," citing *Dynacore,* 363 F.3d at 1275. In Microsoft's view, "[t]hat is so even if the seller knows that its multiuse product is sometimes used in an infringing manner; such knowledge being 'legally irrelevant,' " citing *Warner–Lambert Co. v. Apotex Corp.,* 316 F.3d 1348, 1364 (Fed.Cir.2003). Microsoft's Brief at 13.

Microsoft furthermore argues that "Veritas has no qualified expert opinion or other evidence meeting its burden on" the "specific intent to encourage another to infringe the patent." Microsoft argues that "[i]n particular, there is no evidence that any managing agent (or agent at all) both (1) knew of the '573 Patent and (2) 'knowingly induced infringement and possessed specific intent to encourage another's infringement' using Microsoft's accused software." Microsoft also challenges Veritas' reliance on "a number of Microsoft patents in which the '573 Patent was cited in prosecution," noting that "[t]his is not nearly enough to survive JMOL under *DSU*" standards. Microsoft further argues that "[i]t would be illogical to merely presume, without supporting evidence, that any particular reference cited in patent prosecution will be provided to and read by managing agents, or others, responsible for designing or publishing the accused software." Microsoft's Brief at 20–21.

Veritas responds that "Microsoft misstates the intent requirement for inducement" and that *"circumstantial evidence of intent to induce infringement remains sufficient to meet the plaintiff's burden of proof."* Veritas contends that "there is more than sufficient evidence to establish that Microsoft has long been aware of the '573 Patent yet proceeded in selling the Accused Products with documentation instructing customers * * * to practice the methods of the '573 Patent." Veritas further argues that "during the prosecution of Microsoft's U.S. Patent[s] * * * previously asserted by Microsoft against Veritas in this case, many claims sought by Microsoft were repeatedly rejected in view of the '573 Patent." According to Veritas, this demonstrated that "not only was Microsoft aware of the '573 Patent, it was also expressly aware of the subject matter thereof and of its applicability to Microsoft's intended and now accused approaches to automated system recovery." Veritas' Response at 15–17 (Veritas' emphasis) (citations omitted).

Veritas also argues that "Microsoft induces infringement of the '573 patent," as shown "by the wealth of literature provided by Microsoft instructing its customers how to use the Accused Product to perform the claimed methods." With respect to system deployment, Veritas argues that "Microsoft has provided customers with substantial documentation instructing customer how to use the Accused Products in an infringing way, has encouraged customers to use the products in this way." According to Veritas, Microsoft announcements, statements and witness testimony indicate Microsoft's "encouragement to use the claimed methods." Veritas urges that "Mr. Miller also testified that he and other at Microsoft 'evangelized' the use of WinPE to deploy Windows operating systems in an infringing manner." In addition, Veritas argues that Microsoft provided "assistance to specific customers to perform the claimed methods" through the "various Usenet posting by Microsoft employees", "an email thread produced by * * * [Mr.] Miller", and Mr. Miller's attendance at " 'many trade shows' to discuss using WinPE 'primarily for Enterprise deployment.' " Veritas' Response at 13–14.

With respect to system recovery, Veritas argues that "Microsoft's associated product documentation for the accused system recovery features of Windows Vista * * * instruct users to use these system recovery features of Windows Vista and Windows Server 2008 to practice the patented recovery methods." In addition, according to Veritas, "Microsoft's lead program manager for the Windows Recovery Environment project for Windows, Desmond Lee, confirmed under oath that the accused recovery features were developed to provide important and demanded system recovery solutions for Microsoft customers." According to Veritas, "Microsoft also encourages customers to use these solutions and is aware of its customers using these accused system recovery features in infringing ways." Veritas' Response at 14–15.

Microsoft replies to Veritas' "constructive knowledge" argument by reurging the points of its moving brief that "there is *no* evidence that any Microsoft employee or outside counsel had heard of the '573 Patent prior to February 19, 2002" and "[t]here is *no* evidence that any Microsoft employee heard of the '573 Patent prior to suit." Microsoft's Reply at 11–12 (Microsoft's emphasis). Microsoft further asserts that "Veritas' 'constructive knowledge of the patent' theory" "is unworkable in practice and simply bad policy" as it "would "make liability turn on whether a corporation took 'reasonable care' to analyze its every action against every claim, of

every patent ever cited as prior art, against every patent application it ever filed." " *Id.* at 12.

## B. Discussion

Once again, "[w]hoever actively induces infringement of a patent shall be liable as an infringer." § 271(b). At issue here is whether the evidence of record is sufficient to raise a genuine issue of material fact regarding Microsoft's intent to induce its customers to infringe.

As discussed above, "the intent requirement for inducement requires more than just intent to cause the acts that produce direct infringement. Beyond that threshold knowledge, the inducer must have an affirmative intent to cause direct infringement. * * * Accordingly, inducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *DSU*, 471 F.3d at 1306 (citations omitted). Intent requires a "clear expression or other affirmative steps taken to foster infringement." *Id.* (citations omitted) *See Grokster*, 545 U.S. at 915 ("Evidence of active steps taken to encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe.").

In *DSU*, the *en banc* Federal Circuit "clarifie[d] that intent requirement by holding en banc that * * * '[t]he plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce ·actual infringements.' The requirement that the alleged infringer knew or should have known his actions would induce actual infringement necessarily includes the requirement that he or she knew of the patent." *DSU*, 471 F.3d at 1304 (quoting *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 554 (Fed.Cir.1990)).

■ Thus, the threshold question is whether Microsoft knew of the '573 patent. There is no dispute that for two of Microsoft's patents, namely, U.S. Patent Nos. 6,820,214 and 6,851,073, the PTO cited the '573 patent as a basis for rejecting claims. *See* Schallop Decl., Exh. N: Prosecution History of Microsoft's U.S. Patent No. 6,820,214 at 885 and Exh. O: Prosecution History of Microsoft's U.S. Patent No. 6,851,073 at 1159. There is no dispute that both of those patents were prosecuted by outside counsel, namely, the firm of Michalik & Wylie, PLLC of Bellevue, Washington. *See* Schallop Decl., Exh. N at 871 and Exh. O at 1149. There is also no dispute that Microsoft has ~75,000 employees and more than 7,500 U.S. patents. Veritas does not contend that the inventors of those two patents knew of the '573 patent, and Microsoft urges that "[t]here is *no* evidence that any Microsoft employee heard of the '573 patent prior to suit." *See* Veritas' Response at 17; Microsoft's Reply at 11. Thus, there appears to be no dispute that the inventors did not know of the '573 patent. Nevertheless, under Ninth Circuit law, the knowledge of Microsoft's lawyers is imputed to Microsoft. *See Feature Realty, Inc. v. City of Spokane*, 331 F.3d 1082, 1093 (9th Cir.2003)("Feature Realty's former lawyer knew of the assurances when they were made, in October 1998, and that knowledge properly attributable to Feature Realty itself. *See Busk v. Hoard*, 65 Wash.2d 126, 134–35, 396 P.2d 171 (1964)('knowledge or notice by or to the agent is imputed to his principal; and the knowledge had by an agent will, therefore, bind his principal....')."); *Kyocera Corp. v. Prudential–Bache Trade Servs., Inc.*, 299 F.3d 769, 782 (9th Cir.2002), *vacated in part on unrelated grounds*, 341 F.3d 987 (9th

Cir.2003)("Imputation is proper in this instance, as communication of the proposed changes is supported by the above facts. *See Kelley v. British Commercial Ins. Co.,* 221 Cal.App.2d 554, 561–62, 34 Cal.Rptr. 564 (1963)('Once communication is presumed or shown to have occurred, the principal is charged with knowledge of all the information acquired by the agent relative to the scope of his agency.'). This is true regardless of whether Kyocera's lawyer actually relayed the information it received to Kyocera officials."). Viewing the evidence, and drawing inferences, in light most favorable to Veritas, Microsoft is deemed to have known about the '573 patent as of the earliest date that the '573 patent appears of record in the prosecution histories of those two Microsoft patents.

Microsoft argues that "Veritas asserts constructive knowledge—based solely on citation, to outside counsel, in patent prosecution; but cites *no* case basing inducement liability on such a theory. The statute prescribes 'actively inducing' infringement, which presupposes *actual* knowledge of the patent, such as provided by negotiations or demand letters." Microsoft's Reply at 12 (Microsoft's emphasis) (citing *DSU* (prior dealings), *MEMC,* 420 F.3d at 1369 (demand letter) and *Mentor H/S, Inc.,* 244 F.3d at 1379 (cease and desist letter)). However, the Federal Circuit has held that "[a] crucial element of induced infringement is that the inducer must have *actual or constructive* knowledge of the patent." *Insituform*

*Techs., Inc. v. Cat Contracting, Inc.,* 161 F.3d 688, 695 (Fed.Cir.1998)(emphasis added). *Cf. DSU,* 471 F.3d at 1311 (Michel, J. and Mayer, J. concurring)("Moreover, we write to make clear that we do not set forth a new standard here as to what satisfies the 'knowledge of the patent' requirement in cases brought under 35 U.S.C. § 271(b). *See, e.g., Insituform Techs., Inc. v. Cat Contr. Inc.,* 161 F.3d 688, 695 (Fed.Cir.1998) (analyzing section 271(b) liability under both actual and constructive knowledge standards). There is no dispute that ITL Corporation Pty, Ltd., had actual knowledge of United States Patent No. 5,112,311. Accordingly, the 'knowledge of the patent' issue is not before us."). Microsoft's argument must thus be rejected as a matter of law.[19]

■ With respect to intent, Veritas urges that it has circumstantial evidence of intent. *See* Veritas' Response at 16. Veritas relies on much of the same evidence that it uses to support its arguments regarding direct infringement. In other words, Veritas argued that Microsoft's customers directly infringed because Microsoft instructed its customers to practice the claimed methods—and now Microsoft relies on that same evidence to establish intent. As noted above, circumstantial evidence may support a finding of both direct infringement and intent to induce infringement. *See Moleculon,* 793 F.2d at 1272.

Veritas again points to Dr. Nichols' report, and particularly to the infringement

---

19. Thus, the master need not reach Microsoft's arguments that "Veritas' theory also disregards the 'specific intent' requirement. Specific intent requires a heightened and particularized showing of an alleged infringer's intent, all *premised* on knowing that a patent exists. Veritas' 'constructive knowledge of the patent' theory, in piling legal fiction on legal fiction, would incorrectly undercut this requirement and permit statutory liability on mere negligence. Veritas' theory also is un-

workable and practice in simply bad policy. On the facts of this case, alone, it would make liability turn on whether a corporation took 'reasonable care' to analyze its every action against every claim, of every patent ever cited as prior art, against every patent application ever filed. This ignores the practical realities of business, and outside patent prosecution, and is unworkable." Microsoft's Reply at 12 (Microsoft's emphasis).

claim charts of Exhibits E, F, G, H and I. Dr. Nichols' exhibits are discussed above in connection with the discussion regarding direct infringement substantial non-infringing use. Again, there is no dispute that the accused products have substantial non-infringing uses, and that Dr. Nichols' supporting evidence discloses many of those noninfringing uses in both the deployment and backup and recovery contexts. Thus, mere encouragement to use the products for those purposes is insufficient to raise a genuine issue of material fact regarding intent. Furthermore, the steps identified by Dr. Nichols as infringing were generally not recited together or in the claimed order. Thus, even if Veritas could show direct infringement and that Microsoft knew of the infringement, a juror could not reasonably conclude from that evidence—even circumstantially—that Microsoft encouraged its customers to infringe the '573 patent. *See DSU*, 471 F.3d at 1306 ("[I]nducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities").

Beyond Dr. Nicholas' report, Veritas points to documentary evidence, such as the statement in Introduction of the "Windows Platform Design Notes—Preinstalling Microsoft Windows XP By Using the OEM Preinstallation Kit, Part 1" that Veritas urges constitutes "encouragement to use the claimed methods" (*see* Schallop Decl., Exh. FF: MS–VRTS 439956–78):

BEST PRACTICE: Microsoft recommends that system builders use the image-based network model because it is faster and less cumbersome than the other models. Downloading Windows along with a complete application package is a complex process, but it can be streamlined if the image is customized before you copy it to the hard disks. You can also use OPK tools to customize after the image is built without any additional configuration of the destination computers. System builders who manufacture more than 20,000 systems per month can save significant time and manufacturing costs by using image-based network preinstallation. Information about this process is presented in "Network-based Preinstallation" later in this paper.

Id. at MS–VRTS –958. Veritas also points to the 2–page "Windows Vista Compare Editions" chart comparing the features of Basic, Home Premium, Business, and Ultimate versions of Windows Vista. *See* Schallop Decl., Exh. M: VRTS 1842472–73.[20] Additionally, Veritas points to the Zions Bank email thread. *See* Schallop Decl., Exh. GG: MS–WM 10101–04. Each of those documents is discussed above in connection with discussing direct infringement. However, for much the same reasons that those documents are insufficient show actual use of an infringing method, those documents are insufficient to show intent by Microsoft to induce infringement. At best, those documents suggest that Microsoft was urging use of those products for deployment and backup and restoration. But, given the number of substantial non-infringing deployment and backup and restoration uses, and the lack of any link between the disclosed methods (if any) and the claimed methods, no reasonable juror could conclude that Microsoft intended that its customers infringe the '573 patent

20. Veritas also urges that "Microsoft's encouragement to use the claimed methods came in the form of announcements such as the June 21, 2006, announcement titled 'Download WinPE 2.0 Beta 2 now!!!!,' which tells users to download Beta 1 of the BDD 2007 software and describes BDD's imaging and deployment features." Veritas' Response at 13–14. Veritas relies on "Ex. EE: MS– VRTS 43549–61," but Exhibit EE (the 23–page "Windows Deployment Service (Long-horn)" document discussed above in connection with direct infringement) does not appear to contain those document numbers nor the statements urged by Veritas. Accordingly, the master is unable to evaluate what Veritas urges.

by using the accused products in a particular way

 Veritas also points to deposition testimony. According to Veritas, Wes Miller "testified that he and others at Microsoft 'evangelized' the use of WinPE to deploy Windows operating systems in an infringing manner." Veritas' Response at 14. Microsoft responds that this representation of Miller's testimony regarding his "evangelizing" of the deployment method is a mischaracterization and "wildly false." Microsoft's Reply at 8. Mr. Miller testified as follows:

Q. Oh, I understand. There are lots of uses for Windows PE, correct?

A. Uh-huh.

Q. But one of the uses for Windows PE is for deployment purposes, correct?

A. That is one of the uses you can use Windows PE for.

Q. And the OPK contains documents that describe specifically how to use Windows PE for deployment purposes, correct?

A. Can you, can you restate?

Q. Sure. The OPK contains documents that describe specifically how to use Windows PE for deployment purposes, correct?

A. It contains prescriptive guidance on how you can—how you can use Windows PE for deployment, yes.

Q. You've used that term quite a bit today, prescriptive guidance.

A. Uh-huh.

Q. Is that a term that you normally use?

A. Yes.

Q. Ok.

A. Well, when speaking at Microsoft I would often use it.

Q. What do you mean by that?

A. When Microsoft produces a technology, especially being the big company that they are today, they generally produce it and they'll release it to the world and the thing you hope is that people will actually be interested in and utilize that technology. As a result of that, Microsoft often uses the term evangelize. And part of my job at Microsoft was to actually evangelize the technology. So we would provide, as I mentioned, prescriptive guidance on here's how you might use the tools that we provided to do X, Y or Z.

Q. And as part of this evangelizing effort, it was your desire as an employee of Microsoft and also Microsoft's desire to have as many companies follow these prescriptive guidances with respect to deployment as possible, correct?

A. I think—my, my goal was always to make Windows deployment easier. And it didn't really matter how they did it, which is why we actually wound up coming up with—when I worked on Windows XP—at least three different ways to * * *.

Miller Dep. at 19:4–20:25 (objections omitted) (Mr. Miller's answer is incomplete because Veritas does not provide page 21). Microsoft is correct. Mr. Miller's testimony does not reference "evangelizing" the "use of WinPE to deploy Windows operating systems in an infringing manner." Rather, Mr. Miller describes his role at Microsoft to inform others "how [customers] might use the tools that [Microsoft] provided to do X, Y or Z." Mr. Miller's testimony does not suggest any particular use of the accused products that Microsoft evangelized, much less that such use would infringe the '573 patent. That testimony is thus insufficient to show intent.

Veritas also points to the following testimony of Mr. Miller as evidence intent:

Q. [* * *] Windows PE for deploying Windows operating systems, correct?

A. We—I did go to many trade shows and discuss how you could use Windows PE primarily for Enterprise deployment, among other things.

Q. Thank you. And when giving these presentations you tried to be as accurate as possible, correct?

A. Define accurate.

Q. Well, you weren't trying to mislead or misinform your customers about how to use Windows PE for operating systems when giving these presentations, correct?

A. I was trying to give my customers the best guidance they could get Windows deployed.

Q. And the best guidance included, to your knowledge, the most accurate information possible regarding Windows PE and deployment, correct?

A. Included Windows PE. We also knew many customers were using Windows PE, some weren't interested because they didn't have the memory to handle it. So we included numerous tools.

Miller Dep. at 29:1–22 (objections omitted) (Veritas does not provide page 28 or 30). Again, Mr. Miller's testimony does not suggest a particular deployment use of the accused products that Microsoft evangelized, much less that such use would infringe the '573 patent. That testimony is thus insufficient to raise a genuine issue of material fact regarding intent.

■ Additionally, Microsoft urges that "Microsoft's lead program manager for the Windows Recovery Environment project for Windows, Desmond Lee, confirmed under oath that the accused recovery features were developed to provide important and demanded system recovery solutions for Microsoft customers. According to

Mr. Lee, Microsoft developed these especially adapted features and then bundled them in Vista and will also include them in its forthcoming Windows server 2008 release. Microsoft also encourages customers to use these solutions and is aware of its customers using these accused system recovery features in infringing ways. Microsoft also advertises the accused system recovery features for the Accused Products as well." Veritas' Response at 15 (citations omitted). Veritas relies on the following testimony (*see* Schallop Decl., Exh. E: Deposition Excerpts of Desmond Takman Lee ("Lee Dep.")):

Q. And has it continued to be part of installation media for Windows Vista moving forward since 2005?

A. Yes.

Q. And we've also had some discussions about the next version of Windows, Windows Longhorn Server or Server 2008. Is WinRE also part of that operating system?

A. Yes.

Q. So WinRE is a part of both Vista and Longhorn Server; is that correct?

A. That is correct.

Lee Dep. at 53:2–12.

Q. In your interactions with OEMs, have they ever discussed system recovery with you?

A. Yes.

Q. And in what context did they discuss system recovery with you?

A. On several occasions OEMs have requested Windows RE—or tools within Windows RE to provide capability of restoring the operating system that can be used by OEM—by OEMs.

Q. And was system recovery an important feature for OEMs?

A. I could not speculate on what future OEMs think is important or not.

**1282**

Q. But given your interactions with these OEMs and the types of discussions you had with them, could you tell whether or not system recovery was and is an important feature that they were concerned about?

A. It is one of many important functionalities that they think are important.

Lee Dep. at 60:2–20.

Q. So WinRE can be used in conjunction with some sort of backup set in order to restore a system that's fully crashed?

A. That is one option.

Q. And does Micro—Microsoft recommend using WinRE for that purpose?

A. In Windows Vista Microsoft recommends using CompletePC in conjunction with Windows RE for that purpose.

Q. And does Microsoft teach any other procedure in Windows Vista for that purpose?

A. I'm not sure if Microsoft publishes any other official recommendation.

Q. Are you aware if Microsoft provides any other technology that allows you to deal with the scenario that we just described, full system recovery when your hard disk has crashed?

A. I'm not—I'm not aware of any technology that the end-user can use other than CompletePC.

Q. With WinRE.

A. Yes. Running on WinRE.

Q. Because CompletePC can only run on WinRE; is that correct?

A. That's my understanding.

*Id.* at 64:5–65:4 (objections omitted).

Q. Thank you. Could you please take a look at the second page of this presentation. It's Bates numbered 943210. See how it discusses "Brand new backup and restore features for Windows Vista and Windows Server Longhorn" Do you see that, Mr. Lee?

A. Yes.

Q. And then on the following page, under "New Features," it says "CompletePC backup and restore; Block-level image, Entire computer"? Do you see that?

A. Yes.

Q. Is that the CompletePC product, we talked about earlier today for Vista?

A. I believe so.

Q. And CompletePC Backup and Restore allows for the recovery of your entire computer, as listed here?

A. That's one of the capabilities.

Q. And CompletePC is currently shipping with Windows Vista?

A. It is being—it is currently shipped with certain editions of Windows Vista.

Q. And CompletePC is currently available for Vista Business, Enterprise and Ultimate?

A. That is my understanding.

Q. Thank you. If you take a look at the page that's Bates numbered 943219. See how it says "CompletePC Image Backup, Block-level backup of the entire PC"?

A. I see.

Q. And the third bullet point, "Easy restore via Windows Recovery Environment (Windows RE)"?

A. Yes, I see it.

Q. Is that a correct description of CompletePC Image Backup?

A. That is one aspect of CompletePC.

Lee Dep. at 73:15–74:25.

Q. Thank you. Then going back along the lines of what we discussed before, CompletePC and WinRE provide important features to the Vista operating system; is that correct?

A. Portions of Windows RE and CompletePC provides one of the many important functionalities in Windows Vista.

Q. And if your entire Vista system crashes or fails, the recommended—recommended recovery solution by Microsoft is to use CompletePC Backup and Restore with WinRE; is that correct?

A. I do not know if that is the official recommendation from Microsoft or not.

Q. Is it a solution provided by Microsoft?

A. Yes.

Q. And to the best of your knowledge, are there any other solutions provided by Microsoft for such a procedure?

A. I'm not aware of any other end-user solutions provided by Microsoft to do that.

Q. So then to the best of your understanding, if your entire Vista system crashes or fails, the only solution provided by Microsoft is to use WinRE and CompletePC Backup and Restore to restore your entire system; is that correct?

A. That is the only solution I know of.

Q. And is CompletePC Backup and Restore sold separately from the Vista operating system?

A. I do not believe so.

Q. Is WinRE sold or distributed separately from the Vista operating system?

A. No.

Q. And can WinRE be removed or separated from the Vista operating system?

A. I do not believe so.

Q. And can CompletePC Backup and Restore be separated or removed from the Vista operating system?

A. I do not believe so.

Lee Dep. at 79:8–80:19.

Q. Thank you. Maybe then we can take a look quickly on Page 4 of this document. And you see Section 1.3, "Goals"? And, "Empower users with readily available recovery tools and an integrated experience without having to call support"? Is that a goal of WinRE?

A. Yes.

Q. And, "Lowering"—"Lower OEM costs by eliminating the need to include proprietary recovery platform," is that also a goal of "WinRe"

A. That—that's one of the goals.

Q. So from this document, it appears that the goals of WinRE were to provide recovery tools to users as well as lower OEM costs; is that correct?

A. Yes, but the method to lower OEM costs does not necessarily—that's not necessarily from providing the recovery tools.

Q. Understood. But generally a high level, in terms of—actually, maybe you can help me. When was the specification written, do you recall? Maybe I can refer you to the second page, where it has a revision summary, and under the line where it says "Comments, First draft," there's a date of April 17th, 2005. Do you see that, Mr. Lee?

A. Yes.

Q. And was the "Goals" section written during that time frame?

A. It was drafted at that time, but I do not recall how many revisions were made afterwards.

Q. But on or around April 2005 and three revisions later, it is correct, then, that the goals of WinRE were to provide recovery tools to users, as well as to provide OEMs certain benefits, such as lowering costs?

A. Those are two of the goals.

Lee Dep. at 82:5–83:14.

Q. What did Microsoft provide to OEMs?

A. The tools to create such a media.

Q. And what are the tools to create the media?

A. OPK and WAIK, Windows automated installation kits.

Q. And would this media be what is referred to as recovery disk?

A. I do not know if that is the case.

Q. Were you involved in the development of this aspect of WinRE?

A. Can you specify which aspect you're talking about?

Q. Providing the tools in OPK and WAIK to allow end-users to create a recovery media for using WinRE.

A. I'm not directly involved in the development of the—of these tools.

Q. Are you familiar with these tools?

A. Yes.

Q. But is it at least your understanding that Microsoft provides OEMs with tools, i.e., OPK and WAIK, to create a recovery media that use WinRe for full system recovery; is that correct?

A. These tools allow OEMs to create bootable media, they can run with Windows RE.

Q. And these tools are provided by Microsoft to the OEMs; is that correct?

A. That is correct.

Lee Dep. at 90:7–91:18.

Q. And if you look back at Section 1.1, the last paragraph there. Again, I'll read it into the record. "Customers and OEMs have asked for the functionality to create their own winRE CD for over a year." Is that an accurate statement?

A. I only heard from OEMs—certain OEMs that have requested this functionality. I have—I personally have not heard a request from end-users who have asked for this.

Q. Which OEMs have you heard from that requested this functionality?

A. I do not recall the specific OEMs.

Q. Do you recall how many OEMs?

A. I would say about two to three.

Q. And do you recall when they requested this functionality?

A. I do not recall.

Q. How many OEMs do you work with: Mr. Lee?

A. I frequently work with approximately three to four OEMs, and I have on-[and]-off engagements with other OEMs.

Q. How many others, approximately?

A. About five to six.

Q. And the two to three OEMs who asked for a WinRE recovery disk, was it out of the group of OEMs that you work with frequently?

A. Some of them might have been, but I do not recall exactly which ones were and if all of them were.

Q. Can you name the OEMs that you work with?

A. HP, Dell, and Sony.

Lee Dep. at 93:23–95:1.

A. OEMs have asked Microsoft—some OEMs have asked Microsoft to provide an end-user tool so that end-users can create a bootable media for diagnostics, repair and recovery purposes.

Q. Including full system recovery when your system can no longer boot?

A. That is one of the functionalities.

*Id.* at 99:7–13.[21] As with Mr. Miller's testimony, Mr. Lee's testimony does not suggest a particular recovery use of the accused products provided to the OEMs, much less that such use would infringe

---

**21.** Veritas also cites Mr. Lee's deposition testimony at pages 19 and 20, but does not provide those pages of transcript. *See* Veritas' Response at 15.

the '573 patent. That testimony is thus insufficient to show intent.

Overall, "[t]he requisite intent to induce infringement may be inferred from all of the circumstances." *Water Techs. Corp. v. Calco, Ltd.,* 850 F.2d 660, 668 (Fed.Cir. 1988). Here, viewing all the foregoing evidence in the light most favorable to Veritas, and even assuming *arguendo* direct infringement by Microsoft's customers and Microsoft's knowledge of the same, no reasonable jury could conclude that Microsoft intended to induce its customers to infringe the '573 patent. Even if it can be said that Microsoft had "knowledge" of the '573 patent, there is no evidence linking Microsoft's alleged knowledge of the '573 patent to the actions that Veritas urges induced infringement. Also, having "knowledge" of a single patent only because it was cited during prosecution of two patents among thousands (and then only through imputing that knowledge from Microsoft's attorneys) does not give Microsoft sufficient "knowledge" to formulate the "intent" required for inducement. Given the undisputed substantial non-infringing uses of the accused products for both deployment and system back up and recovery, and the lack of evidence that Microsoft specifically encouraged an infringing method, the master must conclude that Veritas has failed to raise a genuine issue of material fact regarding intent.

### C. Recommendation

In view of the foregoing, therefore, the master recommends that the court GRANT Microsoft's motion with respect to intent to induce infringement.

### VII.

### Willfulness

### A. The Parties' Arguments

Microsoft's arguments in connection with willful infringement are largely those put forward in connection with inducing infringement. Among other things, Microsoft contends that that "Veritas has no qualified expert opinion or other evidence meeting its burden on" the intent requirement for a finding of "willful infringement." Microsoft's Brief at 21.

Veritas responds that the discussion "concerning evidence of Microsoft's intent in connection with the inducement claim applies with equal force to the willfulness claim. Whether Microsoft infringement of the '573 Patent and in reckless disregard of the rights of Veritas is a factual inquiry ill-suited for summary judgment." Veritas' Response at 21. Again, according to Veritas, "Microsoft has presented no evidence that it took any steps, much less reasonable steps, when the company first learned of the '573 Patent to determine its actions did not infringe" and that "Microsoft has offered no evidence that it took any steps to ensure that its activities did not infringe the '573 Patent even after this action was filed." *Id.* at 17.

Finally, Microsoft argues that "Veritas cannot base its willfulness claims on activities after August 1, 2006, when it asserted the patent in this litigation, without having supplemented its pleadings under Fed. R.Civ.P. 15(d)." Microsoft's Reply at 12.

### B. Discussion

The statute, § 284, provides in pertinent part:

> When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed.

The *en banc* Federal Circuit in *In re Seagate,* 497 F.3d 1360 (Fed.Cir.2007), set forth the standard for willfulness. In *Seagate,* the Federal Circuit "abandon[ed] the affirmative duty of due care" and held that

"proof of willful infringement permitting enhanced damages requires at least a showing of objective recklessness." *Id.* at 1371. According to the Federal Circuit, "[t]he civil law generally calls a person reckless who acts * * * in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* (quotation marks omitted). The Federal Circuit then concluded that:

> Accordingly, to establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent. The state of mind of the accused infringer is not relevant to this objective inquiry. If this threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer. We leave it to future cases to further develop the application of this standard.

*Id.*

 Against that standard, the foregoing evidence falls well short of raising a genuine issue of material fact that Microsoft was objectively reckless in making, using, offering to sell and selling the accused products, or in its communications with its customers regarding the accused products. As noted above, there is no dispute that no one at Microsoft actually knew of the '573 patent, much less considered that patent in connection with any commercial activities involving the accused products.

### C. Recommendation

In view of the foregoing, therefore, the master recommends that the court

GRANT Microsoft's motion with respect to willfulness.

### VIII.

#### Damages
#### A. The Parties' Arguments

Microsoft asserts that "if Veritas manages, in opposition to this Motion, to create a triable issue of fact of one or more instances of direct infringement for which Microsoft is liable, for one or more asserted patent claims and one or more items of accused software, then the Court should limit Veritas' infringement liability and damages case to *only* those specific instances of direct infringement." Microsoft further argues that "[d]amages for vicarious liability are available only to the extent of direct liability" so that "[e]ven when indirect infringement has been established, damages are still limited to the sale of products actually used to directly infringe, and are not available for sales of products never used in an infringing manner." Thus, according to Microsoft, "as a matter of law, even where the alleged infringer's customers have benefited from having the capability to infringe, where there is no actual infringement, there is no case for liability or damages against the supplier of that capability." Microsoft's Brief at 22–23 (Microsoft's emphasis).

Veritas responds that "Microsoft is wrong on the need to prove each and every act of direct infringement in order to recover for indirect infringement;" rather, "[i]t is sufficient to show circumstantial evidence of direct infringement by a class of users (such as Microsoft's OEM and corporate customers * * *)." Veritas' Response at 21–22. Veritas further argues that "not only can proof of infringement by Microsoft's customers generally support Veritas' damages claim, but once that infringement is established, it is Microsoft

who bears the burden of any uncertainty in the allocation of damages and who must present evidence distinguishing between individual infringing and non-infringing uses of its Accused Products in order to reduce damages." Veritas' Response at 22–23. In addition, Veritas argues that "Microsoft presented *no evidence* to establish that any allocation is necessary at this time." According to Veritas, Microsoft's limitation of damages argument "not only ignores that direct infringement can be shown by circumstantial evidence (of which there is a significant amount), but also ignores the direct proof of the underlying infringement by Microsoft's OEM partners and customers produced by Veritas and its expert." *Id.* at 23–24 (Veritas' emphasis).

## B. Discussion

In light of the substantial non-infringing uses of the accused products and insufficient evidence to raise a genuine issue of material fact regarding intent, the master need not reach Microsoft's liability for indirect infringement. *See Dynacore,* 363 F.3d at 1276 ("We do not reach the defendant's liability under § 271(b) or (c) if there are substantial non-infringing uses of the defendants' products and there is no evidence of active and willful inducement.").

Nevertheless, the master notes that Veritas may identify "an entire category of infringers" and "may consequently seek damages or injunctions across the entire category." *Id.* at 1274. To do so, however, Veritas must demonstrate that the accused products necessarily infringe. Failing that, Veritas must limit its damages to the specific instances of direct infringement that it can identify. *See id.* at 1275–76 ("Dynacore must therefore either demonstrate that LANs compliant with the IEEE 1394 Standard necessarily infringe the '732 Patent, or point to a specific in-

stance of direct infringement and restrict its suit to liability stemming from that specific instance."). As noted above, there is no dispute that the accused products have substantial non-infringing deployment and system backup and recovery uses. Accordingly, Veritas must restrict its damages to those stemming from specific instances of direct infringement by Microsoft's customers. Because Veritas has failed to raise a genuine issue of material fact regarding direct infringement by Microsoft's customers, Veritas has, on the present record, no basis upon which to recover damages from Microsoft for its customers' infringement.

## C. Recommendation

In view of the foregoing, therefore, the master recommends that the court GRANT Microsoft's motion with respect to monetary damages.

## IX.

### Recommended Disposition

Accordingly, the master recommends that the Court GRANT Microsoft's Motion for Summary Judgment on Veritas' Claim of Infringement of U.S. Patent No. 5,469,-573.

## X.

### Report and Recommendation

This is the master's report and recommendation. Under Rule 53(g)(2), Fed. R.Civ.P.:

(2) *Time To Object or Move.* A party may file objections to—or a motion to adopt or modify—the master's order, report, or recommendation no later than 20 days from the time the master's order, report, or recommendation are served, *unless the court sets a different time.* [Emphasis added.]

The parties are encouraged to review Rule 53(g)(3), (4), Fed.R.Civ.P., relating to the Court's *de novo* review of findings of fact and conclusions of law. The parties may, of course, seek further comment or clarification through motions directed to the Court.

Pursuant to the Court's order of January 18, 2007, the Court required that the master make findings of fact and conclusions of law, and make a recommendation to the Court. The foregoing constitutes the master's findings of fact and conclusions of law, and the master's recommendations to the Court.

SIGNED in San Antonio, Texas on January 17, 2008.